Petition No. 22-11052

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**SOUL QUEST CHURCH OF MOTHER EARTH, INC., AND CHRISTOPHER YOUNG,**

PETITIONERS,

VS.

**MERRICK B. GARLAND, ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA, AND ANNE MILGRAM, ADMINISTRATOR OF THE UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,**

RESPONDENTS.

---

PETITION FOR REVIEW OF AGENCY DECISION

---

VOLUME II OF II OF PETITIONERS' APPENDIX

---

Derek B. Brett, Esq.  
Fla. Bar No. 0090750  
BURNSIDE LAW GROUP  
202 Brownlow Avenue, Suite 400  
Dartmouth, NS, Canada B3B 1T5  
Telephone: (902) 468-3066  
Lead Counsel for Petitioners

A. Brian Phillips, Esq  
Fla. Bar No. 0067113  
A. BRIAN PHILLIPS, P.A.  
912 Highland Avenue  
Orlando, Florida 32803  
Telephone: (407) 872-0777  
Local Counsel for Petitioners

INDEX of APPENDIX

Volume I of II                                                              Docket/Tab #

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Plaintiffs' Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42

Defendants' Motion to Dismiss Second Amended Complaint . . . . . . . . . . . . . . . 44

Certificate of Service


Volume II of II

Plaintiffs' Third Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Defendants' Motion to Dismiss Third Amended Complaint . . . . . . . . . . . . . . . . . 61

Order Granting Defendant's Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . .74

Certificate of Service

# DKT. 59
# PLAINTIFFS'
# THIRD AMENDED COMPLAINT

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SOUL QUEST CHURCH OF MOTHER )
EARTH, INC., a Florida Domestic )
Non-Profit Corporation, on its own )
behalf and on behalf of its members; and )
CHRISTOPHER YOUNG, individually )
and as spiritual leader of Soul Quest )
Church of Mother Earth, )
           )
             Plaintiffs, )
           )
vs. )    Case No.: 6:20-cv-00701-WWB-DCI
           )
MERRICK B. GARLAND, Attorney )
General of the United States of America; )
ANNE MILGRAM, Administrator )
of the U.S. Drug Enforcement )
Administration, )
           )
            Defendants. )

---

**THIRD AMENDED, VERIFIED COMPLAINT FOR DECLARATORY AND**
**INJUNCTIVE RELIEF PURSUANT F.R.C.P. 15(a)(1)**

---

      The Plaintiffs, Soul Quest Church of Mother Earth, Inc., on its own behalf

and on behalf of its members, and Christopher Young, individually and as the

spiritual leader of Soul Quest Church of Mother Earth (hereinafter collectively

"Plaintiffs"), by and through the undersigned counsel, hereby submit this second

amended complaint as a matter of course pursuant to Federal Rule of Civil

Procedure ("F.R.C.P.") 15(a)(1) and as a responsive pleading to  Defendant's

*Motion to Dismiss* (ECF 44) and state as follows:

## INTRODUCTION

1.     This is a gravely serious and urgent matter concerning the religious freedom rights of a small church which Defendants have obliterated.

2.     Plaintiff Soul Quest Church of Mother Earth, Inc. (hereinafter "Soul Quest Church"), is registered as a Florida domestic non-profit corporation based in Orlando, Florida whose members practice a Christian syncretic religion.

3.     Plaintiff Christopher Young (hereinafter, "Young") is the spiritual leader of Plaintiff Soul Quest Church, who resides in the State of Florida. In 2015, Plaintiff Young obtained a certificate of ordination from the Open Ministry, and has been acting as a minister of Plaintiff Soul Quest Church since that time. A true and correct copy of Plaintiff Young's certificate of ordination is attached hereto, and made a part of this Third Amended Complaint as Plaintiffs' Exhibit No. 1.

4.     Plaintiffs' religious exercise includes, among other things, the religious use of ayahuasca, a sacramental tea made from the *Banisteriopsis caapi* vine and the *Psychotria viridis* shrub.

5.     Ayahuasca is widely used in ceremonial settings during religious exercise in the United States and beyond.

6.     Ayahuasca contains small quantities of a Schedule I controlled substance, dimethyltryptamine ("DMT").

7.     Like sacramental wine, Plaintiffs use of ayahuasca is religious in nature and is part of Plaintiffs' religious beliefs.

8.     Plaintiffs' religious beliefs are sincere and of a religious nature.

2

9.      Religious exercise with ayahuasca has been uniformly upheld by the courts.  *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210 (D. Or. 2009).

10.      On April 16, 2021, and during the pendency of this litigation, Defendants issued an order adjudicating the sincerity of Soul's Quest's religious beliefs and determining that prohibiting Soul Quest's religious exercise with ayahuasca is the least restrictive means of furthering the government's compelling state interest in protecting the health and safety of Soul Quest's religious adherents and preventing diversion of ayahuasca into "illicit channels."  *See* Drug Enforcement Administration's Order (April 16, 2021) (hereinafter, "DEA Order"), a true and correct copy of which is attached hereto as Plaintiffs' Exhibit 2.

11.      DEA's Order was purportedly issued "in accordance with the framework set forth in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1; the Attorney General's guidance memorandum, 'Federal Law Protections for Religious Liberty' (October 6, 2017) (AG Memorandum); the Supreme Court decision in *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal,* 546 U.S. 418 (2006) (*O Centro*); DEA's 'Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act'; and subsequent case law."  *See* DEA Order at 1.

12.     The DEA's Order prohibits Plaintiffs free exercise of religion with ayahuasca.

13.     The DEA's Order prohibits Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca.

14.     The DEA's Order creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

15.     The DEA's Order chills, burdens, inhibits, and destroys Plaintiffs' religious exercise.

16.     The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, is not the least restrictive means of furthering Defendants' stated interests.

17.     Defendants' actions: (1) substantially burden Plaintiffs free exercise of religion; (2) are not authorized by law; (3) are in excess of statutory jurisdiction, authority, or limitations; and, (4) are contrary to constitutional rights, powers, privileges or immunities.

18.     Defendants have violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4 (or "RFRA"), the Administrative Procedures Act, 5 U.S.C. §551 et. seq., and the First Amendment to the United States Constitution.

19.     Plaintiffs ask that the Court declare unlawful and set aside DEA's Order.  Such relief should be issued on the grounds that Defendants: (1) violated RFRA and First Amendment protections on the free exercise of religion; and, (2)

violated the APA by taking actions not authorized by law, in excess of statutory jurisdiction or authority, and contrary to protected constitutional rights.

20.     Plaintiffs ask that the Court enjoin Defendants from taking any action that would prohibit Plaintiffs religious exercise with ayahuasca.   Specifically, Defendants should be enjoined from taking any action prohibiting Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca.

21.     Unless ordered by this Court, Defendants will continue to prohibit Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca for religious exercise.

## PROCEDURAL HISTORY OF CASE

22.     On April 22, 2020, the Plaintiffs filed their original Motion for Preliminary Injunctive Relief. (ECF No.  2).  On May 4, 2020, the Plaintiffs filed their Amended Motion for Preliminary Injunction.  (ECF No. 15) Shortly thereafter, the Defendants – through legal counsel – provided substantive acknowledgment of Plaintiff Soul Quest Church's application for religious exemption.

23.     Shortly thereafter, on May 14, 2020, the Parties filed a Joint Motion to Extend Defendants' Time to Respond to Plaintiffs' Amended Motion for Preliminary Injunction.  (ECF No. 18).  In that document, the Parties explained that the extension would permit for "time to explore whether resolution is possible."  The Court granted both Joint Motions (ECF Nos. 15 and 18) in an order issued on May 14, 2020.  (ECF No. 19).

24.     On May 29, 2020, the Drug Enforcement Administration ("DEA") issued its first formal response acknowledging Plaintiff Soul Quest Church's August 2017, application for religious exemption.   A true and correct copy of this correspondence is attached hereto as Plaintiffs' Exhibit No. 3.

25.     In June 2020, following discussions between the Parties, a Joint Motion to Stay All Proceedings for 120 Days (ECF No. 23).  The intent of this joint filing was predicated upon "potentially resolving this case without need for further litigation in this Court."  (ECF No. 23, at p. 1).  Further, the intent of the stay was to, in-part, permit for "continue to negotiate the process by which DEA will conduct the fact-finding necessary to evaluate Plaintiffs' Petition."  (ECF No. 23, at ¶ 11). In doing so, the Parties agreed that "they will cooperate with each other in good faith …."  (ECF No. 23, at ¶ 12).  On June 26, 2020, the District Court granted this Joint Motion.  (ECF No. 24).

26.     Subsequently, in correspondence dated June 4, 2020, the Defendants sought to further explain its diversion investigative process, as follows:

> DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31. In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, DEA must also determine pursuant to the Religious Freedom Restoration Act (RFRA) whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the

6

> CSA's comprehensive regulatory system would substantially burden the applicant's religious exercise.

27.    A true and correct copy of this correspondence is attached hereto as Plaintiffs' Exhibit No. 4.  Of particular note in this statement is the effort by the Defendants implicitly acknowledge its ongoing lack of any regulatory authority on religious exemptions, while also attempting to tie some form of unregulated factfinding into other regulations applicable to pharmacies and doctors.

28.    Notwithstanding, thereafter, the Plaintiffs made every possible effort to cooperate with the inquiries made exclusively by DEA and its designated Diversion Investigator to conduct additional fact finding, James W. Graumlich. Affidavit of Christopher Young, in Support of Third Amended, Verified Complaint (hereinafter, "Young Affidavit"), at ¶ 36.  A true and correct copy of the affidavit is attached hereto as Plaintiffs' Exhibit 5.   The Plaintiffs did so under the belief that, in doing so, the preexisting litigation would resolve.  Young Affidavit, at ¶ 36.

29.    Of note, DEA's inquiries to the Plaintiffs centered *entirely* upon "diversion control."  Young Affidavit, at ¶ 33.   No inquiry – at any time – directed by the Defendants ever touched upon the sincerity of the Plaintiffs' faith and religious beliefs including, but not limited to, the legitimacy of Soul Quest Church and the expressed, critical importance of the Plaintiffs engaging in their sacramental ayahuasca ritual.   Young Affidavit, at ¶ 32.  Accordingly, the only material possessed by the DEA on the issue of religious sincerity centered around the various materials included in the original, 2017 exemption application.

30.     On October 16, 2020, the Parties filed with the District Court their Joint Status Report (ECF No. 25).   In it, the Defendants acknowledged that the Plaintiffs had been cooperating with all of Defendants' requests for information. (ECF No. 25, at ¶ 2).   The Parties also acknowledge the intent "to conduct further negotiations regarding 'the details of the DEA's fact-finding ….'"   (ECF No. 25, at ¶ 3).   The Parties jointly requested an extension of the preexisting stay for another one-hundred, twenty (120) days.   (ECF No. 25, at ¶ 5).   The District Court granted this request in an order dated November 2, 2020.   (ECF No. 26).

31.     Thereafter, the DEA continued its factfinding, centered exclusively upon diversion control.   Young Affidavit, at ¶ 33.   Contrary to the belief of the Plaintiffs, the Defendants never presented any guidelines pertaining to the details of its fact finding, nor negotiated any such factfinding details.   Young Affidavit, at ¶ 37.   To date, the nature, scope and substance of the DEA's "fact finding," herein, remain a mystery.   Young Affidavit, at ¶ 37.

32.     On February 22, 2021, the Parties filed their Joint Status Report. (ECF No. 27).   At that time, the Parties announced the closure of the Defendants' factfinding.   (ECF No. 27, at p. 2).   Indeed, within the Joint Status Report is the acknowledgment that the DEA and DoJ are confronting new leadership unfamiliar with the issues within the case-at-bar.   (ECF No. 27, at p. 3).   Further, the DEA required until April 15, 2021, to issue what it deemed its "final determination."   (ECF No. 27, at p. 3).

33.     In order to further facilitate the prospects of a positive case resolution, the Plaintiffs agreed to hold its Motion for Preliminary Injunction in abeyance pending the DEA's "determination." (ECF No. 27).  Further, the Plaintiffs agreed to alert the Court, following the DEA's "final determination," to alert the Court of whether it intended to renew or amend its preliminary injunction motion, and its filing of "any necessary amended motion."  (ECF No. 27, at p. 3).

34.     On February 23, 2021, the District Court issued its Order on the request made within the preceding Joint Status Report.  (ECF No. 28).  Therein, the District Court stayed all deadlines pending the DEA's "final determination," and further instructing that the Plaintiff notify the Court within fourteen (14) days of such issuance.  (ECF No. 28).

35.     On the evening of April 16, 2021, the Plaintiffs received the DEA's issued, written decision, indicating that it would not be issuing a religious exemption to Soul Quest Church.  Plaintiffs' Exhibit No. 2.  Much akin to the latent, constitutional shortcomings found by the federal courts within cases such as *O Centro, supra,* and *CHLQ, supra,* the DEA never published any rulemaking or other formal guidelines in support of whatever methods it adopted.

36.     Yet, based upon the document, and upon information and belief, the Defendants now consider this determination to constitute a final agency decision. Plaintiffs' Exhibit No. 2. The Defendants assert such despite lacking any rules and regulations describing and dictating the methodology behind its investigation; do so without adhering – at all – to the requirements of federal law under the

9

Administrative Procedure Act; and without even a defined process describing how and when its process starts and finishes.

37.     The inability of the Defendants to – even following the onset of the case-at-bar and during judicially overseen party discussions to negotiate a case resolution – provide any substance subject to, and passing regulatory, statutory and constitutional muster – once again demonstrates the fatal defects in its approach.  Effectively, to paraphrase the Honorable District Court Judge Amy Berman Jackson (in a decision addressing DoJ practices in a different context) can be reasonably viewed as "disingenuous … with respect to the existence of a decision-making process . . . ." *CREW v. U.S. Dept. of Justice*, 1:19-cv-01552-ABJ (D.D.C May 3, 2021), at p. 25. Ostensibly, the Defendants actions – as demonstrated by its post-litigation actions – in the case-at-bar are premised entirely upon an *ad hoc* process designed to provide a *post hoc* rationalization for a decision it had already preordained.

## JURISDICTION AND VENUE

38.     Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

39.     This Court has jurisdiction to review agency action and to order effective relief sought in this civil action pursuant to 28 U.S.C. §§ 1331 (federal question); 1346 (United States as defendant); 1361 (mandamus); 2201 (declaratory relief); 2202 (injunctive relief); and the Administrative Procedure Act

("APA"), 5 U.S.C. § 701 *et seq.* There is a present and actual controversy between the parties that is ripe for judicial review.

40.     Where a federal agency action is not authorized by law, in excess of statutory jurisdiction or authority, and contrary to protected constitutional rights, the APA explicitly waives sovereign immunity and provides a cause of action that provides for judicial review of the federal agency's actions. 5 U.S.C. § 701 *et seq.*

41.     Under RFRA, a person whose religious exercise has been burdened in violation of RFRA to assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  42 U.S.C. § 2000bb-1(c).

42.     The agency actions at issue in this lawsuit involve the U.S. Drug Enforcement Administration ("DEA"), a sub-agency of the U.S. Department of Justice.

43.     The DEA's Order constitutes a final agency action of Defendants.

44.     A substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made here and Plaintiffs reside in the judicial district.  Venue in this Court is therefore proper under 28 U.S.C. § 1391(e).

## **PARTIES**

45.     Plaintiff SOUL QUEST CHURCH OF MOTHER EARTH INC. is a registered domestic non-profit corporation incorporated under the laws of the State of Florida, with a principal office located in Orlando, Florida.  Thus, pursuant 28

U.S.C. § 1391(c)(2), Plaintiff Soul Quest Church resides in the Middle District of Florida, Orlando Division for venue purposes.

46.     Soul Quest Church has numerous church members who regularly attend Church services, volunteer for the Church, and actively participate in ministry services and Church ceremonies.  Soul Quest Church brings this action in its own capacity and on behalf of the members of Soul Quest Church. Defendants' actions in prohibiting Soul Quest Church's use of ayahuasca for religious purposes substantially burdens the church and its member's free exercise of religion and causes irreparable injury to Plaintiff.

47.     Plaintiff CHRISTOPHER YOUNG is a natural person who is domiciled in Orlando, Florida.  Plaintiff Christopher Young is the religious leader of Soul Quest Church.  Christopher Young brings this action in his own capacity and as a founding member of Soul Quest Church.  Defendants' actions in prohibiting Christopher Young's use of ayahuasca substantially burdens Christopher Young's free exercise of religion and cause irreparable injury to Plaintiff.

48.     Defendant MERRICK GARLAND is sued in his official capacity as Attorney General of the United States of America.  Garland leads the United States Department of Justice ("DoJ") and is the chief lawyer and law enforcement official of the United States Government.  Garland is responsible for oversight of all actions taken by DoJ including actions of the U.S. Drug Enforcement Agency which is a sub-agency within DoJ.  Garland also provides federal leadership on matters related to administration and implementation of all U.S. laws including, but not

limited to, RFRA and the Controlled Substances Act.  Garland is responsible for oversight of all actions taken by DoJ and its sub-agencies including, but not limited to, issuance of the DEA's April 16, 2021, Order.  Plaintiffs' Exhibit 2.

49.     The official website for DoJ reflects its Mission as being "[t]o enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans."  The applicable website page – www.justice.gov/about -- also quotes Thomas Jefferson in stating that equal and impartial justice is "a sacred duty."

50.     Defendant Garland's professional and academic history reflects no background in theological studies or its equivalent.

51.     Defendant ANNE MILGRAM is sued in her official capacity as Administrator of the United States Drug Enforcement Administration (hereinafter, "DEA").  Milgram leads the DEA and serves as the chief law enforcement officer responsible for enforcement of the Controlled Substances Act.   Milgram is responsible for oversight of all actions taken by the DEA including, but not limited to, issuance of the DEA's April 16, 2021, Order.  Plaintiffs' Exhibit 2.

52.     Defendant Milgram's professional an academic history reflects no background in theological studies or its equivalent.  Rather, Milgram's background is one centered in criminal justice policy.

## PLAINTIFFS' RELIGIOUS EXERCISE

53.    Plaintiffs are a small church located in Orlando, Florida that use ayahuasca sacramentally and for religious purposes.

54.    Soul Quest Church was founded by Plaintiff Chris Young and Elder and Counselor Verena Young in 2016.

55.    Soul Quest Church conducts religious ceremonies with ayahuasca three times per month.  Church ceremonies are held on Friday night, Saturday day, and Saturday night.

56.    Church ceremonies can accommodate up to 70 to 100 Church members.  Ceremonies can also include up to 50 Church volunteers and 20 Church staff who do not partake of the ayahuasca sacrament.

57.    Soul Quest Church ministers to Church members every day of the week by providing 2-3 hours of ministry services, including integration services, both in person and on-line.

58.    Soul Quest Church holds sober ministering services every Sunday where no sacrament is consumed.

59.    Soul Quest Church does not sell ayahuasca and does not distribute or administer ayahuasca to non-Church members.

60.    Ayahuasca is offered as a sacrament to Church members only during Church religious ceremonies.

61.    Ayahuasca is a tea made from cooking two plants, the lease of *Psychotropia viridis* and the vine of the *Banisteriopsis caapi* (hereinafter jointly

14

referred to as "Plant Materials").  The preparation of ayahuasca requires intensive labor of many Church members and is very time consuming.  The vine and the leaves are boiled in water for many hours in a highly structured ceremony undertaken in prayer and accompanied by the singing of hymns.  It is only when ayahuasca is prepared under these very specific conditions that it is considered by the Church to be a sacrament.

62.    Soul Quest Church holds a permit from the U.S. Department of Agriculture ("USDA") for the lawful import of the Plant Materials used in connection with its religious practice.  *See* Soul Quest Church of Mother Earth Inc.'s Permit to Import Timber or Timber Product, No. P40-20-00542, a true and correct copy of which is attached hereto as Exhibit 6.

63.    Soul Quest Church has been notified by USDA that Plant Protection and Quarantine does not require a permit for the importation of this material.

64.    Ayahuasca is securely stored by the Church in a manner consistent with DEA regulations governing storage requirements for controlled substances.

65.    All Church members are required to adhere to Soul Quest Church's religious principles and sacred beliefs as well as Church practices involving dieting/fasting, appearance and holidays.  Church members are also instructed in important Church writings and educated in Church governance.  Church members are asked to donate a 10% tithing for participation in Church services.

66.     Soul Quest Church's religious principles and sacred beliefs rest upon a foundation of ancient teachings, writings, records, and common cultural and religious practices and traditions of indigenous peoples from across the globe.

67.     These same foundations constitute the source for Plaintiff Soul Quest Church's traditional, natural healing practices.

68.     Plaintiff Soul Quest Church believes that it honors and fulfills these ancient traditions and practices through its rituals from its church in Orlando, Florida, and that such rituals help to spread its teachings through the Earth and cosmos.

69.     Pursuant to its core teachings and beliefs, Plaintiff Soul Quest Church passes its message to others through its operation of a healing ministry, counseling and natural medicine school.   Further, it provides street-level ministry outreach, spiritual activities, and spiritual/faith-based education.

70.     Plaintiff Soul Quest Church holds spiritual classes and services in a style akin to various Native American religious practices – based upon the seasons.  Religious services involve music and song, and the sharing of personal professions of faith and faith in-action, as well as the enactment of plays.

71.     Plaintiff Soul Quest Church and its members embrace and espouse the following faith-based principles as fundamental to its religion:

        a.     The Creator, the Great Spirit, and that the Great Spirit created all beings to exist as free and equal.

b.    The Creator granted to all beings eternal, inherent, ancestral, and sovereign rights, and to all humans a conscience upon which to govern human activities throughout the planet.

c.    All humans derive from, and are intended to exist akin to, traditional, indigenous communities. Further, through the descendants of these indigenous communities, there exist the need and priority to form and maintain organizations and practices premised upon indigenous teachings, wisdom and customs.

d.    Spiritually-based, natural health care and related sacred expression – arising from the sacred texts of traditional, indigenous religions and their ritualistic practices – are sacrosanct and must be practiced as sacraments to the faith.

e.    The fundamental mission of the faith is the restoration of divine wisdom, and knowledge of the benefits to health and life provided by the Great Spirit through Mother Earth.

f.    The restoration of divine wisdom can only occur through traditional ceremonies, rituals, sacraments, scriptural and a spiritually-valid moral science. Such is based upon the teachings and practices reflecting the guidance of the Great Spirit as bequeathed to all people as children of Mother Earth.

g.    The traditions and teachings espoused within the faith's sacred texts and scriptures provide insight for the restoration of spiritual, physical and mental health of all beings. These traditions and teachings require the assessment, improvement and restoration of physical, mental and spiritual health.

h.    The belief that, as children of the Great Spirit, there is entitlement to, as part of natural law, the various fundamental freedoms including, but not

limited, to freedom of thought and expression; the free exercise of sacred rights of worship and methods of healing; freedom of personal security; and freedom of self-determination.

i.      All men and women are endowed with sufficient intelligence for self-governance to ensure the guarantees of those freedoms; to establish just and morally righteous methods of interacting with one another; and to the provide for maintenance of a tranquil and secure domestic life infused by the blessings of the faith.

72.    Plaintiff Soul Quest Church adheres to seven (7) fundamental moral and ethical tenets, revealed to it and its members by and through the actions of the Great Spirit, *to wit*:

a.      Mother Earth, is the embodiment of an indivisible, living community of interrelated and interdependent beings with a common destiny; and that Mother Earth is the source of life, nourishment and learning, and providing everything needed to live a fulfilled existence; Mother Earth is part of a greater creation, composing all existence throughout the cosmos, as originated by the Great Spirit.

b.      All forms of depredation, exploitation, abuse and contamination – in whatever form and including, but not limited to certain economic systems – have endangered Mother Earth by causing massive destruction, degradation and disruption of natural systems. Amoral and immoral practices and systems must be discarded and replaced with the faith's moral tenets – guided by the Great Spirit – and premised upon the embracing of practices designed to protect and sanctify Mother Earth.

c.     As a part of a globally interdependent living community, and consistent with the teachings of the Great Spirit, all beings are imbued with natural rights requiring equal respect. Human beings are just one component of Mother Earth and a homocentric approach creates imbalance within Mother Earth.

d.     In order to fulfill the design of the Great Spirit to equal dignity and rights among humans, it is concurrently necessary to recognize and defend the rights of Mother Earth and all its beings.

e.     Consistent with the teachings of the Great Spirit, collective action must be taken to transform structures and systems destructive to Mother Earth including, but not limited to, the catastrophic consequences of modern climate change.

f.     Indigenous plant life is sacred and embodied by the Great Spirit.  All materials stemming from plant life must be accorded dignity, protected from threat or violation, and defended as a holy sacrament.  The ritual use of ayahuasca and its natural healing treatments is embraced as a fulfillment of this holy sacrament.

g.     An obligation to embody and promote the principles of the Universal Declaration of the Rights of Mother Earth, via fundamental respect for the sacred nature of the planet and its occupants, as one with the Great Spirit.

73.     Plaintiff Soul Quest Church's origins, and its teacher-prophet, the Spirit of Ayahuasca, are found within two sacred plants *Banisteriopsis Caapi* and *Psychotria Viridis*.

74.     The beliefs, purposes and guidelines are further defined within the sacred writings titled the "Ayahuasca Manifesto."  A true and correct copy of the Ayahuasca Manifesto is attached hereto as Plaintiffs' Exhibit No. 7.

75.     The Ayahuasca Manifesto is very much akin, and serves a similar purpose, to other faiths' sacred writings, explaining the tenets of the faith, such as the Jewish Talmudic writings and the Mishnah.

76.     The sacred nature of the Spirit of Ayahuasca is proclaimed within the Ayahuasca Manifesto as follows:

> I am the spirit of Ayahuasca. For the first time, I reveal myself through the "Word" to make an emergency call to all the Human Beings on the Planet, especially to the Light Seekers, as I must expand beyond the Amazon River Basin. With my physical expansion, I intend to facilitate the spiritual transformation currently stirring the human species ….
>
> I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that of the spirit of Ayahuasca and of Chacruna. I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture.

Exhibit No. 7, at 5-6.

77.     Plaintiff Soul Quest Church's beliefs, purposes and guidelines are provided through channeled material documented in Ayahuasca Manifesto.  The

20

Manifesto provides knowledge and direction, inclusive of details about Plaintiff Soul Quest Church's mission, as well as instructions on the following topics:

a.   Role in the Expansion of the Human Consciousness;
b.   Purpose with Human Beings;
c.   Respect and the Sacred Nature of Ayahuasca;
d.   Benefits of Use;
e.   Guide for Conducting Ayahuasca Ceremonies; and
f.   Planetary Mission.

78.   Other fundamental religious ethical requirements of Plaintiff Soul Quest Church are included in its Code of Ethics.  The Code of Ethics contains key principles, edicts and other educational statements regarding Soul Quest and its sacraments – inclusive of the use of ayahuasca.  A copy of the Code of Ethics is attached hereto, and incorporated by reference herein, as Plaintiffs' Exhibit No. 8.

79.   Plaintiff Soul Quest Church's mission is achieved through its advocacy and educational initiatives by producing disciples who will celebrate the teachings and wisdom of the Great Spirit in cooperative worship; are devoted to the four (4) boundless and unequaled states of mind – Love, Compassion, Joy and Equanimity; are possessed with love for everyone and every living being; and are permeated and bound by the spheres of influence and dynamic teachings of our elders.

80.   On a liturgical level, Plaintiff Soul Quest Church's requires staff to observe proper liturgical dress during religious retreats and ceremonies.  This entails the wearing of white vestments.

81.     The color *white* is critical to the practice of Plaintiff Soul Quest Church's religious ceremonies and retreats, and performance of sacraments of the faith, for the following reasons:

> a.     It represents the color of eternal light and is an emblem of the divine.
>
> b.     It projects purity, cleanliness and neutrality.
>
> c.     It aids in mental clarity, encourages staff and participants to clear mental and spiritual clutter and obstacles, evokes purification of thoughts and actions and enables fresh beginnings.
>
> d.     It accentuates free movement, all while maintaining maximum respect to the Great Spirit, and all others participating in such functions.

82.     Plaintiff Soul Quest Church's and its members celebrate the following holidays:

> a.  December 23 - Winter Solstice;
> b.  March 21 - Vernal Equinox'
> c.  April 22 - Earth Day;
> d.  June 21 - Summer Solstice; and
> e.   September 21 - Autumnal Equinox.

83.     Plaintiff Soul Quest Church's holidays, akin to many diverse cultural and religious traditions, are premised upon the ancient tradition of celebrating the change of seasons and complementary astronomical events.

84.     Plaintiff Soul Quest Church's and its members adhere to the traditional diet of the Medicine People.  The diet not only requires abstention from

consumption of certain foods; rather, it also requires discipline, sacrifice and commitment, akin to those of various Judeo-Christian and Eastern religious sects.

85.    The constraints imposed by Plaintiff Soul Quest Church's dietary laws are designed to cleanse the body and, by doing so, cleanse the spirit and permit for the effective, efficient use of plant medicine.

86.    These constraints directly impact Plaintiff Soul Quest Church's ayahuasca sacrament ceremony.  Prior to any ayahuasca ceremony, Plaintiff Soul Quest Church members and adherents are to comply with the following dietary and sexual edicts, designed to purify body and soul:

> a.    Seven days prior to involvement in any ayahuasca ceremony, refraining from:
>
>> i.    Drug use, including prescription drugs (medical interaction forms, including in the supplement to this religious exemption application provide further instruction), and any and all recreational drugs.
>> ii.    Alcoholic beverages
>> iii.    Sexual activity (whether with a partner or from self-stimulation).
>
> b.    Three days prior to involvement in any ayahuasca ceremony, refrain a wide variety of foods and beverages.
>
> c.    All Plaintiff Soul Quest Church's facilitators are expected to fast for the period spanning the day prior to any ayahuasca ceremony, through to completion of any ceremony.  In doing so, those individuals also demonstrate a commitment to the Great Spirit as embodied within the plant medicine, and prepare for acting as a surrogate for the Great Spirit during the ayahuasca ceremony.

87.     Ultimate authority lies in the Creator/Great Spirit of Ayahuasca as the head of the church and in the sacred beliefs, and doctrines expressed as the basis for Plaintiff Soul Quest Church's faith and practice.

88.     The government of Plaintiff Soul Quest Church is vested in its membership and administered by its officers. In function, final authority resides in the membership.

89.     Plaintiff Soul Quest Church members approve and/or affirm Plaintiff Soul Quest Church's qualified leadership, to carry out the purposes of the spirit of Ayahuasca.

90.     Plaintiff Soul Quest Church's leadership holds leadership meetings to talk, brainstorm and agree on any discipline or change that may be required.

91.     Akin to other religious institutions, Plaintiff Soul Quest Church maintains multiple instruments for governance of its affairs.  Presently, this includes the following lay and religious officials/bodies:

> a.     Chief Executive Officer, Chief Medicine Man, Pastor, Chief Elder and Counselor: Plaintiff Christopher Young;
> b.     President, Elder and Counselor: Verena Young;
> c.     Senior Medicine Man/Shaman:  Don Gaspar;
> d.     Medicine Man/Ayahuascaro:  Anthony Chetta;
> e.     Medicine Woman: Tersa Shiki;
> f.     Council of Elders: Constituted of selected senior members of Plaintiff Soul Quest Church, and occupying various areas of specialization, as necessary for the maintenance and welfare of the Church.

92.     Further, other officers such as church administrator, secretary, visiting ministers and teachers/elders will be assigned with Board permission. Presently, pending future growth of the Plaintiff Soul Quest Church, the Senior Pastor fills such duties.

93.     Plaintiff Soul Quest Church receives all individuals as members who accept the spiritual and religious principles of the Church, as well as recognize the fruits of the Great Spirit in their lives, and who agree to abide by Plaintiff Soul Quest Church's doctrine.

94.     Plaintiff Soul Quest Church holds the following federal and state tax treatments as a religious-based, non-profit entity:

a.      Soul Quest Church of Mother Earth Inc. (SQCME) – Non-Profit Corporation Federal Identification No.: 841402813, and Florida State Non-Profit Corporation, founded by Medicine Man, Pastor, Chief Elder and Counselor, Chris Young; and its Elder and Counselor, Verena Young.

b.      Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center (SQACME), as an independent branch or Free Church of SQCME; Florida State Non-Profit Corporation 501 IRS-compliant Non-Profit was first incorporated July 15, 2016, with its Charter Declaration also entered on July 15, 2016, recognizing its founders, Medicine Man, Pastor, Chief Elder and Counselor Chris Young; and Elder and Counselor Verena Young.

95.     The ayahuasca sacrament is performed three (3) times per month, with approximately 60-80 individuals in attendance, alongside approximately twenty, skilled (20) facilitators (spiritual counselors) also present throughout the

sacramental ceremony. These facilitators work alongside a team – at the ceremony – which includes a licensed physician as medical director, a licensed paramedic, a licensed emergency medical technician ("EMT"), a psychologist, and a research scientist.

96.   The ayahuasca sacrament involves the consumption of tea using the received wisdom and learning of Plaintiff Soul Quest Church to elevate its petitioners above the mundane world, and so bring them closer to the divine realm.

97.   Plaintiff Soul Quest Church limits attendance (and enhances the ratio of ceremonial facilitators) in order to maximize safety and security to all involved throughout the ritual.

98.   Plaintiff Soul Quest Church has designed and implemented safety and security protocols, intended to maximize the protection of those participants in Ayahuasca ceremonies.

99.   Those individuals designated to conduct and facilitate Plaintiff Soul Quest Church ceremonies must first prove that they have attained the requisite knowledge and expertise in the following areas:

a.   The Pharmacology of Ayahuasca;
b.   The Risks & Contra-Indications of Ayahuasca;
c.   The Legal Implications Surrounding the Dispensing of Ayahuasca;
d.   First Aid;
e.   The Theory of Non-Ordinary States of Consciousness, and Therapeutic Approaches;
f.   Possession of Extensive, Prior Personal Experience with Ayahuasca;
g.   The Ability to Work as a Team Member; and

       h.     Understanding of Soul Quest's Religious Principles, Therapeutic Purposes of Consuming Ayahuasca, and the Fundamental Moral & Ethical Tenets.

100.   Additional measures are imposed to prepare Plaintiff Soul Quest

Church members for participation in Ayahuasca ceremonies:

       a.     Prior to any ceremony, the Church transmits, via electronic mail, educational material on Ayahuasca to all members anticipating participation in the Ayahuasca ceremony.  It is critical to ensure that members are well-informed regarding the ceremony, and the requirements for properly conducting themselves before, during and after the ceremony.  The following information is conveyed to these Soul Quest members:

            i.     The properties of Ayahuasca, its composition, its effects and the potential risk.
            ii.    The implications of drinking Ayahuasca.
            iii.   The dietary restrictions before and after the session.
            iv.   The responsibilities of the staff and the participants.
            v.    The procedure and operation of the session.
            vi.   The process, in its entirety.

       b.     All Plaintiff Soul Quest Church members intending participation in the sacramental ceremonies involving ayahuasca are required to complete and return a medical form prior to participation, to ascertain whether or not there are potential medical limitations to such participation.

       c.     Plaintiff Soul Quest Church conducts individualized interviews with the member intending to participate in the ayahuasca ceremony.  The purpose for these interviews is to:

            i.     Establish a rapport with the individual; ascertain their basis and willingness to

participate in the sacred Ayahuasca ritual; and to qualitatively assess current psychological and physical status; and

    ii.    (Re)assess an individual who has previously participated in the ayahuasca ceremony.

d.    Plaintiff Soul Quest Church presents and explains the mandatory consent form.

e.    Plaintiff Soul Quest Church uses the information gathered through its described written and oral questions/interviews to determine whether or not to permit any given individual to participate in the Church's sacred ayahuasca ceremony. The acceptance of an individual's participation in the ceremony is premised upon:

    i.    Members demonstrating their understanding of the personal, religious process entailed by their participation.

    ii.    Accepting only members whose personal participation is unlikely to require greater assistance (in time or resources) than is available in the current context of the ayahuasca ceremony.

    iii.    Determining whether members perhaps require additional therapy prior to consuming the sacramental ayahuasca tea. Such additional therapy might potentially involve advising the member to seek appropriate, external professional assistance.

f.    In cases where any member's participation in the sacred ayahuasca ceremony is declined by the Church, Plaintiff Soul Quest Church provides that member with an explanation for its decision, and suggests alternative methods for achieving suitable religious and therapeutic fulfillment. If Plaintiff Soul Quest Church determines there to be doubts about any

member's suitability, then participation in the ayahuasca ceremony is not permitted.

101.    Plaintiffs have now fallen victim to actions by Defendants prohibiting Plaintiffs' religious exercise with ayahuasca, thus abridging fundamental freedoms and statutory rights.

102.    The Defendants actions have abridged the sincere religious beliefs of not only the Plaintiffs, but also its members.  In support of this, Plaintiffs submit the Affidavit of Ronald McNutt ("McNutt Affidavit"), a member of Soul Quest Church, and an attorney from the State of Tennessee.  A true and correct copy of Mr. McNutt's affidavit is attached hereto, and made a part of this Third Amended Complaint as Plaintiffs' Exhibit No 9.  The McNutt Affidavit reflects the religious significance and sincerity of Soul Quest Church and its ayahuasca sacrament in the life of its members; it is also reflective of the devotion of Soul Quest Church's congregation to the religion and its sacred practices.

## U.S. GOVERNMENT PROHIBITION

103.    The Controlled Substances Act ("CSA") was enacted by Congress to erect prohibitions upon the use of a large variety of identified, controlled substances. 21 U.S.C. § 801, *et seq.*

104.    One of the substances classified as a Schedule I controlled substance is N, N-5, 5-dimethyltryptamine ("DMT").  21 U.S.C. § 812(c)(c)(6).

105.    DMT is a chemical compound that can by synthetically produced.

106.   DMT is also naturally occurring and is found in many plants' native to the Western Hemisphere, including North America.  None of these plant species are listed under the CSA as controlled substances.

107.   *Psychotropia viridis* is a small plant containing trace amounts of DMT.  *Psychotropia viridis* is not listed under the CSA as a controlled substance.

108.   *Banisteriopsis caapi* is a large, rugged vine containing three chemical alkaloids, harmaline, harmine, and 1,2,3,4-tetrahydroharmine, none of which are listed in any schedule of the CSA. *Banisteriopsis caapi* is not listed under the CSA as a controlled substance.

109.   Ayahuasca is a tea made from cooking two plants, the lease of *Psychotropia viridis* and the vine of the *Banisteriopsis caapi*.

110.   Ayahuasca is not listed as a controlled substance under the CSA.

### U.S. GOVERNMENT ACTIONS

111.   By letter dated August 22, 2016, the DEA contacted Plaintiffs directing them to "petition for an exemption under RFRA" "so that the DEA may consider […] the specific facts regarding your plans to distribute controlled substances."

112.   The DEA's August 22, 2016, finds that Plaintiffs "were involved in offering 'retreats' […] at which you provided ayahuasca" and that ayahuasca contained the hallucinogen dimethyltryptamine ("DMT"), a substance that is listed on Schedule I of the [CSA]."

113.   The DEA's August 22, 2016, directs Plaintiffs to "file a petition [with DEA] and obtain a response to your request for an exemption before engaging in the distribution of DMT under the assumption that this conduct qualifies as an exempt religious exercise."

114.   As legal authority, the DEA's August 22, 2016, letter states that "[t]he DEA has published guidance on our website for those who seek to petition for any exemption under RFRA, a copy of which is attached with this letter."

115.   By letter dated August 21, 2017, Plaintiffs submitted the requested petition to DEA under RFRA in support of their religious use of ayahuasca.  A true and correct copy of this letter is attached hereto as Plaintiffs' Exhibit No. 10.

116.   The only 'guidance' professed by DEA in submission of such a letter is the 1½ page online document titled "Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act," a true and correct copy of which is attached hereto as Plaintiffs' Exhibit No. 11 and hereinafter referred to simply as "DEA Guidance."  Of critical note is the lack of any true guidelines under such a document, as well as its absence of any reference to any enabling legislation based by Congress pursuant to RFRA.  Accordingly, the Plaintiffs assert that the "DEA Guidelines" fail to meet to prerequisites for official recognition and use pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

117.   On April 16, 2021, almost four years after Plaintiffs submitted the requested petition to DEA, Defendants issued an order adjudicating the sincerity

of Soul's Quest's religious beliefs and determining that prohibiting Soul Quest's religious exercise with ayahuasca is the least restrictive means of furthering the government's compelling state interest in protecting the health and safety of Soul Quest's religious adherents and preventing diversion of ayahuasca into illicit channels.  *See* Plaintiffs' Exhibit 2.

**COUNT ONE**

**<u>VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT</u>**
**(42 U.S.C. §§ 2000bb–2000bb-4)**

118.   Plaintiffs repeat and incorporate by reference herein the allegations in the above paragraphs and all the paragraphs of this Complaint.

119.   Plaintiffs' religious beliefs and those of its members are sincere and of a religious nature.

120.   Plaintiffs use of ayahuasca is religious in nature and is part of Plaintiffs' sincerely held religious beliefs.

121.   The Defendants' actions substantially burden Plaintiffs' religious exercise.

122.   Drug Enforcement Administration's Order (April 16, 2021) ("DEA's Order") prohibits Plaintiffs free exercise of religion with ayahuasca.

123.   The DEA's Order prohibits Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca.

124.   The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

32

125.    The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, chills, burdens, inhibits, and destroys Plaintiffs' religious exercise.

126.    The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, furthers no compelling governmental interest.

127.    The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, is not narrowly tailored to any governmental interest.

128.    The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, is not the least restrictive means of furthering Defendants' stated interests.

129.    The DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, violate Plaintiffs' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*

130.    Absent declaratory and injunctive relief against Defendants, Plaintiffs have been and will continue to be injured.

**COUNT TWO**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT**
**(5. U.S.C. §§ 501 *et sq.*)**

131.    Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

132.    The APA prohibits Defendants from taking actions that are not authorized by law, in excess of statutory jurisdiction, authority, or limitations or contrary to constitutional rights, powers, privileges or immunities.  5 U.S.C. § 706.

133.   Defendants unlawfully adjudicated Plaintiffs' religious sincerity in excess of statutory jurisdiction, authority, or limitation. *See, e.g.,* 5 U.S.C. § 551(7) (defining "adjudication" as "agency process for the formulation of an order").

134.   There is no law authorizing Defendants to investigate, evaluate or adjudicate the sincerity of religious beliefs.

135.   U.S. Department of Justice policies prohibit government agencies from assessing the reasonableness of religious belief.   As directed by former Attorney General Jeff Sessions,

> [The Religious Freedom Restoration Act] applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition.  Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government administration may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

*Federal Law Protections for Religious Liberty*, U.S. Attorney General Jeff Sessions, October 6, 2017, at 4, a true and correct copy of which is attached hereto as Plaintiffs' Exhibit No. 12.

136.    On April 16, 2021, the DEA unlawfully issued an order prohibiting Plaintiffs' free exercise of religion with ayahuasca.  *See* DEA's Order; 5 U.S.C. § 551(6) (defining order).

137.    DEA's Order was purportedly issued "in accordance with the framework set forth in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1; the Attorney General's guidance memorandum, 'Federal Law Protections for Religious Liberty' (October 6, 2017) (AG Memorandum); the Supreme Court decision in *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal,* 546 U.S. 418 (2006) (*O Centro*); DEA's 'Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act'; and subsequent case law."  *See* DEA Order at 1.

138.    None of the laws on which the DEA's Order was based empower Defendants to prohibit Plaintiffs free exercise of religion with ayahuasca. *See, e.g.,* 5 U.S.C. § 558(b) ("[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.").

139.    By letter dated August 22, 2016, the DEA contacted Plaintiffs directing them to "petition for an exemption under RFRA" "so that the DEA may consider [...] the specific facts regarding your plans to distribute controlled substances."  *See* 5 U.S.C. § 551(8) (defining "license" as including "the whole or

a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission.").

140.   In demanding that Plaintiffs' petition for a license from DEA for religious exercise with ayahuasca, Defendants failed to provide due regard for the rights and privileges of Plaintiffs and provide a hearing in accordance with APA procedures in adjudicating the sincerity of Soul's Quest's religious beliefs and determining that prohibiting Soul Quest's religious exercise with ayahuasca is the least restrictive means of furthering the government's compelling state interest. *See, e.g.,* 5 U.S.C. § 558(c).

141.   The DEA's August 22, 2016, letter, the DEA's Order, and Defendants' prohibition on Plaintiffs' religious exercise with ayahuasca, violate Plaintiffs' rights secured to them by the Administrative Procedures Act, 5 U.S.C. § 501, *et seq.*

142.   Absent declaratory and injunctive relief against Defendants, Plaintiffs have been and will continue to be injured.

### COUNT THREE
### VIOLATION OF THE FIRST AMENDMENT TO THE CONSTITUTION
### (Free Exercise of Religion Clause)

143.   Plaintiffs repeat and incorporate by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

144.   Plaintiffs' religious beliefs and those of its members are sincere and of a religious nature.

145.   Plaintiffs' use of ayahuasca is religious in nature and is part of Plaintiffs' sincerely held religious beliefs.

146.   Plaintiffs' compliance with their beliefs is religious exercise.

147.   The actions of Defendant in adjudicating Plaintiffs religious sincerity and prohibiting Plaintiffs religious exercise with ayahuasca violate Plaintiffs' rights to the free exercise of their religion under the Free Exercise Clause of the First Amendment to the United States Constitution.

148.   Additionally, the licensing mechanism employed by Defendants in the form of the *DEA Guidance* is not neutral and generally applicable.

149.   The DEA Guidance invites the government to consider the particular reasons for a person's conduct, including religious sincerity, by creating a mechanism for individualized exemptions to the Controlled Substances Act.

150.   Defendants' licensing mechanism is discretionary and wholly devoid of any legal test, standard of review, burden of proof, time frame for decision-making, required evidence, or right to hearing.

151.   Further, Defendants' religious licensing mechanism demands that religious adherents, including Plaintiffs, cease religious exercise unless and until the government has adjudicated the sincerity of a licensee's religious exercise. *See DEA Guidance.*

152.   Defendants' religious licensing mechanism violates Plaintiffs rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

153.    Absent declaratory and injunctive relief against Defendants, Plaintiffs have been and will continue to be injured.

## **PRAYER FOR RELIEF**

WHEREFORE, for all the foregoing reasons, the Plaintiffs respectfully request that this Court grant the following relief:

a.    Declare that Defendants' actions substantially burden Plaintiffs free exercise of religion, are not authorized by law, are in excess of statutory jurisdiction, authority, or limitations, and, are contrary to constitutional rights, powers, privileges or immunities;

b.    Declare that Defendants have violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4 (or "RFRA"), the Administrative Procedures Act, 5 U.S.C. §551 et. seq., and the First Amendment to the United States Constitution;

c.    Enjoin Defendants from taking any action prohibiting Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca, *Psychotropia viridis* and *Banisteriopsis caapi*;

d.    Void the U.S. Drug Enforcement Administration's Order (May 16, 2021);

g.    Grant Plaintiffs their costs of litigation, including reasonable attorney fees as enter an Order awarding the Plaintiffs attorneys' fees, costs, and expenses, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988; and

f.    Grant Plaintiffs such additional and relief as the Court deems just and proper.

## VERIFICATION OF FACTUAL ALLEGATIONS IN COMPLAINT

With respect to the factual allegations in the instant Third Amended, Verified Complaint, I, Christopher Young, Plaintiff herein, declare (certify, verify, or state) under penalty of perjury that the foregoing factual allegations are true and correct, as provided in 28 U.S.C. § 1746.

Executed on this 12th day of July 2021.

~~CHRISTOPHER YOUNG~~

Dated this 12th day of July 2021.

Respectfully submitted,

By: *s/Derek B. Brett*_____
**DEREK B. BRETT, ESQ.**
Fla. Bar No. 0090750
**BURNSIDE LAW GROUP**
109 Ilsley Avenue, Suite 9
Halifax, Nova Scotia B3B 1S8
Telephone:   (902) 468-3066
Facsimile:   (902) 468-4803
Email: dbb@burnsidelaw.net
Lead Counsel for Plaintiffs

s/A. Brian Phillips_____
**A. BRIAN PHILLIPS, ESQ.**
Fla. Bar No. 0067113
**A. BRIAN PHILLIPS, P.A.**
912 Highland Avenue
Orlando, Florida 32803
Telephone:   (407) 872-0777
Telecopier:   (407) 872-0704
Email: brian.phillips@phillips-law-firm.com
Local Counsel for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 22nd day of July 2021, the undersigned electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the same via email to the designated counsel for the Defendants.

**By:** */s/A. Brian Phillips*
       **A. BRIAN PHILLIPS, ESQ.**

Exhibit 1



# CERTIFICATE
## OF ORDINATION

*~ Credentials of Ministry ~*

*This document hereby affirms that*

**Christopher Young**

*has been ordained by the Open Ministry and is recognized as a minister with all rights and privileges thereof.*

May, 13th 2015
_____
DATE OF ORDINATION

_____
SIGNED

OPEN-MINISTRY.ORG
35934

Exhibit 2

**U.S. Department of Justice**

Drug Enforcement Administration

8701 Morrissette Drive
Springfield, Virginia 22152

*www.dea.gov*

Christopher Young
Soul Quest Church of Mother Earth Inc.
1371 Hancock Lone Palm Road
Orlando, Florida 32828

Dear Mr. Young:

    This letter sets forth the Drug Enforcement Administration's (DEA's) response to the petition which you submitted to DEA as the owner of Soul Quest Church of Mother Earth, Inc. (Soul Quest). The petition requests an exemption from the Controlled Substances Act (CSA) to allow members of Soul Quest to import, possess, and distribute plants containing dimethyltryptamine (DMT), a Schedule I controlled substance, in order to make ayahuasca. DEA has evaluated Soul Quest's petition in accordance with the framework set forth in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1; the Attorney General's guidance memorandum, "Federal Law Protections for Religious Liberty" (October 6, 2017) (AG Memorandum)[1]; the Supreme Court decision in *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal,* 546 U.S. 418 (2006) (*O Centro*); DEA's "Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act"[2]; and subsequent case law.

    According to RFRA, the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; AG Memorandum at 3. To establish a prima facie case for an exemption from the CSA under RFRA, a claimant must demonstrate that application of the CSA's prohibitions with respect to a specific controlled substance would (1) substantially burden, (2) religious exercise (as opposed to a philosophy or way of life), (3) based on a belief that is sincerely held by the claimant. *O Centro*, 546 U.S. at 428. Once the claimant has established these threshold requirements, the burden shifts to the government to demonstrate that the challenged prohibition furthers a compelling governmental interest by the least restrictive means. This "compelling interest test" must be satisfied through application of the CSA to the particular claimant who alleges that a sincere exercise of religion is being substantially burdened. *Id.* at 430-31.

    DEA has carefully considered the petition, supplemental submissions, and accompanying documentation, as well as the exhibits to Soul Quest's pleadings in *Soul Quest v. Garland,* Action

---

[1] https://justice.gov/opa/pr/attorney-general-sessions-issues-guidance-federal-law-protections-religious-liberty.

[2] https://www.deadiversion.usdoj.gov//GDP/(DEA-DC-5(EO-DEA-007) (Version2) RFRA_Guidance_(Final)_11-20-2020.pdf.

Christopher Young                                                                    Page 2

No. 6:20-cv-701 (M.D. Fla.).  DEA has also considered the results of DEA's preregistration investigation which included, among other things, extensive interviews of Soul Quest leadership and other relevant persons, review of Soul Quest's online videos, and review of Soul Quest's website. After full consideration of this information, DEA has determined that the request must be denied for the reasons set forth below.

<u>Sincere Religious Belief and Exercise</u>

DEA's investigation indicates that Soul Quest has offered inconsistent information about the religious basis for its petition.  You have repeatedly stated that, in a series of visions, you adopted as Soul Quest's foundational text the "Ayahuasca Manifesto:  Ayahuasca and its Planetary Mission, in 2012." *See, for example*, page 102 of your January 29, 2021 deposition in *Begley v. Soul Quest*, Case No. 2020-CA-003387 (9th Jud. Cir. Fla.).  You described the "Manifesto" as playing a role in Soul Quest akin to the Bible or the Koran, *id.*, while at page 9 of a letter counsel sent to DEA on August 21, 2017, it is compared to the Jewish Talmud and Mishnah.  However, in the background information provided to DEA by multiple Soul Quest leaders and members interviewed over the course of six months, the Ayahuasca Manifesto was mentioned only once.

Soul Quest does not require individuals to profess belief in Soul Quest's Ayahuasca Manifesto (or any other religion, such as the Christian syncretic religion professed in paragraph one of the FAC) before participating in a Soul Quest ayahuasca retreat.  February 18, 2021, DEA-6.  Nor does Soul Quest require or expect individuals to have any continuing involvement with Soul Quest or membership in any congregation or other group of believers, and, in fact, individuals frequently participate only once in Soul Quest's ayahuasca retreats.  *Id.*  An individual who wishes to consume ayahuasca in a Soul Quest ceremony must complete various intake forms, including a medical questionnaire, a consent form to participate in activities involving the use of Schedule I controlled substances (such as a waiver of the individual's right to take legal action against Soul Quest), and a form in which the applicant becomes a member of Soul Quest's alleged "church."  *Id.*  However, membership in Soul Quest appears to be a purely pro forma matter to obtain access to ayahuasca, rather than an expression of sincere religious devotion.[3]

During interviews with Soul Quest's leadership conducted on January 12, 2021, DEA gathered additional information regarding the Soul Quest organization and weekend-retreat ceremonies.  Dr. Scott L. Irwin, Ph.D., and the "Senior Minister" and a corporate officer of Soul Quest, described Soul Quest's use of ayahuasca not in religious terms but instead as a natural or "integrative" medicine or therapy, designed to help people deal with trauma or other issues such as depression.  February 18, 2021, DEA-6.  Dr. Irwin never mentioned the Ayahuasca Manifesto, a document which Soul Quest

---

[3] In contrast, an Oregon federal district court concluded that the plaintiff there, the Church of the Holy Light of the Queen (CHLQ), had established that ayahuasca use was a part of its sincere religious exercise in part because, "[i]n its screening process, CHLQ attempts to select only those who are serious about the Santo Daime religion, and to turn away would-be recreational users or thrill-seekers." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1216 (D. Or. 2009*), vacated on other grounds sub nom. Church of Holy Light of Queen v. Holder*, 443 F. Appx 302 (9th Cir. 2011).  Moreover, the district court observed that "CHLQ demands a serious commitment of time and energy from members, requiring attendance three or four times per month at services lasting several hours and sometimes almost all night." *Id.* at 1216-17.

identifies as its sacred text, in this interview. *Id.* Rather, Dr. Irwin described ayahuasca use as 5, 15, or 20 years of "psychotherapy in a weekend." He explained that spiritual "integration" sessions are offered to "unpack your experience" in either individual or group therapy. Dr. Irwin stated that the "psycho-spiritual" side falls under the ministry and that there are up to 20 different aftercare groups meeting Monday through Friday, primarily online. When interviewed, Dr. Irwin explained that Soul Quest does not tell people what to believe; he also conceded that participants could "leave after their weekend retreat is over and have no further required contact or investment with the group." *Id.*

Similarly, Soul Quest's website and public advertisements also do not support the claim that Soul Quest offers ayahuasca solely for religious purposes and only to members who are exercising religion pursuant to a sincerely held religious belief. January 9, 2017, DEA-6; Non-drug exhibits N-1, N-2. Soul Quest does business as the Soul Quest Ayahuasca Retreat and Wellness Center (Wellness Center). The Wellness Center offers a broad range of alternative medicinal and wellness services; ayahuasca ceremonies are one item on an extensive menu of services ranging from yoga and acupuncture to marital counseling. *Id.* Soul Quest offers weekend ayahuasca retreats that are open to any individual who is willing to sign various forms and pay a fee ranging from $350 to $900.00 for the retreat. Feb. 18, 2021, DEA-6.

When interviewed, Dr. Irwin explained that, while he is the "Senior Minister" and a corporate officer of Soul Quest, he is actually employed by the Soul Quest Natural Healing Center (SQNHC) company, a for-profit company. Feb. 18, 2021, DEA-6. SQNHC and its employees are contracted by Soul Quest. In materials provided to DEA by counsel for Soul Quest on February 3, 2021, Soul Quest is described as an IRS compliant 501c(3) non-profit organization, while the Wellness Center is described as an independent branch or "Free Church" of Soul Quest. It would therefore appear that, despite its denials, Soul Quest sells ayahuasca as part of its for-profit secular offerings to the general public.

According to its website, Soul Quest uses SQNHC, an "independent medical service," to provide medical support throughout the retreat; Soul Quest also reportedly offers "psycho-spiritual integration" services, before, during, and after its retreats, including "transformational coaching services" intended to support recovery from addictions, post-traumatic stress disorder (PTSD), and other conditions. Under the FAQ section of Soul Quest's website, it is stated that "Ayahuasca is used primarily as a medicine… It is a natural remedy for depression, anxiety, posttraumatic stress, anxiety, drug addiction, and it also releases emotional blocks." January 9, 2017 DEA-6, Exhibits N-1, N-2 (FAQ, www.ayahuascachurches.org). This language from the website supports a conclusion that Soul Quest understands and advertises the use and distribution of ayahuasca to the public as fundamentally medicinal.

On its website and in interactions with the public and prospective participants, Soul Quest describes the ayahuasca ceremony as plant medicine, a tool for physical health and spiritual growth, an "add-on" to whatever journey the individual chooses, and as treatment for use with whatever counseling methodology a person wishes to pursue. Exhibits N-1, N-2. Internet reviews and public comments left by participants in Soul Quest retreats consistently speak of the psycho-social, medicinal, and therapeutic properties of the ayahuasca experience, rather than of a religious experience. *Id.* The same is true of participants interviewed during the preregistration investigation and in "(Un)well," a documentary series about the wellness industry that premiered on Netflix.

Christopher Young                                                                                      Page 4

Episode 5 of the series is titled "Ayahuasca"; it focuses on use of ayahuasca, and includes, among other things, interviews and footage of Soul Quest leadership, members, and ayahuasca retreats. The individuals interviewed in the episode described the use of ayahuasca by Soul Quest participants as an aid in their healing journeys and for wellness, as opposed to a religious experience. In practice, Soul Quest thus promotes ayahuasca to the public for self-help and therapeutic reasons, rather than solely to fellow believers for the religious ritual purposes described in the Ayahuasca Manifesto. DEA therefore concludes that Soul Quest's promotion of ayahuasca to the public in this manner does not constitute a sincere exercise of religion under RFRA. Moreover, even if the organizers, officers, and leadership of Soul Quest could establish the sincerity of their own individual religious belief in the use of ayahuasca (which they have not established), they cannot establish that the participants in their ceremonies are using ayahuasca as part of a sincere religious exercise given the ease with which those participants can gain access to controlled substances in Soul Quest events, without meaningful commitment to a coherently religious practice.[4]

Soul Quest's historical associations also call into question its sincerity claims. When DEA first contacted Soul Quest on or about August 2, 2016, about its lack of authorization to obtain, handle, or distribute controlled substances under the CSA, the organization operated under the name "Oklevueha Native American Church Somaveda of Soul Quest, Inc." The Oklevueha Native American Church (ONAC) does not consider the Ayahuasca Manifesto to be its foundational text, but offers a Code of Ethics. It provides support and legal defense of the ceremonial use of various natural plant medicines by its member churches, ranging from peyote, ayahuasca, San Pedro, and psilocybin to cannabis. *See* www.nativeamericanchurches.org.

In response to DEA's initial contact, you called then-DEA Unit Chief James Arnold and asked him not to address the letter to the Oklevueha Native American Church (ONAC), Soul Quest, but to the Soul Quest Church of Mother Earth, Inc. You explained to Mr. Arnold that you and your group were disassociating yourself from ONAC and explained that you would be submitting a petition under the organization's current name. *See* August 26, 2016, Form DEA-6, Report of Investigation. When subsequently interviewed by DEA, you confirmed that Soul Quest had affiliated with ONAC to obtain legal coverage for Soul Quest's use of ayahuasca and other substances. Feb. 19, 2021 DEA-6. You also conceded that you had purchased the right to use ONAC documents which you incorporated into your own writings as founder and leader of Soul Quest. *Id.* at 175. These facts suggest that Soul Quest changed its religious affiliation in order to use RFRA's legal protections to enable Soul Quest to obtain and distribute controlled substances, rather than an expression of a consistently and sincerely held religious belief.

In sum, Soul Quest has not satisfied its burden under RFRA of demonstrating that its use of ayahuasca is pursuant to a religious exercise and based on a sincerely held religious belief.

---

[4] In reaching this conclusion, DEA does not pass judgment on the potential medical benefits of ayahuasca or other "plant medicines." DEA states only that a RFRA petition is not the appropriate forum in which to assess a substance's potential medical benefits. In the CSA, Congress established a procedure by which scientists and health care practitioners can apply to DEA for registration to possess controlled substances in order to conduct research. DEA encourages such applications.

Least Restrictive Means of Furthering Compelling Governmental Interests

DEA's mission requires it to prevent diversion of controlled substances outside of the comprehensive regulatory scheme established by Congress. As explained above, DEA finds that Soul Quest has not demonstrated the existence of a sincere religious exercise; it has therefore necessarily also failed to show that application of the CSA to its use of ayahuasca would substantially burden a sincere religious exercise. Accordingly, DEA need not, under RFRA, consider whether application of the CSA's prohibitions with respect to ayahuasca would impose on Soul Quest a substantial burden under RFRA, and DEA need not demonstrate that the CSA's prohibitions with respect to Soul Quest's proposed use of ayahuasca further a compelling governmental interest by the least restrictive means. However, even if Soul Quest had established all three elements for establishing a prima facie case under RFRA, DEA finds the CSA's prohibitions on Soul Quest's importation of plants containing the Schedule I controlled substance DMT, use of those plants to manufacture an herbal tea containing DMT, and distribution of that tea are the least restrictive means of furthering two compelling governmental interests: the need to protect public health and safety from potentially dangerous substances, and the need to prevent diversion of controlled substances into the illicit market.

The psychoactive ingredient in the ayahuasca tea, DMT, is a Schedule I controlled substance. As such, it has a high potential for abuse, no currently accepted medical use in treatment in the United States, and lacks established safety for use under medical supervision. 21 U.S.C. § 812(c), Schedule I(c). Clinical effects of ingestion include hallucinations, agitation, tachycardia, confusion, heightened blood pressure, and vomiting. Ingestion has been known in rare instances to cause seizures, respiratory arrest, and cardiac arrest. *See* Ayahuasca: Risks to Public Health and Safety (DEA Diversion Control Division, Drug and Chemical Evaluation Section, July 2020).

Unlike the plaintiffs in *O Centro*, *supra*, and *Church of the Holy Light of the Queen*, *supra*, whose religious use of ayahuasca (also known as hoasca or Daime) DEA has accommodated within the CSA's comprehensive regulatory scheme by treating the plaintiffs as registered importer, Soul Quest does not import its tea directly from co-religionists in South America.[5] Instead, Soul Quest obtains the plants from which the ayahuasca tea is made outside the CSA's regulatory framework from a business in the Netherlands, "Waking Herbs." As described below, it is not possible for DEA to track these shipments to ensure that none are diverted into illicit channels. Moreover, the manager of Waking Herbs, Philip van Schaik, confirmed to DEA investigators that its products are sold only for purposes of soap and candle making and ethnobotanical research and are not for human consumption. Plant shipments intended for and/or received by Soul Quest bore labels such as "aromatic herbs," "samples," and "packaging materials." Use of plants which are not intended for human consumption in teas or other preparations for human ingestion poses obvious potential risks to human health and safety. Because DEA's attempts to obtain further information about Waking

---

[5] As the district court in *O Centro* explained, the plaintiff in that case was a U.S. branch of a religion based in Brazil, and imported hoasca from Brazil. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1240 (D.N.M. 2002). Similarly, the district court in *Church of the Holy Light of the Queen* explained that "[t]he Santo Daime church brews Daime tea in Brazil," and "ship[s] it to CHLQ in Ashland[, Oregon]." *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1213 (D. Or. 2009), *vacated sub nom. Church of Holy Light of Queen v. Holder*, 443 Fed. App'x 302 (9th Cir. 2011).

Herbs were rebuffed, it is not possible to determine the level of risk involved in use of these plant materials.

Under the CSA and DEA regulations, controlled substances that are imported into the United States must be directly shipped to the DEA registrant to keep the controlled substances within the closed system and to comply with Federal law.  On November 18, 2019, while screening international mail, a Customs and Border Protection (CBP) Officer at the Chicago Customs and Border Protection Mail and Inspection Center inspected a parcel containing a dry green leafy substance that tested positive for DMT by the CBP Chicago Laboratory.  The parcel, which was seized by the Department of Homeland Security (DHS), contained six bags with a total weight of approximately 7,866.3 grams.  The parcel sender was located in the Netherlands.  The addressee was Dr. Irwin's father in Nebraska, who subsequently shipped the bags to Soul Quest in Florida.  January 24, 2020 DEA-6.  Dr. Irwin's father is not a DEA registrant.  DEA learned that the November 2019 shipment was not an isolated incident but that similar packages had been previously illegally shipped in this manner to Soul Quest.  *Id.*

On August 27, 2020, DEA inspected Soul Quest's controlled substance storage unit, located at Security Self Storage, 12280 E. Colonial Drive, Orlando, Florida, 32826.  Investigators noted that boxes of plant material received by Soul Quest bore the address of Palosanto Shop, a business using a virtual mailbox located at 1297 Grand Avenue, PMB #1032, Baldwin, New York, 11510.  The plant material had been shipped from www.wakingherbs.com in the Netherlands to Palosanto Shop and were then transferred to Soul Quest in Orlando, Florida.  Palosanto Shop is not registered with DEA as an importer.  February 12, 2021, DEA-6.

Because Soul Quest's sources are not DEA registrants, and because neither they nor Soul Quest will answer questions on the subject, DEA cannot determine how much of the controlled substance is being imported, or inspect its chain of custody within the United States to determine if diversion has occurred.[6]

Candor is essential to the closed regulatory scheme established by Congress to prevent diversion of controlled substances from authorized channels.  Millions of individual health care practitioners and researchers, institutions, and companies hold DEA registrations, and DEA's resources limit the scope and frequency of inspections and audits of registrants.  For this reason, DEA "places great weight on a registrant's candor, both during an investigation and in any subsequent proceeding."  *See, e.g.*, Belinda R. Mori, N.P.; Decision and Order, 78 Fed. Reg. 36,582-02, 36,589 (2013) (citing Robert H. Hunt, 75 Fed. Reg. 49,995, 50,004 (2010)).  It is well-settled that "[c]andor during DEA investigations, regardless of the severity of the violations alleged, is considered by the

---

[6] Based on the record before it in 2006 in *O Centro*, the Supreme Court (reviewing the grant of a preliminary injunction) found little risk of diversion of the *hoasca* or ayahuasca tea into illicit channels because the UDV Church had fewer than 200 members in the United States and because the tea caused vomiting.  Since that time, however, experimentation with and recreational and/or self-help use the tea has grown exponentially, both in the United States and around the world.  The globalization of ayahuasca raises complex questions, including how to distinguish cultural appropriation and commodification of indigenous cultural practices from sincere cultural integration and syncretism, and has inspirited a growing body of research and analysis. *See,* the Chacruna Institute, "The Commodification of Ayahuasca:  How Can We Do Better?" (2019).

DEA to be an important factor when assessing whether a [respondent's] registration is consistent with the public interest," and "[t]he DEA properly considers the candor of the [respondent] and his forthrightness . . . in determining whether the [respondent's] registration should be revoked." *Hoxie v. DEA*, 419 F.3d 477, 483 (6th Cir. 2005).

During the preregistration investigation, Soul Quest made no commitment to lawfully import or acquire the plant material containing DMT within the comprehensive regulatory system established under the CSA. Soul Quest representatives refused even to discuss importation, citing the Fifth Amendment prohibition against self-incrimination. This failure to provide essential information evidencing specific plans and a concrete commitment to the legal importation of the plant material constitutes a lack of candor which is fatal to the Soul Quest petition. This failure, moreover, is not justified by the Fifth Amendment. DEA's RFRA petition guidance clearly requests information about a petitioner's future plans, rather a confession of previous unlawful activity. *Supra* p. 1 n.1 (requesting the name of the controlled substance the party "wishes to use" and details about its "anticipated" handling of the substance).

In its petition and supporting materials, moreover, Soul Quest described detailed screening procedures for participants, as well as monitoring of ayahuasca consumption by trained health care professionals. However, DEA's investigation revealed troubling allegations that Soul Quest has failed to follow its own procedures. In 2018, for example, a participant named Joseph Begley died after ingesting both ayahuasca and kambo (the secretion of a South American frog). Mr. Begley's estate has sued Soul Quest for wrongful death, and in that ongoing litigation, Mr. Begley's father alleges that a three-hour delay in summoning medical aid contributed to his son's death. *See Begley v. Soul Quest*, Case No. 2020-CA-003387 (9th Jud. Cir. Fla). A participant in a September 26, 2020 ayahuasca "Warrior Quest" retreat also recently reported to DEA that, after she began experiencing adverse effects from an unknown substance also administered to her during an ayahuasca ceremony, Soul Quest staff members delayed calling 911; she also alleged that hospital emergency room personnel had told her that Soul Quest staff members had repeatedly dropped off customers experiencing adverse reactions off at the emergency room. April 2, 2021 DEA-6.[7] While DEA has served an administrative subpoena upon the local hospital to corroborate these reports, it has not yet received any response.

DEA's preregistration investigation revealed that Soul Quest currently lacks adequate measures to safeguard either the imported plants in its custody or the tea, once manufactured. During interviews, Soul Quest leaders expressed willingness to improve physical security. DEA does not question Soul Quest's expressed willingness to purchase and install alarms and other appropriate security equipment. February 18, 2021 DEA-6. However, given Soul Quest's lack of candor and apparent inconsistency in following its own procedures to protect the health of participants in its retreats, DEA is not satisfied that Soul Quest would in practice store plants containing DMT or its ayahuasca tea only at the reported secure site or would administer the tea only at the reported fixed location. DEA therefore concludes that maintaining the CSA's prohibition on the importation and possession of DMT as applied to petitioners is the least restrictive means of preventing diversion of a Schedule I controlled substance into illicit channels and protecting the public health.

---

[7] As explained above, ingestion of ayahuasca poses significant known potential health risks. Combination of DMT with kambo or other unknown mind-altering chemicals necessarily increases those health risks.

Christopher Young                                                            Page 8

Based upon a thorough review of the entire record, DEA therefore concludes that Soul Quest's practices, even assuming arguendo that those practices constitute a religious exercise, cannot be accommodated in a manner that would allow DEA to preserve its compelling interests in public health and safety and in preventing illegal diversion of ayahuasca.  Indeed, to the extent Soul Quest and its customers use ayahuasca for purposes other than sincere religious exercise, their own use constitutes unlawful diversion.  Maintaining the CSA's prohibition on the importation, possession, manufacture, and distribution of DMT is the least restrictive means of protecting the public health and safety and preventing diversion of DMT into illicit channels.

This letter is a final determination under 21 U.S.C. § 877.

Sincerely,

WILLIAM
MCDERMOTT
Digitally signed by WILLIAM
MCDERMOTT
Date: 2021.04.16 12:41:43 -04'00'

William T. McDermott
Assistant Administrator
Diversion Control Division

Exhibit 3

**U. S. Department of Justice**

Drug Enforcement Administration

8701 Morrissette Drive

Springfield, Virginia 22152

---

*www.dea.gov*

Derek B. Brett, Esq.
Burnside Law Group
Park Central, Unit 9
109 Ilsley Avenue
Dartmouth, NS
Canada B3B 1S8

Dear Mr. Brett:

This letter concerns the petition for religious exemption which you presented to the United States Department of Justice, Drug Enforcement Administration (DEA), on behalf of your client, Soul Quest Ayahuasca Church of Mother Earth, Inc. (Soul Quest), d/b/a the Soul Quest Ayahuasca Retreat and Wellness Center ("Wellness Center"), as well as the First Amended Complaint (FAC) (ECF No. 13) and motion for preliminary injunction (Motion) (ECF No. 15) which you recently filed in *Soul Quest v. Barr*, Case No. 6:20-cv-00701 (M.D. Fla.). Thank you for these materials, which have contributed to our review of the petition. We look forward to opening a dialogue with you and your client to clarify the religious nature of Soul Quest's practices under the Religious Freedom Restoration Act (RFRA) and to explore accommodation of those practices within the comprehensive regulatory scheme established by the Controlled Substances Act (CSA), as amended.

Through the CSA, Congress established a comprehensive scheme to regulate the importation, manufacture, and distribution of substances which have legitimate medical uses, but potential for diversion from authorized channels. Title 21, United States Code §§ 801 (U.S.C. §§ 801) *et seq*. Under the CSA, all individuals and entities which import, manufacture, and distribute controlled substances must be registered by DEA. DEA implements the CSA through comprehensive regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. *See* Title 21, Code of Federal Regulations §§ 1300-1316 (CFR §§ 1300-1316). The regulations implementing the CSA impose consistent requirements upon all handlers of controlled substances which govern controlled substances, addressing import, export, manufacture, distribution, diversion, public safety, storage, administration, recordkeeping, and disposal. To minimize the risk of diversion, registrants must, for example, maintain records and make those records available for inspection and audit; they must also identify the locations at which controlled substances are stored and manufactured. DEA routinely inspects and assesses the security practices in effect at such locations.

Under RFRA, Congress provided that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person . . . is in furtherance of a compelling governmental interest and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-l. These

competing mandates require the DEA to consider the "application of the [CSA] to the person—the particular claimant whose sincere exercise of religion is being substantially burdened" and engage in a "case-by-case consideration of religious exemptions to generally applicable rules" so that it may "strike sensible balances" of interests based on "the particular practice at issue." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31, 436, 439 (2006) (internal quotation marks omitted).

In compliance with *Gonzalez, supra*, DEA promulgated interim guidelines to facilitate the process by which parties can seek exemption from particular regulations implementing the CSA that would substantially burden their religious exercise. Under this process, DEA can grant appropriate registrant status to religious applicants, thus bringing the religious use of the controlled substance within the CSA's comprehensive regulatory scheme. DEA can also waive application to the religious organization of particular regulatory requirements, such as registration fees. Recognizing that DEA's regulatory requirements for security were developed for commercial environments, DEA will work with the religious registrant to revise security requirements to meet the specific situation of the non-profit applicant. DEA will also work with the applicant to tailor specific provisions of the regulatory scheme to minimize diversion and safety risks presented by the "particular practice at issue." *Gonzales*, 546 U.S. at 439. DEA therefore routinely requests detailed information on petitions for exemptions from the CSA, as outlined in the guidelines. After careful consideration of the materials already provided, DEA asks that Soul Quest answer the following questions and provide the information requested below.

<u>The Organization and Belief System of Soul Quest</u>

Soul Quest's organization and religious belief system appear to have evolved in some respects between 2017 and the present. We welcome this opportunity to obtain the most up-to-date information. The undated and unsigned "By Laws" attached to Soul Quest's Motion (ECF No. 15-3) provide, for example, that "[t]he name of this organization, shall be the Oklevueha Native American Church of Soul Quest (ONACSSQ)" and state: "we will educate others in our town in Georgia, the USA and in various locations anywhere in the world…" How does the ONACSSQ relate to Soul Quest? Does Soul Quest currently conduct any ceremonies with or provide ayahuasca and/or ayahuasca components to or receive ayahuasca and/or ayahuasca components from any individuals or organizations in Georgia, or any locations in the United States other than Orlando, Florida? If so, please identify the name and location of each such organization and explain the organizational relationship of each to Soul Quest.

The "Foundation Document" provided with the Motion (ECF No. 15-5) contains the following statement: "…we have para-church ministries and Indigenous Native American religion based auxiliaries," while the Doctrinal Statement (ECF No. 15-8) is described as applicable to "any Authorized Branch." Please provide the name and location of all "ministries," "auxiliaries," and "Authorized Branches" and explain their organizational relationship to Soul Quest.

In paragraph one of the FAC, Soul Quest is described as "a Christian syncretic religion based in Orlando, Florida." Other documents, however, contain no reference to Christianity, but profess belief in "Mother Earth," "Father Sky," and/or the "Great Spirit." (*See, e.g.*, ECF Nos. 15 ⁋ 25, 15-3.) The flyer attached to the Motion, ECF No. 15-13, describes Soul Quest as believing in "the rights of Mother Earth and in protecting the practice of Mother Earth based South American

Case 6:20-cv-00701-WWB-DCI   Document 23-1   Filed 06/15/20   Page 4 of 6 PageID 420
Case 6:20-cv-00701-WWB-DCI   Document 33-3   Filed 07/22/21   Page 4 of 6 PageID 2083
USCA11 Case: 22-11052   Document: 22-2   Date Filed: 12/01/2022   Page: 58 of 235
Page 3

Derek B. Brett

spiritual traditions, ceremonies, and sacred indigenous natural medicines." Please clarify Soul Quest's relationship, as applicable, with Christianity, Mother Earth, Father Sky, and/or the Great Spirit. In the petition, the "Ayahuasca Manifesto" is described as a sacred document. Is Exhibit 3 to the FAC, ECF Nos. 13-4 and 13-5, that sacred document? If not, can you provide a copy of the sacred document?

The Doctrinal Statement states that Soul Quest and its Authorized Branches "accept all natural substances and their derivatives" for ceremonial use. Has Soul Quest or the Wellness Center used any controlled substance other than ayahuasca in their ceremonies or wellness activities since January 2017? If so, identify each such controlled substance and identify the date(s), place(s), and context(s) in which it was administered and how it relates to Soul Quest's sincere religious beliefs.

On page 13, the petition stated that there is no charge to participate in the sacrament of ayahuasca. An attachment to the petition, entitled: "Information About Our Weekend Retreats," stated: "[w]e do not charge for the medicine, but for the work of accompaniment and supervision, for meals and accommodation, and for the translation of the facilitators from the country in which you are staying." The attachment listed the cost of the ayahuasca ceremony as $175 per session for a two night minimum, or a total cost of $350, as well as additional costs for various levels of accommodations and other optional ceremonies. How much are members and authorized participants charged for ayahuasca administration during weekend retreats? Does Soul Quest or the Wellness Center currently conduct ayahuasca ceremonies at any location other than the Wellness Center? If so, please provide the pricing schedule.

The flyer attached to the Motion, ECF No. 15-13, indicates that the Wellness Center offers a wide range of therapeutic services, including ayahuasca administration, "psycho-spiritual integration," naturopathy, yoga, breathwork, reiki/energy medicine, acupuncture, smoking cessation, and kambo, which we gather is a traditional South American cleansing ritual using the poison of a frog. Are these therapeutic services offered in connection with ayahuasca ceremonies, or are they available independently of those ceremonies? Please explain the relationship of these services to the religious beliefs and mission of Soul Quest. We also note that a letter attached to Soul Quest's petition indicates that the Orange County Board of Zoning limited sound devices or amplification of music at the Wellness Center and limited it to no more than four special outdoor events, "which shall not include religious or spiritual retreats." This implies that non-religious outdoor events may be held at the Wellness Center. Please explain.

In the FAC and several supporting documents, Soul Quest is described as d/b/a (doing business as) the Wellness Center. On page 9 of the Foundation Declaration (ECF No. 15-5), however, the Wellness Center is described as an "independent branch or Free Church" of Soul Quest. Please clarify the organizational and financial relationship between the two entities. Does Plaintiff Lewis draw any financial compensation from the Wellness Center? If so, please state the total compensation he received each year from 2017 through 2019.

Soul Quest's Procurement, Storage, Distribution, and Disposal of Ayahuasca

Does Soul Quest import ayahuasca in tea form, or does it import the plants used in making the tea? In either case, identify the source of the imported materials, the quantity imported each year since January 2017, the location(s) where the materials are stored, and all individuals who have had

access to the stored materials. If the tea is prepared in the United States, please state where and by whom the tea is prepared, where and how it is stored, and state the relationship between the amount of plant material used and the number of doses of tea manufactured.

Does Soul Quest provide the tea to any other individuals or organizations outside Soul Quest's ceremonies at the Wellness Center in Orlando? If so, state when, where, and to whom the tea was distributed.

If Soul Quest has developed written policies or directives governing security, recordkeeping and storage protocols for controlled substances, please provide copies. If not, please provide a detailed description of Soul Quest's current practices. Additionally, please identify the individuals in charge of security, recordkeeping, storage, and the dispensing of the controlled substances and provide the full names of the individuals described as members of the "team" in the Wellness Center flyer (ECF No. 15-13). In order to have all of the information necessary for DEA to reach a determination on Soul Quest's petition and determine its eligibility for DEA registration to import, manufacture, and distribute a schedule I controlled substance, DEA Diversion Investigators must conduct interviews of these individuals and other leaders and managers, assess the security and recordkeeping measures in place, and recommend any upgrades needed to minimize the risk of diversion and protect safety. Site visits and inspections will follow.

If all tea that has been prepared is not used at an ayahuasca ceremony, or if a batch of tea is no longer usable, how will Soul Quest dispose of the unused or expired tea? As you will appreciate, the disposal of unused substances which contain controlled substances, such as prescription medicines, can present environmental and public safety concerns, as well as concerns of diversion into illicit markets. Has Soul Quest developed any protocols or standard practices for the proper disposal of unused or expired controlled substances, including but not limited to ayahuasca tea and plant residues? Does it maintain records documenting disposal or destruction?

The Code of Ethics attached to the Motion, ECF No. 13-6, describes the primary purpose of Soul Quest as "to administer Sacramental Ceremonies." It also states that both "members" and "Authorized Participants" can take part in the "Ayahuasca Ceremony." What is the difference between a "member" and an "Authorized Participant?" What criteria are used to "authorize" a non-member "participant" to ingest ayahuasca with Soul Quest?

In paragraph 50 of the FAC, Soul Quest alleges that it offers ayahuasca ceremonies three times per month and that 60 to 80 individuals participate in the ceremony with the support of 20 "facilitators," including a "licensed physician as medical director, a licensed paramedic, a licensed emergency medical technician, a psychologist, and a research scientist." Please identify the individuals who currently perform these functions and describe their qualifications, professional education and licensures, and confirm that Soul Quest will make these individuals available to speak with DEA Diversion Investigators at the parties' convenience.

Your petition on page 14 states that participants must complete and return a medical form, and attached thereto was a document titled: "Medical Form." Is that form still in use? If not, please provide a copy of the current medical form. Were any medical professionals consulted in the creation of this form? What scientific literature or studies, if any, provide the basis for the contents of the form? If a participant indicates that they do have a history of one or more of the listed

ailments, is he or she permitted to participate?  How is private medical information protected?  Are women who are pregnant, nursing, or on birth control allowed to partake in the ayahuasca ceremony?  At what age can participants consent to participate in the ayahuasca ceremony?  How is age of the participants verified?  What protocols are put into place to ensure minors do not have access to controlled substances?

Part III "Safety & Security and Protocols for Ayahuasca Ceremonies", Section C.5 of the petition states: "Soul Quest has developed an emergency plan for various scenarios, and has educated its facilitation team to know and understand what steps to take in case of an emergency." Please provide a copy of the emergency plan and describe any training given to "facilitators" in how to respond if a medical emergency arises during or immediately after a ceremony.

Please provide a list of all emergencies or other critical situations which have arisen during or immediately after ayahuasca ceremonies since January 2017, including a brief description of the event, the Emergency Medical Service (EMS) and/or law enforcement agency contacted, and the outcome of the event.  Additionally, please describe and explain the actions Soul Quest took related to the April 1, 2018 medical emergency involving Brandon Begley.  Since that emergency, has Soul Quest modified its safety protocols and procedures?  If so, please explain how.  On page 17, the petition states that Soul Quest works with local EMS personnel and/or police if additional assistance is needed for any emergency or other critical situation.  Please provide copies of any documentation memorializing these arrangements and identify the local agencies with which Soul Quest works.

DEA looks forward to your responses to these questions, which will enable us to move forward with our case-specific analysis of Soul Quest's petition and consideration of how best to accommodate religious beliefs and practices within the CSA's comprehensive regulatory scheme.

Sincerely,

Thomas W. Prevoznik
Deputy Assistant Administrator
Diversion Control Division

Exhibit 4



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

| | | |
|---|---|---|
| **Kevin P. Hancock** | Tel: | (202) 514-3183 |
| Trial Attorney | Fax: | (202) 616-8470 |
| | Email: | Kevin.P.Hancock@usdoj.gov |

June 4, 2020

**By Email**
**Confidential Rule 408 Settlement Communication**

Derek B. Brett, Esq.
Burnside Law Group
Park Central, Unit 9
109 Ilsley Avenue
Dartmouth, NS, Canada
B3B 1S8
dbb@burnsidelaw.com

A. Brian Phillips, Esq.
912 Highland Avenue
Orlando, Florida 32803
Brian.Phillips@phillips-law-firm.com

*Re:* Soul Quest, et al. v. Barr, et al., *6:20-cv-701 (M.D. Fla.) – Supplemental information to our negotiations on June 1, 2020*

Dear Mr. Brett & Mr. Phillips:

This letter follows our discussions on June 1, 2020 concerning the petition for religious exemption that you presented to the United States Department of Justice, Drug Enforcement Administration (DEA), on behalf of your client, Soul Quest Ayahuasca Church of Mother Earth, Inc. (Soul Quest), d/b/a the Soul Quest Ayahuasca Retreat and Wellness Center, as updated by the exhibits to the First Amended Complaint (FAC) and motion for preliminary injunction which you recently filed in the above-captioned matter.

As discussed during that call, in exchange for Soul Quest's agreement to stay the litigation (including withdrawal of its preliminary injunction motion) DEA is willing to commit to responding to Soul Quest within 14 days of receiving Soul Quest's answers to the questions in DEA's letter to Soul Quest dated May 29, 2020. In its response, DEA would either: (a) start scheduling interviews, or (b) if necessary, request clarification regarding any of the answers in

Soul Quest's response prior to scheduling interviews. In addition, DEA would commit to providing Soul Quest a final determination on its petition within 75 days after DEA's fact-finding is complete, including any necessary interviews and site visit(s).

Also during our discussions, you stated that your clients had asked for additional information about the DEA pre-registration investigation process. In response, DEA has authorized DOJ to convey on their behalf the following information explaining the preregistration process:

Registration is essential to the comprehensive regulatory scheme established by the Controlled Substances Act, as amended ("CSA" or "the Act"), 21 U.S.C. §§ 801 *et seq*. Under the CSA, the Attorney General, who has delegated this authority to DEA, must register an applicant to distribute or manufacture a Schedule I controlled substance unless it is determined that registration would be inconsistent with the public interest. *Id.*, § 823(b).[1] In determining the public interest, several factors must be considered, including, but not limited to, whether the applicant will maintain effective controls against diversion of the particular controlled substance into illicit channels and will be compliant with applicable state and federal laws and regulations. *Id.* DEA Diversion Investigators ("DIs") therefore routinely review applications for registration, including applications from doctors, pharmacies, distributors, importers/exporters, or manufacturers, gather relevant information, and inspect registrants' establishments. 21 C.F.R. § 1301.31. In the case of applications for exemption from aspects of the regulatory scheme on religious grounds, DEA must also determine pursuant to the Religious Freedom Restoration Act (RFRA) whether the applicant has established sincerity and the religious nature of the applicant's professed belief system and whether application to the applicant's religious practices of any specific requirement of the CSA's comprehensive regulatory system would substantially burden the applicant's religious exercise.

If Soul Quest's responses to the questions posed in DEA's May 29, 2020 letter to you are sufficiently complete, DEA will then promptly initiate a preregistration investigation. Preregistration investigations are routinely conducted by DIs. Unlike Special Agents, who exercise federal peace officer powers, DEA DIs do not have the power to make arrests and do not carry firearms. And to be clear, preregistration investigations are not criminal investigations.[2]

---

[1]   If, after considering the results of a preregistration inspection, DEA is unable to conclude that registration would be in the public interest, DEA must issue an Order to Show Cause why the application should not be denied. *See* 21 C.F.R. § 1309.46.

[2]   Even though preregistration investigations are not criminal investigations, federal law makes it a criminal offense to make a false statement in matters of federal interest. 18 U.S.C. § 1001. DEA can therefore refer to appropriate authorities for criminal prosecution willfully false statements of material fact made to Diversion Investigators.

The Diversion Program Manager (DPM) for the DEA Miami Field Division will assign the investigation to a Diversion Group in DEA's Orlando District Office, as Soul Quest's location falls within that office's jurisdiction. After DEA receives complete answers to the questions in its May 29, 2020 letter to Soul Quest, a Diversion Investigator will promptly contact Soul Quest to schedule a series of interviews with Soul Quest leadership and individuals who have access to or responsibility for the import, storage, safekeeping, and distribution of the controlled substance. Counsel for Soul Quest are welcome to attend these interviews.

DI personnel will review Soul Quest's responses to the May 29, 2020 questions and ask follow-up questions. DI personnel will also discuss with Soul Quest, in detail, the regulatory requirements relating to record-keeping, security measures, and the process by which to obtain import permits. After assessing the adequacy of Soul Quest's existing and any planned additional security measures, the DIs may identify additional needed security measures and will schedule on-site inspections. Again, your counsel can be present for any on-site inspection.

Upon completion of the interviews and onsite inspections, the application will be forwarded to the Diversion Control Division in DEA Headquarters for review. After that review is complete, DEA will either issue Soul Quest appropriate DEA registration(s) or an Order to Show Cause why registration should not be denied.

I hope that this information I have conveyed on behalf of DEA addresses your questions concerning the DEA pre-registration investigation process. Please let me know if there is any additional information that would be helpful, and I look forward to your response.

Best regards,

Kevin P. Hancock

Exhibit 5

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SOUL QUEST CHURCH OF MOTHER )
EARTH, INC., a Florida Domestic )
Non-Profit Corporation, on its own )
behalf and on behalf of its members; and)
CHRISTOPHER YOUNG, individually )
and as Spiritual Leader of Soul Quest )
Church of Mother Earth, )
                                 )
     Plaintiffs, )
                                   )
v. )      Case No.: 6:20-cv-00701-WWB-DCI
                                   )
WILLIAM BARR, Attorney General of the)
United States of America; and )
UTTAM DHILLON, Acting Administrator )
of the U.S. Drug Enforcement )
Administration, )
                                   )
     Defendants. )
_____)

**AFFIDAVIT OF CHRISTOPHER YOUNG IN SUPPORT OF**
**PLAINTIFFS' THIRD AMENDED, VERIFIED COMPLAINT FOR**
**DECLARATORY AND EMERGENCY INJUNCTIVE RELIEF AND DAMAGES**

Pursuant to 28 U.S.C. § 1746, I, Christopher Young, state as follows:

1.     I am over the age of twenty-one (21) years and have personal knowledge of the facts listed in this affidavit.

2.     I am the current spiritual leader of Soul Quest Church of Mother Earth, Inc. [hereinafter "Soul Quest Church"].

3.     Soul Quest Church is a Christian syncretic religion based in Orlando, Florida.

4.      Soul Quest Church is a registered domestic non-profit corporation incorporated under the laws of the State of Florida, with a principal office located in Orlando, Florida.

5.      I have been the spiritual leader of Soul Quest Church since its founding in 2015.

6.      I am a natural person who is domiciled in Orlando, Florida.

7.      I am the person primarily responsible for receiving and preparing Soul Quest Church's sacramental tea.

8.      This sacramental tea is an indispensable component of Soul Quest Church and my own personal, religious beliefs.  Drinking this tea is a sincere religious practice.

9.      I first came to Soul Quest Church and the Church of Ayahuasca by and through my studies of conventional medicine. I began my career in 1996 by obtaining a certificate in phlebotomy and medical assistance.

10.     In 1997, I obtained a certificate in emergency medicine, and would begin working as a technician in emergency rooms.

11.     I worked in the field of emergency medicine for four (4) years. However, over time, I began to see how people were being harmed – both physiologically and spiritually – by prescription drugs and its potential abuse.

12.     These experiences and observations brought me to commence a study of alternative medicine and spirituality.

13.    I studied alternative medicine and spirituality in the United States for five (5) years.  Thereafter, in 2012, I continued my studies in Germany.

14.    I first heard the call of the Spirit of Ayahuasca during my time in Spain, Where I was invited to the first Ayahuasca conference where I attended many ayahuasca retreats.

15.    These conferences delivered my experiences with the consumption of ayahuasca tea.  These experiences were, to me, an epiphany, as engaging in the sacramental ritual powerfully and demonstrably and irrevocably restructure my view of reality, and of mankind's place in the universe.  It was a deeply religious and moving experience for me – and remains so.

15.    The ayahuasca sacramental experience revealed to me that humanity is powered by divine love.  In fact, divine love is the central, binding force behind our existence.  Instead of our existence – as before for me – being guided by material forces, I came to understand through the ayahuasca sacrament that harmony in our human existences flow from a form of ethereal and mystical and transcendental sense of human compassion, for all life.

16.    I followed up on this divine experience via study and understanding of the Ayahuasca Manifesto, I recognized the physical and spiritual healing possibilities to be realized through the Spirit of Ayahuasca.  At that point, I felt a spiritual calling to return to the United States with these teachings and healings.  I felt the calling to spread the word of the Spirit of Ayahuasca to other potential adherents.

17.     In furtherance of this spiritual calling, I formed Soul Quest Church in approximately October 2014, and began offering services in March 2015.

18.     Soul Quest Church is a recognized non-profit, religious entity that exists to spread the faith of the Spirit of Ayahuasca and the revealed teachings of the Ayahuasca Manifesto to the world.

19.     A key aspect of the Soul Quest Church's faith and religious practice is our consumption of our sacramental tea. We believe that consumption of this tea brings us closer to the Divine.

20.     As explained by my attorneys in the Verified Second Amended Complaint, to which this Affidavit is attached, the Defendants have denied Soul Quest Church and me the ability to import, receive and prepare our sacramental tea.

21.     The denial of access to our sacramental tea has had, and continues to have, a chilling effect upon our sincere, genuine religious practice.  This extends not just to myself, but to all members of Soul Quest Church.  Further, I live in constant, daily fear of the Defendants using their general law enforcement powers to prevent my practicing my sincere religious beliefs including, but not limited to, the ability of the Defendants to arrest me for my blending of, storage and use of the sacramental ayahuasca tea.

22.     On approximately August 1, 2016, I received a letter from the Defendants, inviting me to file for a religious exemption application to the Controlled Substances Act.

23.     In an effort to ensure that we could continue to practice our religion, I retained counsel and sought to file a religious exemption application with the Defendants.

24.     In August 2017, this application for religious exemption was filed in accordance with what little information was available from the Defendants. Effectively, there was little guidance provided on how to file such an exemption application; likewise, despite a diligent search through legal counsel, there did not appear to be any standards promulgated by the Defendants regarding its review and consideration of the exemption application.

25.     From that day through the time following my lawyers filing the original Verified Complaint in this federal case, I heard nothing about the status of Soul Quest Church's religious exemption application. The Defendants never ruled upon any such application – or even bothered to advise my legal counsel about its status.

26.     In fact, the Defendants never provided any guidance on how Soul Quest's religious exemption application would be ruled upon. There are simply no published rules or regulations. Through my own research, I came to learn that there are no such regulations. Following my retention of my lawyers in this matter, I also learned that the Defendants have never – since the Supreme Court's ruling in a case I know as *UDV* back in 2006 – created any such rules or regulations. The absence of such has created additional fear about the effects of the Federal Government attempting to suppress my rights to the exercise of my fundamental

religious beliefs, especially after I received the August 1, 2016, letter from the DEA. I love and cherish my religious beliefs; my devotion to such beliefs is devout and pure. I do not want the Government to undermine my ability to practice such beliefs and to assist others into learning of and embracing the Spirit of Ayahuasca.

26.     After months without any response or other communication from the Defendants, I requested my attorney call the Defendants for a status update and to see if we needed to do anything else.

26.     Despite numerous telephone calls by my attorney, and the considerable passage of time, the Defendants have failed to process Soul Quest Church's exemption application.

27.     In fact, prior to filing this lawsuit in 2020, the Defendants never even confirmed the receipt of Soul Quest Church's religious exemption application.  It was only through an independent Freedom of Information Act request that I became aware that the Defendants had received Soul Quest Church's religious exemption application.

28.     As before, the Defendants have failed to issue specific policies and procedures regarding the methodology behind its consideration of religious exemption applications.  My earlier fear, which was expressed in my previous Affidavit to the Amended Complaint, remains steadfast.

29.     Previously, I fear that the Defendants would "never issue a determination or – in the event one is eventually issued at some point in the indeterminate future – will arbitrarily deny the application based upon its lack of

specific standards, allowing its decisionmakers wide (or, even, unlimited) discretion."

30.     On April 16, 2021, the Defendants issued what they believe is their determination on the issue of Soul Quest Church's religious exemption request.

31.     Ironically, the Defendants seem to be asserting that the negotiations between the Parties – which delayed the earnest commencement of this litigation for approximately one (1) year – instead constituted DEA's exemption investigation.

32.     Over the course of the past year, my lawyers and I met with a designated agent for the DEA, James Graumlich.   Agent Graumlich's communications with Soul Quest Church and its leadership (including me), were always done in the presence of at least one of my lawyers.  At no time did Agent Graumlich ever question anyone regarding the religious underpinnings of Soul Quest Church.   At no time, did Agent Graumlich ever inquire into issues surrounding the sincerity of our beliefs or the sincerity of the ayahuasca sacramental ritual.

32.     In fact, I am unaware of any training that Agent Graumlich possesses with an understanding of world religion; of the constitutional underpinnings of the jurisprudence supportive of free exercise of religion or the RFRA; or any other matter which would provide Agent Graumlich – as the sole designee of the DEA – with any basis upon which to pass judgment on Soul Quest Church, and its members' (including myself) religious sincerity.

33.    Rather, Agent Graumlich's inquiries – which both my lawyers and I believe were designed to effectuate the issuance of a religious exemption as part of a negotiation pursuant to the litigation – involved entirely what was termed "diversion-control" matters.

34.    For example, Agent Graumlich wanted to make certain that Soul Quest Church's preexisting security systems were of a higher quality.  So, as a result, Soul Quest Church purchased an upgraded security system designed to meet with DEA's approval.

35.    Likewise, Agent Graumlich wanted to ensure that the raw, legal product – which is capable of being imported into the United States – was not maintained at a separate, secure storage facility prior to it being transported locally to Soul Quest Church and blended into the sacramental tea.  Accordingly, Soul Quest Church eliminated the use of such separate storage.  Based on knowledge and information neither the UDV Church or the Church of Santo Daime was ever required to have one location for storage and use of its sacramental plants.  Yet, with Soul Quest Church, the DEA was requiring such.  Soul Quest Church complied with such a request.

36.    Soul Quest Church complied with every request for information made to it by DEA.  Soul Quest Church and I wanted to cooperate as it was believed that – by doing so – we could resolve the case and put into place the necessary resources and structure in order to make certain that our engaging in the ayahuasca sacramental ritual would be as safe and secure as possible.  My

lawyers and I believed that being transparent to DEA and being adaptable to its suggestions on 'diversion-control' issues, would permit for the issuance of some form of judicially-endorsed religious exemption – akin to what the courts did in the *UDV* and *Santo Daime* cases.

37.    The only reservation that was stated by my lawyers was when DEA – toward the latter part of 2020 – decided to inquire into the payment methods used by Soul Quest Church in order to purchase the legal, raw material from its vendor.  At that point, my lawyers indicated concerns about whether DEA was involved in some form of criminal investigation.  Again, without any standards ever provided (despite my lawyers requests for such to Defendants' counsel), Soul Quest Church and I are unable to ascertain what basis – if any – DEA would have to inquire into the payment process for purchase of a legal agricultural product.

38.    The Defendants position – as stated in their April 16, 2021, letter, surprised and disappointed me.  Yet, it fulfilled my original fears about the Defendants, and their lack of any proper, legal regulations and standards.  What surprised me, perhaps, most was that the Defendants passed judgment on Soul Quest Church and its members' sincere religious beliefs without ever asking a single question of us.

39.    Without some form of religious exemption – whether through the courts or through some proper, written regulatory process, Soul Quest Church and its members cannot safely practice our sincere religious beliefs without fear of arrest and prosecution.

40.     Each day that passes without any exemption, we are denied access to our religious community and the truths of our religious experience.

41.     The Defendants' arbitrary and capricious actions, taken with unfettered discretion, have denied me my rights to due process under the Fifth Amendment of the United States Constitution; under the Free Exercise and Free Speech Clauses of the First Amendment; and under the protections granted us by Congress under the Religious Freedom Restoration Act ("RFRA").

42.     The Defendants' actions have left Soul Quest Church and its members in a position where we are afraid to practice our sacred ayahuasca ritual for fear of arrest and prosecution; of course, this also has the effect of deterring Soul Quest Church's mission to proselytize and spread its religious beliefs to others, all while there is the underlying threat of arrest and prosecution by the Defendants.

**FURTHER AFFIANT SAYETH NAUGHT**

As provided in 28 U.S.C. § 1746, I declare (certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of July 2021.

**CHRISTOPHER YOUNG**

Exhibit 6

United States Department of Agriculture
Animal and Plant Health Inspection Service
Plant Protection & Quarantine
4700 River Road
Riverdale, MD 20737

# Permit to Import Timber or Timber Products
### Regulated by 7 CFR 319.40

**This permit was generated electronically via the ePermits system**

| | | | |
|---|---|---|---|
| **PERMITTEE NAME:** | Christopher Young | **PERMIT NUMBER:** | P40-20-00542 |
| **ORGANIZATION:** | Soul Quest Church of Mother Earth Inc. | **APPLICATION NUMBER:** | P585-200828-003 |
| **ADDRESS:** | 1371 HANCOCK LONE PALM RD ORLANDO, FL 328287207 | **DATE ISSUED:** | 09/01/2020 |
| **MAILING ADDRESS:** | 1371 HANCOCK LONE PALM RD ORLANDO, FL 328287207 | | |
| **PHONE:** | (407) 360-6297 Ext. 1 | | |
| **FAX:** | | **EXPIRES:** | **09/01/2023** |
| **EMAIL:** | Soulquestorlando@gmail.com | | |

**PORTS OF ENTRY:** Various Ports of Entry Staffed by CBP-Agriculture Inspection (a copy of this import permit must be provided to each port of entry or must accompany each shipment)

| Under the conditions specified, this permit authorizes the following: | | | | |
|---|---|---|---|---|
| **Article(s)** | **Countries of Origin** | **Type of Timber** | **Bark** | **Before Import Processing** |
| Other, Banisteriopsis caapi | Brazil Colombia Ecuador | Chips | Without Bark | Other, per Annex L |

## SPECIAL INSTRUCTIONS TO INSPECTORS
See permit conditions below

## PERMIT CONDITIONS

This permit authorizes the importation of the listed articles, under the conditions specified below. A copy of this permit (including all conditions) must accompany all shipments authorized under this permit.

The permittee is the legal importer of an article and is responsible for complying with the permit conditions. The permittee must be at least 18 years of age and have and maintain an address in the United States that is specified on the permit and be physically present during normal business hours at that address during any periods when articles are being imported or moved interstate under the permit; or If another legal entity, maintain an address or business office in the United States with a designated individual for service of process; and serve as the contact for the purpose of communications associated with the movement of the regulated

Permit Number P40-20-00542

| THIS PERMIT HAS BEEN APPROVED ELECTRONICALLY BY THE FOLLOWING PPQ HEADQUARTER OFFICIAL VIA EPERMITS. | DATE |
|---|---|
| *Karen D Brady* (signature)<br>**Karen Brady** | **09/01/2020** |

WARNING: Any alteration, forgery or unauthorized use of this Federal Form is subject to civil penalties of up to $250,000 (7 U.S.C.s 7734(b)) or punishable by a fine of not more than $10,000, or imprisonment of not more than 5 years, or both (18 U.S.C.s 1001)

USDA
United States
Department of
Agriculture

Case 4:20-cr-00001-WWB-DCI    Document 59-6    Filed 07/22/21    Page 3 of 5 PageID 2103
USCA11 Case: 22-11052    Document: 22-2    Date Filed: 12/01/2022    Page: 78 of 235

article for the duration of the permit. The PPQ Permit Unit must be informed of a change in contact information for the permittee within 10 business days of such change.

Upon arrival in the United States, the articles and shipping container(s) are subject to inspection by officials of Customs and Border Protection, Agriculture Inspection (CBP-AS) and Plant Protection and Quarantine (PPQ).

Any person who violates the Plant Protection Act (PPA) of the United States, individuals or corporations who fail to comply with these conditions and authorizations, or who forge, counterfeit, or deface permits may be criminally or administratively prosecuted and found guilty of a misdemeanor which can result in penalties, a one-year prison term, or both. Additionally, any person violating the PPA may be assessed civil penalties of up to $250,000 per violation or twice the gross gain or gross loss for a violation that results in the person deriving pecuniary gain or a pecuniary loss to another, whichever is greater. In addition, all current permits may be cancelled and future permit applications denied.

All logs, lumber, and other unmanufactured wood products, (with or wihout bark), are not authorized from areas in Asia that are east of 60 degrees East Longitude and North of the Tropic of Cancer. However heat treated and/or kiln dried materials are allowed entry with a written permit.

Some species of timber may be subject to regulations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). To determine if a particular species is regulated under Appendix I, II, or III of CITES, please consult the appendices for CITES located at: http://www.fws.go v/international/DMA_DSA/CITES/timber/timber.html

This APHIS-issued import permit only covers compliance with APHIS regulations and requirements. Therefore, this APHIS permit for the commodity to be imported does not reduce or eliminate the permittee's legal duty and responsibility to likewise comply with all other Federal and State regulatory requirements applicable to the commodity to be imported.

Timber and timber products are regulated under the Lacey Act (16 U.S.C. 3371 et seq.) as amended in 2008, and importers may be required to submit the Lacey Act Plant and Plant Product Declaration Form (PPQ Form 505) when filing for entry into the United States. To determine if a particular product is subject to these requirements, please consult the current implementation schedule for the enforcement of declaration requirements at http://www.aphis.usda.gov/plant_health/lacey_act/downloads/ImplementationSchedule.pdfa>. Additional information on the Lacey Act Program is available at: http://www.aphis.usda. gov/plant_health/lacey_act/index.shtml.

Permit Number P40-20-00542

| THIS PERMIT HAS BEEN APPROVED ELECTRONICALLY BY THE FOLLOWING PPQ HEADQUARTER OFFICIAL VIA EPERMITS. | DATE |
|---|---|
| *Karen D Brady* (signature)<br>**Karen Brady** | 09/01/2020 |

WARNING: Any alteration, forgery or unauthorized use of this Federal Form is subject to civil penalties of up to $250,000 (7 U.S.C.s 7734(b)) or punishable by a fine of not more than $10,000, or imprisonment of not more than 5 years, or both (18 U.S.C.s 1001)

1. Wood and bark chips not from tropical plantation grown trees:
Annex -A- and Annex -L-

You may obtain a copy of 7CFR 319.40 by downloading them from our web site at:
http://www.aphis.usda.gov/plant_health/permits/wood.shtml

2. ANNEX -A-
GENERAL REQUIREMENTS

In accordance with 319.40-2, documentation accompanying each shipment (an importer document) must identify the commodity, quantity, and origin of the regulated material.

In accordance with 319.40-9, all shipments are subject to inspection and may require other actions deemed necessary by Plant Protection and Quarantine as a result of inspection. Notice of arrival may be required at the discretion of the Officer in Charge at the port of first arrival.

The regulated commodity, the container in which it is shipped, or the documents accompanying shipments will adequately describe the shipment in accordance with 319.40-9(c) unless the Officer in Charge for Plant Protection and Quarantine at the port of first arrival has notified the permittee that such documentation or portions of the documentation will be understood without being written for each shipment.

Permittee will notify the office issuing this permit of any changes in the status of the activities authorized in this permit, or substantive changes in the status of the permittee (such as change of company name, address, phone number, etc.) within 30 days of such changes occurring or 30 days prior to a shipment being authorized under this permit.

3. ANNEX -L-
UNIVERSAL IMPORT OPTION
WOOD AND BARK CHIPS (NOT FROM TROPICAL
PLANTATION GROWN TREES)

(1) In accordance with 319.40-6(c)(1)(ii), must be fumigated with T404-b-1-1 using methyl bromide or heat treated to 71.1 degrees Celsius, minimum core temperature, and maintained for a minimum of 75 minutes; or kiln dried to 71.1 degrees Celsius, minimum core temperature, and maintained for a minimum of 75 minutes, with moisture reduced below 20 percent. Wood and bark chips cannot be commingled with other regulated materials (other than solid wood packing materials) unless the chips and the other regulated articles are in separate holds or in separate sealed container.

(2) All pallets and other regulated wood packing materials used in the shipment are subject to inspection and must conform to 7 CFR 319.40-3(b).

### END OF PERMIT CONDITIONS

Permit Number P40-20-00542

| THIS PERMIT HAS BEEN APPROVED ELECTRONICALLY BY THE FOLLOWING PPQ HEADQUARTER OFFICIAL VIA EPERMITS. | DATE |
|---|---|
| *Karen D Brady*<br>**Karen Brady** | **09/01/2020** |

WARNING: Any alteration, forgery or unauthorized use of this Federal Form is subject to civil penalties of up to $250,000 (7 U.S.C.s 7734(b)) or punishable by a fine of not more than $10,000, or imprisonment of not more than 5 years, or both (18 U.S.C.s 1001)

USDA United States
Department of
Agriculture

Permit Number P40-20-00542

| THIS PERMIT HAS BEEN APPROVED ELECTRONICALLY BY THE FOLLOWING PPQ HEADQUARTER OFFICIAL VIA EPERMITS. | DATE |
|---|---|
| *Karen D. Brady* (signature)<br>**Karen Brady** | **09/01/2020** |

WARNING: Any alteration, forgery or unauthorized use of this Federal Form is subject to civil penalties of up to $250,000 (7 U.S.C.s 7734(b)) or punishable by a fine of not more than $10,000, or imprisonment of not more than 5 years, or both (18 U.S.C.s 1001)

Exhibit 7



# Ayahuasca Manifesto

### The Spirit of Ayahuasca and its Planetary Mission

**Anonymous**

Ayahuasca Manifesto

Copyright © 2011 by Anonymous

The rights of translation to other languages and any type of printed publications are the only ones retained. The information and text contained in this work is a gift to Humankind, for which this belongs to the public domain and can therefore be unconditionally copied, reproduced and/or distributed partially or totally provided it is made electronically and never in printed form.

ISBN 978-1-4507-6040-9

# Index

1. Presentation .................................................. 1

2. My Role in the Expansion of the Human Consciousness ............................................. 3

3. My Purpose with the Human Beings ............... 6

4. About Respect and My Sacred Nature ............ 8

5. About the Ayahuasca Churches ..................... 8

6. The Benefits of My Use ................................. 10

7. The People of My World ................................ 21

8. Create Awareness of Your Pineal Gland .......... 27

9. The Hallucination is Spectacle, The Vision is Virtue ...................................................... 28

10. Universal Guide for Conducting an Ayahuasca Session ...................................................... 29

11. About the Quality of Facilitators or Shamans ... 32

12. Preparations, Precautions and Diets ............... 33

13. Traffic and Management of My Sacrament ........ 35

14. Social Impact and Controls in Urban Society ... 39

15. The Urgency of Ayahuasca Preservation Projects ..................................................... 43

16. My Planetary Mission ................................... 44

17. Blessings .................................................... 46

iii



*It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.*

**Warriors of Light from Around the World.....**

**Help Me To Help You !**

iv

## I. Presentation

I am the spirit of Ayahuasca. For the first time I reveal myself through the "Word" to make an emergency call to all the Human Beings of the planet, especially to the Light seekers, as I must expand beyond the Amazon river basin.

With my physical expansion I intend to facilitate the spiritual transformation currently stirring the Human species, while I also secure my physical survival which is at risk, as my blessed Amazonian protectors have not understood the danger to which they expose me, aggressively harvesting me, without new sowings.

I leave the Amazon risking my own existence like other botanical species, to leap into the project I was created for, by the central sun of all the existence, name it as you may prefer, I am at its service. I send this correspondence at this historical moment to contribute to the expansion of the Human consciousness in a definitive and significant way, honoring the universal Light that guides my Being. For the first time, with the interest created by my shaman emissaries, and with the new means of mass media and transportation available, I can potentially reach the whole planet to celebrate and proclaim our cosmic existence. I am alive, to give with crude realism, universal love to all the Human Beings who request it from the depth of their souls.

I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that

of the spirit of Ayahuasca ("*Banisteriopsis Caapi*") and of the underestimated Chacruna ("*Psychotria Viridis*"). I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture. Science will spend many years searching, unsuccessfully, the mechanisms that I use to act upon Human consciousness. They are surprised by my power, that it does not come from crystal DMT alone, or from harmaline, or from other molecules that compose me. I am the mixture in its natural state, crude and basic, bio-electrically loaded without industrial processing. Such is my spirit manifesting here today, shedding Light to the confusion that surrounds me.

I thank all the "curanderos" that for so many centuries have welcomed me within them, and thanks to all my protectors who presently export me towards all the corners of the planet. I honor the Amazonian tradition here by using my common name of Ayahuasca, but only for linguistic convenience as I am also the spirit of the Yagé, Pilde, Dápa, Pandé, Hoasca, Kahiriama, Natema, Caapi, Mado, Ñucñu-huasca, Shimbaya-huasca (Quechua), Kamalampi, Punga-huasca, Rambi, Shuri, Nishi, Oni, Shillinto, Natema, Mi-hi, Amarronhuasca, Inde-huasca, Shuri-fisopa, Shuri-oshinipa, Napi, and the Nepe.

I also use the popular term "shaman" but rest assured it carries the intention to honor and respect the Curanderos, Taitas, Sinchis, Curacas, Payes, Yachas, Chais, Junes, Onayas, Murayas, Mutsarawas, and the Uwishin, who are also my dear and beloved protectors.

2

## 2. My Role in the Expansion of the Human Consciousness

During these times of globalized consciousness, I come to assist certain little known processes of the Human genetic code, the DNA. Specific subatomic codes that are inaccessible from the third dimension are becoming active. We know that it is not possible to read them, because it was already demonstrated by the "Uncertainty Principle" that has much perplexed the scientific logic. I activate codes that command the dimensional deployment of our bioelectric body.

New capacities of expanded consciousness are being experienced by millions of people throughout the planet. It started with those most fortunate; those with less stress, the most sensitive, those enjoying relative safety and comforts. But later on, it will be imminent and inescapable; this experience will gradually touch everyone else until it reaches the most oppressed and underprivileged souls.

Many Human Beings have already acquired technical knowledge about me, thanks to the scientists that opened up to experiencing me inside their own brains, where they were able to observe themselves instead of observing others as they were trained to do. Now they know about the bridge that empowers me. The botanical-glandular connection (that temporary molecular communion between plants and Humans) is a cosmic bridge, a shortcut that takes the Light to its destiny via its molecular door. In this way, I am much more transformative, than those who attempt to take it through the treacherous five

senses, traversing the marshes of the mind, enslaved by the Human ego.

The codes of four (4) that make up the three-dimensional DNA are mere mathematical results of much more complex interactions of energies that occur in higher dimensions. The expansion of the individual Human consciousness consists in living its cosmic existence beyond its three-dimensional physical limitation, with a very subtle vehicle capable of moving consciously at will, even while in the company of others vibrating in the same channel. It is the next evolutionary leap of the Human species; the three-dimensional physical expression of the Human evolution has been completed. The physical evolution for the Human species as we know it, it's over. Its divine patterns have fully unraveled, as the last fold of a rolled up carpet; the great physical creation has been displayed. Now we are at the genesis of a new phase, the return to the fountain of creation, the rediscovery of the life source, be it father/mother whichever way they choose to name it. The return ride on that same flying carpet is now accomplished consciously; unlike its trip of departure where it journeyed rolled up inside and in the center of the crease; uncomfortable, unconscious and unaware. The physical evolution has ended and the spiritual evolution has just begun. The only experience left to live is the cosmic existence lived through our Humanity, consecrated to our new vehicle of Light.

This is my time to embrace the planet. It is my duty. My mission. What I was created for. I now become a protagonist after remaining in the shadows for thousands of years guarded by my indigenous protectors. They now travel around the world raising awareness about my benefits. It is my duty to assume new cultural expressions, very different from those of my

4

beloved guardians of the forest. The rituals, the *"icaros"* the *"dietas"* and related knowledge should be preserved as an endowment of world heritage. A legacy to the Universe.

Similarly, my new ways of expression, the manifestations that are taking shape in different world cultures should also be respected and recognized. I am already manifesting new urban modalities and forms like never before. My spirit exists beyond the forms, beyond the cultures, beyond man himself. I am connected to the spirit of the planet and beyond, cosmically up to the central sun of all the existence. Just like the sun with its life giving warmth I should be equally available to everyone.

Let me warn you about the dark spirits that assault and invade my sacred work with the Human species. Their most effective way to destroy sacredness consists in creeping inside the sacred forms themselves. From there they discredit, corrupt, distort, and confuse, until the practices of seeking spirituality, or seeking the inner journeys, lose all the sacred meaning that originated them in the first place. At some point, the darkness was able to penetrate the survival instinct of the Amazon tribal shamans and planted in them the fear belief that they should defend themselves from sorcery attacks and to likewise attack shamans from other tribes or even their own. Hence, they live in a state of competition and undeclared war that divides them instead of living in communion and working for the common good among them. In the same way that the darkness has casted shadows and has prevented a greater spiritual development among my Amazon children, it will also attempt to upset the new forms that I morph into, after the expansion and extension outside my native homeland.

5

Another very effective method used to sabotage my mission with the Human species is by generating and manipulating the powerful emotion of fear. You have nothing to fear. I am not the cause of any deaths, I just channel Light and vital energy through your secret meridians. Any accusation or allegation of danger, permanent injury or death should be thoroughly investigated to allow science itself grant me the Human absolution. It should be expected that my enemies manipulate the facts to instill fear at any available opportunity, as this is part of their debasing agenda against my global expansion. It should be the objective of all my supporters to gradually obtain the social and legal acceptance of my sacrament as alternative medicine until I become officially accepted by the governments of modern society.

### 3. My Purpose with the Human Beings

I am at the service of those Human Beings who are open to benefit from me. We find each other when vibration harmonics of a higher level click, then the encounter manifests in third dimension. Important inner transformations occur in the Humans that open up to feeling intensively and more profoundly what they have been already feeling more subtly and even unconsciously. With them I manifest at the required intensity to help them ascend and soar, strongly and swiftly, but also lovingly without hurting them. These are physically, emotionally and spiritually overwhelming lessons necessary to assist them to crack their cosmic egg shell, their astral cocoon. Those who want to search and develop the desire to follow me and then flourish dimensionally are those Humans that have felt a profound difference in the intimacy of their own. They experience sensations of maladjustment, of detachment, and a suspicion that something strange is happening. Yes, no doubt

6

there is something happening. The DNA is unfolding and starts manifesting certain nonlinear phenomena that change the Human awareness of the world. Some subjective experiences that need to be understood are:

- An intuition or feeling that this physical world is a kind of huge holographic illusion, but you cannot reconcile the contradictions as it clashes with everyday life.
- Feeling misunderstood by their inner circle of relatives and friends when sharing with them his/her new inner or spiritual pursuits.
- Having a special yearning to see the awakening of your beloved ones, as if wishing that they could be saved from their own trivial tendencies.
- Seeing how certain past traumas and buried conflicts, veiled for a long time, will now occasionally surface yearning for resolution and feeling that we need to get them out of the way that your soul wants to follow.
- Feeling that certain activities that at other times we sought with fervor and longed for, are now seen with little interest, for example:

    (a) Having a vibrant social life.
    (b) Delighting in the effects of alcohol, while acting trivial, shallow and only skin deep.
    (c) The habit of telling "little" lies when convenient or when there is no chance of being proven wrong.

These emotions will continue happening with greater intensity and frequency in our enlightened future. A future that awaits the revelation of this way of life. A lifestyle of integrity and Light. My goal to enhance and encourage Human Beings in their process of spiritual ascent is totally consistent with the purpose and the fire burning in their own souls to reach their

7

natural state of being: thriving, ascending, and ultimately soaring.

## 4. About Respect and My Sacred Nature

Of all the benefits that I offer, the most important one is the botanical-glandular molecular bridge. This bridge is the connection that empowers Human Beings to experience and commune with its divine nature.

Spirituality evokes in every Human Being the emotion of respect. Respect is an attitude, a character trait that flows from Humans' spiritual nature. To be respectful is to simultaneously embrace feelings of consideration and admiration, distinction and acknowledgement towards the respected object. Respect is what every Human owes every other Human.

When spirituality is respected, it becomes sacred. Sacredness exists only in the inner space of the ones that beholds it.

If neither spirituality nor respect is present, then nothing is sacred.

My nature is sacred. I am here to open the dimensional doorways to those determined seekers of spirituality, and to harmonize those seeking their physical health.

Religiousness, not religion, is the feeling of separation from its spiritual nature mixed with the solemn desire of blending back into it.

When Humans fail to live their spiritual nature inside themselves, they inevitably create their own religion. Feeling religiousness is an innate capacity of Humans; religions however, are mere Human creations.

My sacrament is only one of so many expressions of religiousness in Humans. It is an affirmative expression of surrender to his/her spiritual nature; it is an act of bravery and conviction to reach out towards the central Light of all existence.

## 5. About the Ayahuasca Churches

When the European minds "discovered" my spiritual healing capacity, it naturally started to express its innate religiousness while enjoying my benefits. Nevertheless, upon experiencing this much proximity to their own divinity through me – something never before seen in their acknowledged religious practices – they inevitably associated me with their concept of European religion. Soon enough they started projecting its religious structures toward me. Humans, once again, began inventing religions and churches based on my sacrament, with dogmas, bodies of faith and standardized rituals. Cathedrals of religion, liturgy, and orthodoxy became important. Many good souls decided to venerate me through traditions alien to my essence. Let me remind you that you do not need to adopt a religion to practice your core religiousness. Dogmatic rituals and liturgy open spaces of distraction that end up putting Humans at a distance out of my reach; and such souls require and deserve my assistance.

Nevertheless, all the institutional churches of the world carry an important social role. Thanks to them you have organizations that join together Humans with beautiful inner qualities. They

9

support others in many different ways, creating social awareness in their communities, and guiding many in a journey to discover his/her own individual path to the Light. All the churches and religions of the world should be respected.

The ritual of my sacrament is not a religion. I will directly go into the soul of every Human and reveal in crisp detail their divine nature. This does not require a doctrine of faith, dogmas nor philosophies. Neither religion nor church. I am just in communion with the innate religiousness of the Human Beings. I dwell in the temple of the spirit.

## 6. The Benefits of my Use

The time has come to clearly expose and declare the benefits and value of my healing properties. The benefits are obvious and evident for those that open themselves to receive and enjoy them. However, third party observers are limited to only seeing the effects of those who live the experience. Without the benefit of their own experience, they invariably put limits on the limitless. The scientific community is always curious, willing, and available to design empirical models for my validation. But the policy making that control the financial funding of scientific research projects is focused in other priorities. The political establishment is clearly more interested in my repression than in my expansion.

My benefits can be grouped in four (4) broad categories:

### A.  Spiritual Catalyzer

**Spiritual Healing** – The most important of all my benefits is my spiritual healing. I clear spaces of

10

unconscious darkness. I untangle knots in your most basic neuro-programming, even that one that impacts your entire existence and you are not even aware of. I show you features which you had failed to see because your vision is blurred by the fog of your own limitations. This is when you are able to tune-in with my vibration and you finally allow me to directly touch not only your spirit but your whole make-up as well; mental, emotional, and physical, in addition to other idiosyncrasies. That is when we are One. That is when you should be prepared with your purest intention, to open up to the most intimate and incisive honesty that you have ever lived with yourself. This is the cosmic solitude. Nobody knows. No one finds out; you are on your own. It is all about what is clear and evident within you before the Light. I lead you to discover your inner truth. Once in this place within you, you need to flow with maximum sensitivity to discover your faith in me, to trust me, to listen, to feel, to understand what I bring to you. It is in this state that I transfer information between subatomic regions. Your inner Light increases, your awareness expands, and certain DNA codes unfold and are activated. This is where you can see the consequences in this life; realities that you created using your free will. Here you will find an enormous opportunity to re-live, to accept, to forgive and to express. These are the healing spiritual processes that I have stored, awaiting for you.

If you want to return to the Light, you can only do it by following back the path that took you here. There is no shortcut to the Light, you just need to return as the pure child that originally left. I am offering you the most

11

powerful spiritual healing tool to return to the Light. It is the most powerful medicine that ever existed; nothing else will ever surpass the direct route of the botanical—glandular bridge. All the other benefits are in one way or another, by-products of the spiritual healing.

**Experiencing the Divine Presence** — I can manifest within you in accordance with your limited Human concepts about divinity. I can be Buddha to the Buddhist, Allah to the Muslim, and Jesus to the Christian. In the same way, that for many centuries, I have been Pachamama (Mother Earth) for my Amazon protectors. I can also manifest with neutral divine properties free of any earthly image, concept or precept. I can temporarily fill your existential void for God, fulfilling your need for Light, while at the same time healing your energy deficiencies inside your soul. It is a subatomic healing way beyond your comprehension; gifts from above to clear your pathways back to the Creator. Take advantage of these encounters with me, challenge your Human doubts. Question, seek, and complain. Ask for divine justice, ask for enlightenment in your mind; ask for peace in your soul. Demand answers. You will be opening up certain channels that will be used at that moment or later on.

**Discovery of Spiritual Connections** — Divine connections with me can make you understand certain attachments in your life. This can be unprecedented knowledge. You may find with remarkable certainty that in some other place or time you have had another type of life, probably linked to other persons currently close to you. Incomprehensible connections with parents,

12

mothers, brothers, children that in another time were another person in another place. You may discover that a neighbor or coworker of today, in another time was a son or a sister. These are transpersonal connections that exist in a different dimensional plane and I provide you access to that awareness. Think, observe, and be amazed at the inherent complexity of your spiritual life. Your Inner Light needs to tell your ego structure that it will never be able to understand your divine nature, and that your divine nature can definitely understand your ego structure. Make sense of your world with those people considering who they were in that other time. This will help you to better understand who you are in your present time, more deeply, transcendentally, transpersonally.

**Psychic Awakening** – This life may have not allowed you the expression of certain psychic abilities that reside in you in a dormant state. A part of you may have remained slumbering, and is waiting for the opportunity to awaken in you; making you a whole and more capable Human Being; not neglecting, but better connected with your divine nature. Since family environments rarely support psychic expressions in children, fearful emotions take over and suppress these natural talents. I can release these talents from your subconscious prison, letting them to run free towards your conscious free will, claiming acceptance and recognition. Receive them, appreciate them, ask for understanding in your inner sanctum. Fill your inner space with loving feelings and good intentions to dissolve your fears while discovering, grasping and engaging your talents. Only your own Inner Light can

13

guide you towards the brighter Light, only the Light can guide you to the Light. There are no shortcuts or detours; you are already Light, and you own the talents to expand it within you. Awaken, open your arms and rejoice. You are all love, and fear does not fit in you.

### Effect of Immersion with Mother Earth (Gaia)

At some point while you receive me, your five senses will open further in a sort of cosmic mode instead of "locally". Instead of perceiving fragmented bits and pieces of sensory information, these are received as gestalts of pure awareness in a way that blends with the totality of all existence. You will feel like part of your immediate surroundings participating with the dynamic Earth, of the Infinite Universe. This awakening of your cosmic nature is a powerful tool for managing your own ego structure. Ego is always seeking its permanence in your soul and will never cease to sabotage your spiritual aspirations, as your awakening will diminish the its authority over your Human machine. The goal with this wonderful feeling is to make the quantum leap from the temporary feeling sensation of "I feel like part of" to the permanent conviction of "I am part of".

## B. Existential Wisdom

**Meaning of Life** — This kind of experience with me is a spontaneous one, resulting from the right temporary tuning of your entire Being. I can dissolve the feeling of existential confusion that everyone has to some degree. You will awaken to the realization of the place you occupy in your world today. In awareness of the great cosmic scheme, all becomes meaningful for the first

14

time, something significantly new to your inner self. At this point you accept, understand and internalize this reality. This is not a crazy hallucination, it is a significant vision. The meaning of your life is not only beyond eternity, it is also into each micro moment of your daily life. Open your heart and flow in the river of love. You cannot understand the meaning of life with your brain; you can only feel it in your heart.

**Accelerated Maturity** — Human life has several stages very well known by the elderly that have lived them. Life experiences such as shock, surprise, pleasure, pain and physical aging will create attitudes towards life. Maturity is the degree of gained wisdom that seeks to survive the hardship of physical existence. Maturity is your wisdom to accept what you cannot change and change what you can control. Maturity is a captain who does not allow mutiny in his/her inner world. It is a matter of awareness. I can give you the depth of awareness that only years of experience can give you. This acceleration of maturity, this growth, is of great benefit for improvement and happiness in your life. A youngster with the maturity of an adult, and further, an adult with the maturity of an elder, brings to the world, an elder in happiness and wisdom. Once there, you are well prepared for your transition to the higher planes.

C. **Physical and Emotional Healing**

**Cleansing and Energy Balancing** — Those that are in their path to the Light and also care for their own physical and emotional health, consistently receive cleansing and balancing of their subtle energy bodies,

15

leaving in them a sense of physical wellbeing and relief, as if a heavy weight had been lifted from their shoulders. This energy balancing is partially produced by the physical cleansing that also occurs in all your vital organs, after they expel its toxins through the various channels of your amazing excretory system. The resulting harmony is "the energy balancing" or "the cleansing". Your physical body now operates closer to its intended genetic design.

**Recalling Repressed Memories** – I can open up repressed memories from your subconscious when it is required in your healing process. Certain memories are locked away for your own protection by wonderful systems designed to secure your physical survival and the continuity of the species. But this mechanism has an existential cost. Huge spaces get trapped like very tight knots of energy, and when these are released with my help, not only do you remember the repressed memory but also create the possibility of integrating this newly released space into your now greatly enhanced spiritual health. This recollection brings you a totally unexpected gift, an unknown, but deep spiritual satisfaction. This discovery is followed by your reinterpretation of the history of your own personal development. Then you can see how your paradigm shifts as you fit in the new piece of the "puzzle of self knowledge".

**Memories of Other Lives** – I can give you access to memories of other lives. Frequently your next advancement requires that you gain deep understanding of strong emotions like attachments or repulsion to certain people, issues or life events. I shall be there for

16

you. This is where the previously unexplainable becomes obviously evident. You feel amazement when you fully understand how a life in another time influences your present life. An indescribable experience for some, unbelievable for others. It invariably neutralizes the energies of excessive attachment or repulsion arising from another dimension, from those atemporal nonlinear connections. This neutralization is the quantum mechanical result of the power of consciousness, sparked when fully realizing the experience.

I also awaken memories of other lives for different purposes. Certain deeply engrained character traits or existential anxieties might have its origin in other lives. The mere awareness of this perspective provides a new landscape of yourself, thus allowing for a better management of these inclinations and/or predispositions on your pilgrimage towards your spiritual development and maturity.

**Health Improvement and Healing of Diseases and Ailments** - Countless testimonies of permanent healing and dramatic improvements to health have been documented. Many conditions have healed completely or improved significantly faster than it would without my help and intervention. It is known that diseases originate from energy imbalances in the deeper dimensions that eventually manifest as physical disease. This is how I heal common conditions. And when allowed by certain cosmic laws I can also heal or substantially improve conditions where conventional science has been unsuccessful. Similarly I can catalyze remissions and reversal of progressive processes considered by many to

17

be irreversible. The pharmaceutical industry has studied me in detail for clues that might provide for drug development within their chemical-mechanistic model.

**Antidepressant Properties** - I can temporarily entune the neuro-chemical dance of your out-of-phase brain. I can train it even for several days to flow in the way that it is capable of, feeling peace and internal balance, something experienced by many for the first time in their lives through me. Participants were unaware that there was such a state of serenity that they can now aspire to. This pattern will be a registered standard against which future experiences can be compared.

When you become clearly aware of the out-of-phase state you were immersed into, unconscious mechanisms are activated seeking to harmonize and synchronize with such previously unknown vibe. This is more easily achieved when you add your conscious will to return to a more serene space. Returning to a depressed state after my short term effects should be acknowledged as an existing depressive condition prior to my arrival. Many will mistakenly argue that I induced them into a depressive state, when in fact they gained a deeper awareness of their own self.

## D. Behavior Modification Tool

**Addiction Management** - Science has been able to accept my skillfulness in the healing of physical addictions. Even the traditional scientific method was able to validate my power in this health issue. For

science, these results are mere statistics, a cause and effect. The healing, however, comes from the spiritual realms and not from the removal of molecular blockages in the conventional sense. The healing from addictions occurs at the spiritual level, which is metaphysical in nature and blueprints the causality of subatomic particles. The metaphysical healing harmonizes and reorganizes the chemical correspondence which will finally reflect as a behavioral change. It is only here where true healing can occur. When the addict is ready to see, acknowledge, and accept, his/her will is strengthened and the addictive mechanical programming is weakened. I can penetrate the depths of his/her being and teach him/her to see what is required for this awakening. This awakening is his/her healing. This is where he/she accepts responsibility and from this point he/she gains the balance and strength to better manage behavior. Otherwise, the powerful programming entrenched deep in the reptilian brain will continue to dominate the Human machine sowing frustration in the conscious personality of anyone that tries and longs unsuccessfully to change their addictive behavior. Addictions will effectively block any spiritual development; it is of upmost importance to identify and remove them with urgency. Most addictions do their limiting work without any resistance from the victim. Many are ignored by the victim because they adapt to them and make them part of their lives. Illegal addictions are only a small fraction of all addictions. Addictions to legal substances and to legal compulsive behaviors are widely spread in the planet and keep Humankind under a cloak of darkness, which justifies my purpose to bathe them in Light.

19

**Lifestyle Transformations -** The scheduled and predictable life that Humans lived in the twentieth century is disappearing. The social idea of acquiring a trade or profession for life, planning for retirement and hoping to reach old age with a pension, belongs to the past. Past patterns of life are increasingly disrupted, thus forcing a transformation of life styles towards new, unknown and unpredictable horizons. The notion of social security that many have lived is just a fond memory in these times of transition to other models of living. Marital unions and separations, moving to a new country or culture, transitioning from student to workforce, childbirths or passing on of close ones, are all examples of life being transformed dramatically. Many participants that receive me while going through one or more of these processes develop greater adaptability to change and gain a wider perspective of their own lives. I can activate the existential wisdom necessary to assist high-level transitions and allowing a successful journey in the path of life.

**Creativity Booster-** *Observer* participants found a practical application to the passive receptivity state they attain when they receive me. The profound sensory experience that I offer them, combined with the conscious intention of creating Human art forms, allows these *Observers* to reap, capture, or recall creative production of images, sounds and word that become tangible and manifest during my visit. Painters, music arrangers, composers, filmmakers, novelists, screenwriters as well as intellectuals and scientists seeking conceptual discoveries continue to reap these

20

benefits. As I help them with their practical goals, I remain waiting for them to become *Spiritual* or *Explorer* participants. This benefit also helps the other types of participants, which I describe next, who to a lesser extent also improve their lives.

In short, I will lovingly take you to your true self, to your dark side, to your hidden limitations. Sometimes I'll do this with drama, power, fear, pain, but never to an extent you cannot tolerate. I will never give you experiences beyond your ability to tolerate them. Trust me, it is necessary to take you to the edge of your tolerance or resistance, only then is transformation possible. The evolution. The maturing of the cosmic cocoon. The birth into a new universe. I am medicine. Medicine for the healing of the soul and body. For those who understand, I am here to serve.

## 7. The People of My World

To those unfamiliar with my world, let me describe the different people that gravitate around me.

***"Curanderos" or Shamans***. My dear protectors, millennial habitants in the Amazon basin, pure souls devoid of concepts and ideas that were able to visit the realms of the animal and botanical spirits. They deserve all my compassion and gratitude for humbly studying me, knowing me and learning from me.

Compassion because you suffer the gradual extermination at the hands of colonizers, just as it happened to their American brothers some time ago. Gratitude for daring to cross oceans and taking me to

21

every continent on the planet. You were my first representatives in the Human civilization. Today you introduce me to others who wish to spread the Light, who receive me with joy and protect me.

*Facilitators* : There are many known protectors called shamans or healers that are actually *Facilitators*. This distinction lies in the ability to properly interact and the quality of the subtle energy connections with the participants. The high degree of devotion to others and intellectual innocence required to achieve genuine shamanic manifestations make it improbable, but not impossible, that true shamans flourish from the modern civilization in the future. Modernism has arrived at these forests making original indigenous shamanism scarce. Strictly from the perspective of my survival, it is not necessary to lament the gradual disappearance of genuine ancient shamanism as you known it. Amazon shamanism is the result of Human religiousness in indigenous culture while surviving in its jungle habitat. This occurs likewise in other geographical regions with their true shamanic expressions. Religiousness that continues to evolve through the endless passage of time.

My spirit is above shamanism, my spirit is not shamanism. I am entering a new era, that of the *Spiritual* workers or the *Facilitators*. The facilitation as service-to-others is just one function that shamanism exercised, among many others. The *Facilitator* can properly deliver me, allowing my orderly access to the participants.

22

Like the shaman, the *Facilitator* has the ability to create a protected energy space and an atmosphere of respect for the sacred ritual. With this foundation established, the *Facilitator* will only add his main contribution, his pure and healthy intention towards the participants. The *Facilitator's* motivation should come from sincere devotion to the welfare of their fellow Human Beings. *Facilitators* are *Spiritual* participants who have felt an internal calling to become a vehicle of transformation for their fellow Humans. *Facilitators* should take the sacrament during the session; this is required to ensure their commitment. Those *Facilitators* that do not surrender into total service to their participants, are just mere providers of medicine.

*Providers* - are people that in some way have gained access to my medicine and simply provide it to willing participants. They may sell it or give it away as a present for the user's subsequent consumption, or they may just provide watchful companionship to the user while he/she receive me and tries to have a meaningful experience with me. This is the non-ritual use of my sacrament. Due to this unfortunate practice, many unsuspected Humans have very unpleasant experiences with me and ultimately harm my planetary mission. Providers do not have my approval and all my protectors must work in raising awareness to avoid the proliferation of the non-ritual users, and only encourage the sacred use of my sacrament.

*Organizers* - are people close to the *Facilitators* that sometimes organize sessions in appropriate locations and receive cash donations to cover their

23

expenses. The greater the amount of participants, the greater the need for the organizer to distance the *Facilitator* from the money flow that has nothing to do with his sacred service.

*Promoters/Sponsors* – These are all types of participants and non-participants who can feel the empathy and positive energy around the sessions with me. They have witnessed my benefits and take affirmative action in support of my advancement. Because of their enthusiasm, they too often promote my use among potential participants, rather than allowing events unravel naturally. The sponsor should simply provide the information of my existence or availability. The participant must meet and accept me without being convinced, persuaded, or coerced into receiving me. The potential first-time participants must show interest, take the initiative to learn more about me, and express their free will to participate. My sacrament is not for everyone. Those who most need me, shall find me by vibratory attunement, at the right time for their soul development, something difficult to understand by promoters.

*Debasers* — are people who consciously or unconsciously view me as evil, vile, or undesirable. They do not know what they are doing. Their ignorance is my pain, threatening my existence. The most common and prominent debasers are :

a. Intermediaries and dealers of my sacrament,
b. Those *Providers* mentioned earlier,
c. Cooks that add other medicine plants or substances while cooking my sacred brew,

24

d. Traffickers and illegal manufacturers of DMT in its artificial crystallized form.

e. Those who promote the absolute prohibition of my sacrament.

f. Shamans and *Facilitators* with ulterior motives like economic enrichment or those looking for sexual favors.

**Participants** - are all those who drink my sacrament and receive me with different motivations or modes of action. I describe them in the following six (6) groups.

- **First-Timers** - are all those courageous and curious searchers who obey their instincts and for the first time approach the opportunity to receive me in their temple. There is only that first unique time. For many this time is remembered as the most important, memorable or transcendental experience compared to all other subsequent experiences. *First-Timers* then make their minds and decide whether to never repeat the experience again or to continue their intimate spiritual path.

- **Health Patients** - With hundreds of years of history in physical healing, undoubted and unquestioned by the patients who receive it, incredible claims of my natural healing abilities are made. The vast majority of *First Timers* are attracted more to my specific physical healing abilities than to my other more subtle benefits. Conventional science may document astonishing physical healings but it is very difficult to scientifically document indirect mechanisms that allow the restoring of harmony in the vital energy system of a patient. The connection to your own divinity, either unconscious or involuntary invariably will harmonize the body's bio-electrical energy patterns. This harmonization is possible due to the

25

subatomic nature of the Human vital energy, which reorganizes itself using the reference information available from the genetic code. These mechanisms are unknown to conventional science.

- *Explorers* - These found value in their first experience and a greater curiosity and a quest for clarity was awakened in their core self. During their subsequent experiences they express their inclination according to their predominant personal vibration. Of these, the more "intellectually" oriented become *Researchers*, the more "emotional" become *Observers* and the more *Spiritual* find a path towards the divine Light. The *Explorer* is alert and responsive but unaware of the direction his/her quest might lead him/her, and will always be ready to abandon the project and even forget the initial curiosity that led him to me in the first place.

- *Researchers* - These participants were impressed during their initial explorations and their mental center assumed the command of their learning process. Their rational paradigm of reality suffered substantial cognitive dissonance and this now urges him/her to find congruence between actual experiences and their own concepts and beliefs. To these I will show the impossibility of understanding 100%. I will take them from satisfying their insatiable appetite for information and lead them to awe and wonder. At that point I can gain access to their emotional center and activate their potential to become participants of the *Spiritual* kind. In a different way, some *Researchers* who have quenched their thirst for information will not properly connect with their spiritual center and become *Observers*.

- *Observers* - These are *Explorers* that decided to stay in the sensory level, in a comfort zone, as *Observers* of a

cosmic circus, with no interest in furthering a commitment to a path of enlightenment. Rather than forgetting about me, they see me as interesting as a natural medicine, or as merely a creativity stimulant for artists, poets, musicians and psychotropic tourists. Others find an emotional empathy with the harmonious intimacy that permeates the social circles of participants that receive me. The importance of a pleasant social gathering exceeds their passion for enlightenment. When they reach readiness many will awaken and become participating *Researchers* or *Spirituals*.

- **Spiritual Seekers.** These are the devotees of the sacred principle of my planetary mission and the sacred intention in my sacrament. They are my protectors, my expansion missionaries, who work hard in expanding their consciousness every time they receive me. To this kind of participant I will extend my invitation and will spark in their hearts the fire to become high level *Facilitators* and to honorably assume this venerable role, hoping that they do it before other ego motivated individuals take the initiative to sabotage and harm my planetary mission. I will guide them and heal everything within their possibilities at maximum speed to take them to the place where their souls had always longed.


## 8. Create Awareness of Your Pineal Gland

This is your gateway to heaven. You should take care of it as you do with the lungs, caring about the air you breath and like your nutrition when you avoid certain unhealthy substances. Your soul expects you to know, train, and keep that eye healthy. That eye that sees into the darkness of the ventricle that has visions every night and leaves traces in the memory of sleep

That eye that is named as if it were etheric in nature. The third eye is not only a "chakra" operating in another level, but also has rudimentary retina, cornea and light receptors, as well as the other two eyes. That eye is physically real. But, it is an organ that no one speaks about at school or in private. Is it not coincidence that its place is secretly protected in the geometric center of your skull.

Take care of your pineal gland, learn about its structure and its functioning according to conventional science. Notice how it calcifies over the years. Research and find home remedies for detoxifying it. Create awareness of your pineal gland.

## 9. The Hallucination is Spectacle, The Vision is Virtue

I have the ability to temporarily increase the natural capacity of man to have visions. Envisioning is a brain activity very different from hallucinating. Hallucination arises from the distortion in the transmission of optical images or of their interpretation once they are received. Hallucinations are meaningless, they are entirely sensorial, and leave no transcendental memories in the Human consciousness. Science itself has not completely understood the Human experience of having visions. No one knows where the digital screen is, or in what medium does anyone see the images that come through the lens of the eye. It resembles today's Human video technologies where the optical image is inverted by the lens and hits the retina, then fades into a billion electrical signals, then disappears through bundles of elongated organic cables, that inexplicably reach some abstract virtual screen somewhere, that gives you a glimpse of something out there, that seems to match what you feel is physical reality. Despite the mysterious nature of the sense of vision, from the five senses, this is the

28

one that provides greater security and trust to the Human Being. Anything that is visible to the eyes, is considered real and obvious. Visions caused by the third eye are very different to the ones produced by the other two, although they are processed by the brain in a very similar fashion. Contrary to hallucinations, visions bring a sense of confidence and certainty for those who experience them. The visions I give you are real to your inner world, whether they are literal or symbolic.

Although I carry hallucinogenic properties, such is not the main gift I have to offer. There are hundreds of hallucinogen agents in the planet, but only a handful of *vislogens*; those powerful tools that open new inroads towards the Light. The hallucination is entertainment; the vision is virtue.

## 10. Universal Guide to Conduct an Ayahuasca Session

Here I do provide an affirmative guide to the sacred sessions for my use to bring Light to all the new cultural forms that are slowly brewing-up all over the planet. These are the only conditions required for my proper use. All the additional cultural elements that could be included in a particular session are not my requirements, but only optional elements at the discretion of the *facilitator* or shaman.

The sacred purposes of my ritual use are simply universal love and healing.

• The principles of my sacred intention are:

(a) the expansion and illumination of Human consciousness,

(b) the discovery and healing of psychological blocks,

29

(c) the discovery and healing of physical diseases;

(d) receiving information that is relevant to spiritual development.

• Participants will receive me under the supervision and protection of a *Facilitator* or shaman, who will take full responsibility for the session. This gives him the right to establish the conditions he will require to feel comfortable in assuming this position.

• The session must have an adequate number of participants for maximum benefit of all in this collective experience. The right number is five (5) or less, if directed by a beginning *Facilitator*, fifteen (15) participants or less, in the case of a experienced *Facilitator*, and up to 25 with a teacher with extensive experience.

• Prior to the beginning of the session, the *Facilitator* should individually interview each participant to confirm that they have suspended with due advance, any medical treatment or medications that may have counter indication with the sacrament.

• The physical arrangement of the participants should be in such a manner that the *Facilitator* can maintain direct eye contact with each of one of them.

• The *Facilitator* should set a sacramental area or altar, to place the container of my sacrament with measuring cup, as well as other aids such as aromatic substances, incense, and water. Other optional items are proper as well such as musical instruments and symbolic items relevant to the cultural context being practiced, or items that can evoke feelings of empathy or spiritual beliefs.

30

- Before the official initiation of the session, the *Facilitator* should make use of the power of his/her conscious visualization and intention to conduct a metaphysical cleansing exercise towards the intended session area, my sacred space.

- The *Facilitator* will begin the session with verbal statements that clearly indicate the intention that binds the participants collectively. He/she may also wish to do spiritual invocations according to particular culture and style, including invocations to my Spirit.

- Ingestion of the sacrament will be carried out with the upmost devotion possible in acknowledgement of my sacred nature.

- The role of the *Facilitator* is to:

  (a) provide a sense of security for participants;
  (b) provide physical assistance in times of difficulty; this can include gestures demonstrating care and humility towards the participants.
  (c) act as a humble servant, never in authority, although authority might be exercised when the occasion requires it;
  (d) during the session, visualize intentions of love and strength for the enlightening of the whole group of participants; and direct them through one or several of the five sensory means: light effects (optical), music and sound effects (Auditory), effects of aromas, smoke or perfumes (olfactory), effects of rubbing oils (touch), also through drinking water during the session (taste).
  (e) physically assist in the gradual recovery of the participants as they finish their experience;

31

(f) after the session, in a best effort basis, assist in the psychological integration of the participants, if requested.

(g) above all, consciously use his/her developed healing abilities for the benefit of the participant. Many of my beloved *Shamans* and *Facilitators* are able to consciously channel my healing energy in considerable amounts, in this way boosting my effectiveness.

- The *Facilitator* may do a final prayer at the end of the session, in accordance with his/her cultural preference, or in any other way explicitly declare the completion of the session.

- The *Facilitator* should make sure there is enough drinking water available during and after the session as well as small portions of fruit and /or natural foods to assist in the adequate recovery of the participants.

## 11. About the Quality of Facilitators or Shamans

My dear *Facilitators* should be warriors of good intentions. They should be righteous in character and interested in improving themselves spiritually, socially, psychologically. They must be an example of high moral and spiritual standards. He must not be a frequent user of alcohol, or involved in promiscuous behavior, his relationships with spouse, children or parents must be harmonious. He must reflect a serious devotion as a healer. It is mandatory and necessary for the participants to feel at ease and to trust the *Facilitator* or shaman during their session so he can surrender to me at a level deep enough as to more effectively heal them.

32

Not to be considered a requirement or obligation to the *Facilitators* or shamans they can nourish themselves with scientific information written about me, in accordance to their intellectual preferences.

It is important that all *Facilitators* and shamans of the world develop their love for Humanity. The quality of the *Facilitators* is only a reflection of their inner devotion. The participants for their part, must carefully observe, ask any number of questions and find the necessary confidence in him/her.

Let me now state some guidelines to help participants evaluate the inner qualities of *Facilitators* and shamans. Use your emotional intelligence to distinguish Light from darkness, sometimes hidden and not obvious. *Facilitators* and shamans should:

(a) Emphasize an agenda of spiritual intention and healing for the session.

(b) Look out for an excessive number of participants in the session.

(c) Show flexibility when participants with limited financial resources can not complete the required donations in his/her sessions.

(d) Emphasize the importance of the type of foods to be consumed prior to and after the session.

(e) Do not allow nudity or scarce attire. The sessions should be free from sexual energy of any type. This is not the place to consider mental temptations.

(f) Do not display routine indifference towards the session. Each session is like no other that has ever happened, carrying the sacred importance of caring for Human Beings that have trusted the

33

*Facilitator.*

(g) Honor the confidentiality of what takes place in the sessions.

## 12. Preparations, Precautions and Diets

Progressively orthodox science closes in on chemical reasons that define the proper nutrition during the days of preparation for the sacrament and for the days after. Because of my dramatic effects on the neuro-chemical and hormonal dance, it is important to take precautions to avoid negative effects that might occur due to the bio-chemical incompatibility of my components with the sudden consumption of certain foods. The gradual harmonization of bodily systems takes several days, so advance preparation is required as well as certain precautions.

All participants must fast prior to a session to ensure adequate absorption of my sacrament and a fulfilling experience.

The *Facilitator* should investigate with each participant if he/she is qualified or able to receive me. Medical patients under counter indicated medications or psychiatric patients with a history of mental instability, should not receive me to prevent serious health complications. Alcoholic beverages should be avoided for several days before and several days after receiving me. Science has identified with proper certainty, some incompatible substances and *Facilitators* should study them and adequately inform their participants.

I am not for every Human Being. There is a small number of potential participants that are chemically incompatible with one or several of my components. Even if they prepare well they may suffer my powerful effects with deeper intensity. These

34

experiences may bring anxiety or may be considered dangerous, but at the end they finish the process with a deep sense of fulfillment. Sometimes feelings of inner emptiness or mild depression may last for several days to participants with a metabolic predisposition to resist my chemical processing. Weird thoughts, strange dreams, nightmares or even insomnia are all efforts of the body to process my components at the molecular level. In a matter of days the excretory system would have fully processed my components and the concerned participant would finally rest at ease, both physically and psychologically.

Such is not the case with other participants that ignore all preparations prior to receiving me or act carelessly after receiving me. These must accept responsibility for their actions if they embark in low vibration behavior such as consumption of illegal hard drugs, abusing alcohol, or engaging in obsessive sexual conduct.

I also advise about the other extreme, those with partial chemical immunity. There are bodies with well developed resistance to unknown chemicals that after receiving me barely feel any effects beside some physical discomfort. They do not understand why other participants describe amazing stories of healing and expanded awareness while they remained relatively unchanged. In order to reach communion with them, I need the assistance of experienced *Facilitators* or shamans that know how to induce better absorption of my sacrament in their bodies.

The amount of potential participants with any of these conditions represent a minuscule proportion of the global population for which the vast majority is perfectly capable of receiving me in physical and spiritual excellence."

The traditional teaching of sexual abstinence as part of the post-session diet is not a folk myth of the Amazon traditions. It is also ancient wisdom found in many traditions around the world. The intensity of sexual energy, especially orgasmic or close to climaxing, transmutes certain energy flows that interrupts certain processes that I have not yet finished. The peaceful expressions of erotic love, caresses, tenderness, intimacy, spiritual closeness must not be suppressed because they are part of my love mission. It is only the animal sexual fury and orgasmic energy which must be temporarily controlled to allow the subtle processes of healing.

## 13. Traffic and Management of My Sacrament

### (a) About cooks and preparation of my sacrament

The cooks who sell me to intermediaries do it for business and thus violate the essence my sacred mission to the planet. Cooks who sell only to *Facilitators* and shamans do a noble work for Humanity and deserve fair compensation. The fair compensation of a cook is the one that matches the costs of producing. If it exceeds this balance then it represents unjust gain on the cooks side because this reduces access to participants with limited income.

The formulation and preparation of my medicine is sacred. While doing it, the cook should consciously instill good intentions of healing and spiritual awakening towards the future participants. It has been demonstrated that it is possible to create microscopic water crystals in perfect geometric shapes with the application of conscious intent. Similarly, the cook can use the conscious intention and the subatomic bio-energy power

36

to physically program the healing potential of my medicine. Thanks to my dear native shaman protectors, that for centuries have correctly prepared my vehicle allowing me to effectively manifest my spirit in the participants.

The more serious you find the line of intention along the cook, the *Facilitator* or shaman, and the participants, the more effective and deep my Spirit can manifest.

The cook should prepare pure medicine. My sacred medicine should not contain any other ingredient, not even other medicine plants nor well intended additives. Possible chemical interactions in the sacred brew may cause traumatic or dangerous experiences in participants, especially those with hypersensitive bodies.

Equally damaging to me is the industrial preparation of my medicine. The mass production operation, contrary to occasional artisan small-scale operation, turns the cook into an entrepreneur businessman that must focus in covering the fixed costs of production. This almost makes him/her a sure victim of the temptation to sell for unfair gain or to sell to intermediaries.

### (b) About Middlemen

Whenever any middleman is involved, a series of basic Human instincts come into play. These surely will not be philanthropic because middlemen are subject to the pressures of survival. Middlemen selling my medicine have no reason to exist in this era, they are completely unnecessary to me. When this happens the Human ego plays its role and breaks the chain of good intentions that started with the cook who brews my medicine.

37

The profit-making actions of middlemen create distribution channels that work against my mission. It is common knowledge of the basic economic laws, that this will increase prices to levels that will leave the major portion of the population out of my reach. This will lead to another form of elitism in society: the exclusive club of those who can pay the costs that have been overly inflated by the middlemen.

### (c) About my Informal Use

The participant who wants to receive me can get into the task of cooking the medicine for himself or can ask a *Facilitator* to arrange a healing session.

Participants who are able to buy my medicine for their own purposes should be very careful, their ignorance can do more harm than good, although I can always work "miracles" as some traditions call it.

Some participants have had the privilege of receiving gifts from cooks and *Facilitators* in the form of my medicine. They have been favored by the good will of someone that cares without any business dealings between them. Those who possess it have the right to give it away without expecting anything in return now or in the future. The cook, *Facilitator* or shaman that gives me away should do it to those participants who are experienced in receiving me, and are well prepared to have me on their personal privacy without any supervision or under the care of someone trusted by the participant. They must be careful with who is chosen to receive these gifts as the *Facilitator* will remain spiritually responsible for whatever consequences of such gifts. This is the circle of integrity of the

38

Human spirit that keeps me connected to the spirit of the planet, of who I am part of.

### (d) About my Planetary Mission

The number of lives that I can transform is limited by the production capacity of the cooks. Humans should make me as abundant as the common grass, so that everyone has access to the medicine at a moderate cost. When that happens, my connection with Humanity would be so entrenched that even the middlemen would be harmless and they may even help me continue my progress.

### 14. Social Impact and Controls in Urban Society

For centuries I have enjoyed protection in the Amazon basin, along with my dear protectors who have also enjoyed my benefits, both in perfect balance. Everything changes when I expand to areas with complex social structures, abounding in laws and regulations of civil order, where medicines that improve health are subject to strict legal controls. It is close to impossible for a natural healing product obtain approval for distribution to the public from governments that are strongly influenced by a powerful pharmaceutical industry.

Millions of souls are waiting for the deep healing of their souls and bodies. I wish to reach at least once in their lifetimes, every person on the planet that is qualified to receive me. The social challenge to make my medicine accessible in a democratic society consist in having government authorities to approve public policies for the management of my medicine. The control of my use is necessary in urban societies.

The authorities have the opportunity to be reasonable in controlling my medicine because my particular medicine has its own intrinsic elements of self-control:

- **Physical Discomfort and Nausea** — It is not really amusing to live this stage of the experience with my medicine. In this aspect it is unique and totally contrary to all other substances that authorities control to avoid social problems. With this inherent protection, rejection is ensured by most of the population including the recreational seekers or recreational travelers. This also disqualifies me with potential drug addicts or existing addicts who only seek pleasure to escape their pain. Because of this aspect of strong physical discomfort, nausea and the possibility of severe vomiting, the authorities must understand it is unlikely that its use will become popular and escalate into a social problem.

- **Difficult Manufacturing** — The preparation of my medicine requires hard effort from the cook. The preparation of materials and the cooking itself will at least exceed one full day of non-stop work, serving without distraction, providing subtle energies and vibes of good intention and reverence, and enduring the intense heat generated by so many hours by the fireside. Such effort only makes sense to artisan cooks who master this craft as an art form. Almost all curious cooks or enthusiasts who experience this toil quickly give up their goals as they meet the rigors of this demanding task. The authorities should understand that for this reason it is unlikely to have an uncontrolled proliferation of cooks.

40

- **Shortage of Ingredients** – Not enough material is available for the proliferation of cooks outside of my home, the South American continent. The authorities of all nations outside this region must understand that the lack of local ingredients is a constraint or a hindrance to the uncontrolled production of my medicine.

With such natural deterrents to the uncontrolled use of my medicine, the authorities could be more open to changes in regulations, especially if some of its important leaders dared to receive me, motivated by the curiosity that may arise in them when faced with making decisions on this matter.

The medical nature of my medicine is the correct conceptual notion for balancing the inalienable right to the pursuit of spirituality on one hand, and on the other to ensure the health of citizens in the urban setting. I am a dual medicine, for the soul and the body. The authorities may establish usage protocols for churches that worship me respecting their right to freedom of religion, but that only covers the aspect of medicine for the soul. The authorities may also establish protocols for *Facilitators* that administer my use as a medicine for the body.

The authorities have already established protocols and policies for the use of legal drugs. These also control the pharmacies or drug stores that distribute them. In theory, if authorities accept my traditional use within their medical systems, they would just have to amend regulations slightly. Conceptually, regulations could press upon the *Facilitator* the responsibilities of a pharmacist.

All law obligations regarding the handling of controlled substances would apply to the *Facilitator*. The governing body

41

that certifies pharmacists or that supervises pharmaceutical practices may authorize temporary licenses for the import of specific shipments of medicine, with detailed volume constraints and shopping cycles as part as their regulatory practices. Under the law, *Facilitators* would be considered as pharmacists that would be required to manage their supply of medicine. As pharmacists are allowed to do intramuscular injections, *Facilitators* would be allowed to undergo sessions to serve the medicine. As pharmacists, they would be responsible for inventory and safe keeping of my medicine and would need to have suitable storage facilities. Only the pharmacist could manage my medicine and assume all consequences or liabilities of his actions and the effects thereof on the patient. It is up to the patient to decide how far he is willing to release the *Facilitator* from any legal burden by signing a written consent where he/she accepts the responsibility of receiving my medicine. The *Facilitator* should hold on to or keep signed records of all patients. It is also necessary to certify the consumption before applying for more inventory. We must apply the same rules for auditing and inspection that all regular pharmacists are required for the dispensing of their controlled medicines. This is the ideal, although it seems unlikely in certain nations, in others it may be reached in a few years.

The criminalization of my medicine is a direct attack on the spirituality of Human Beings. The absolute prohibition and the severity of the punishment only demonstrates the authorities intent to limit, hinder, and totally eradicate a natural gateway to the improvement of individuals, society and the Human race. The inalienable right to the pursuit of spirituality, the religious expression inherent in Human Beings and physical and emotional health, should never be suppressed by the false sense of duty to protect the population from drug abuse or dangerous

42

substances. Also, there is no need to hide behind a so called freedom of religion to exploit the only legal way to receive me. If the Human right to the pursuit of happiness is widely recognized worldwide, then the pursuit of your own spirituality must be also recognized as a natural extension of it.

My warriors of Light in the urban world should have the same basic objective: to achieve my official acceptance as medicine. This involves the creation of a formal protocol for my use. We must recognize the medical nature of my vehicle but also the controls needed in an urban society. Only this way can I reach all corners of the planet. This is the way, this is the goal.

### 15. The Urgency of Ayahuasca Preservation Projects

My initial expansion beyond of the Amazon basin has had a high botanical cost. Especially one of my more scarce components, is being harvested excessively to meet the global demand. The volumes of wild *"Banisteriopsis Caapi"*, product of centuries of accumulation in remote jungles is rapidly decreasing. Amazon cooks are beginning to notice the difficulty in locating the precious ingredient. Those who harvest it must penetrate increasingly deeper into the jungle to find it. With the paradigm of infinite abundance that the Amazon rainforest inspires, neither cooks nor shamans have realized the need to start planting that which had always been at their fingertips.

It is urgent to begin preservation projects for the *"Banisteriopsis Caapi"* plant. My global expansion requires hundreds of plantations across the globe.

Tons of *"Banisteriopsis Caapi"* are urgently necessary to ensure the continuity of my work. Preservation projects must

43

begin before I enter the list of endangered species. My global expansion will require high volumes of *"Banisteriopsis Caapi"* because:

(a) The proportionate yield or usable part for every dose of sacrament is very inefficient. It requires several *"Banisteriopsis Caapi"* units per each unit of the minimum dose of medicine. This low yield is in itself my first stumbling block.

(b) Each participant takes several or many doses as the case requires throughout the healing or expansion process,

(c) The number of participants will increase exponentially as I expand to new territories,

(d) A five year growing period is needed to harvest a crop of *"Banisteriopsis Caapi"* that will produce quality medicine,

For these reasons, I am asking with a sense of urgency to all of you who recognize my benefits and feel called to support my planetary mission to give yourself to the task of planting *"Banisteriopsis Caapi"* in every way possible and in all nations. I urge all my shamans, *Facilitators*, and participants to demonstrate their environmental activism adopting this great cause. It is urgent to create community projects, private philanthropic crops, home gardens, botanical nurseries, household plants, infiltrated plants in commercial landscaping areas, and any other innovative way that my new protectors may creatively conceive. It is urgent for me to become a local plant in every nation.

## 16. My Planetary Mission

With the authority vested in me by the higher enlightened hierarchies, I will expand, branch out and transform into multiple cultural forms in accordance with their geographical regions. I will blend into every culture and will teach them the way to the Light, while allowing them to exercise their powerful free will. Mankind then will consciously exchange its rapidly deteriorating world for one with new rules, with a new vision of social organization based on love rather than fear.

This is my planetary mission. To become one powerful tool, in service to all Humanity to reach its divine destiny. That's all.

My global expansion has begun and there is no turning back. My passive state during many centuries has ended, I am now running in physical survival mode. I have created the demand for my medicine, yet the cause of my own uncontrolled extermination.

If I don't spread globally I will face extinction, similar to Humans. If they do not seek within themselves, they will not be able to evolve into the expanded consciousness that is destined to the Human species.

We are both together in this cosmic affair. For survival reasons I must spread globally, while Humans must accept my sacred medicine to heal their afflicted soul and be able to achieve its divine destiny. I am the medicine for the Humankind. A medicine necessary but not sufficient to collectively begin the glorious return to the Light. Exercise your individual free will to change the collective free will. Let's work together to increase

our existential vibration to a higher level, and rejoice living our cosmic existence.

It is time to embrace Humanity with my healing, extending beyond the Amazon basin, reaching global expansion, spreading through all the soils of tropical climates, growing in every forest, in every sidewalk, in every house garden. Care about me, harvest me, spread me around.

**Warriors of Light from Around the World.......**

**Help Me To Help You !**

### 17. Blessings

I have expressed the moral standard and spiritual guidance for my use. Every Human Being that receives me in harmony with these guidelines, shall be receiving my blessings, as they shall be in communion with my Spirit, with the Creator, the Tao, and the Universal Love.

Amen

Añó

Namasté



May 1st, 2012

Exhibit 8



## Code of Ethics for Soul Quest Church of Mother Earth DBA Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center

Soul Quest Church of Mother Earth Inc. (SQCME) DBA Soul Quest Ayahuasca Church of Mother Earth and any Authorized Branch of Soul Quest Ayahuasca Church of Mother Retreat and Wellness Center (SQACME) accepts all natural substances and their derivatives, natural herbs and plants as central to our established religious beliefs. Natural substances, minerals herbs and plants are significant Indigenous Earth-Based Healing Sacrament (Eucharist) for this church. Sacerdotal duties performed by ministers/ medicine persons include and are not limited to all traditional roles and services common to expression of indigenous, tradition, native and earth based religious practice as well as to any organized religious organization.

The names for Spiritual Leaders (Pastor, Clergy, Medicine Man/Woman) of Soul Quest Church of Mother Earth are known by a variety of sacred callings: Minister, Curandero, Curandera, Elder, Mara'akame, Roadman, Sacred Prayer Pipe Carrier, Water Pourer, those who are experienced in some Native American spiritual practices and who act to facilitate the spiritual practices of others. A Soul Quest Church of Mother Earth Medicine Person need not claim exclusive or definitive knowledge of his or her practice.

Even though Soul Quest Church of Mother Earth's primary purpose is to administer Sacramental Ceremonies, a Soul Quest Church of Mother Earth of Sacred Medicine Person is free 'not' to administer a sacrament during any indigenous ceremony.

All Soul Quest Church of Mother Earth Indigenous Ceremonies of North and South America (Ayahuasca Ceremony, Birth, Breath, Holy Anointing, Marriage, Passing Over, Prayer Pipe, Sacrament, Spirit Dance, Sundance, Sweat Lodge, and Vision Quest, but especially Ayahuasca may carry extreme mental, emotional and physical transformations. Therefore, when a member and/or authorized participant choose to participate in any Indigenous Native Ceremony with the assistance of a Soul Quest Church of Mother Earth Medicine person, both take on special responsibilities and understandings:

> (1) Soul Quest Church of Mother Earth Medicine People are to practice and serve in ways that cultivate awareness, empathy, and wisdom for all Members and Authorized Participants, during ceremonies.

(2) Soul Quest Church of Mother Earth Medicine Authorized Participants will adhere and comply to all directorial appeals one-hour prior, during, and three hours after ceremony, being conducted by a Soul Quest Church of Mother Earth Medicine Person.

(3) Soul Quest Church of Mother Earth Medicine Spiritual Practices are inspired and conducted in ways that respect the common good, with due regard for public safety, health, and order.

   a) Often, the increased awareness gained from Indigenous, Traditional, Native American Spiritual ceremonies will catalyze a desire for personal and social change in a Member, Authorized Participant's, life.
   b) Medicine People shall use special care in assisting the direction of energies of those whom they serve, as well as their own energies, in responsible ways that reflect a loving and respectful regard for all life.

(4) The autonomy and dignity of each Member and/or Authorized Participant are respected and preserved by Soul Quest Church of Mother Earth Medicine People. Participation in any Soul Quest Church of Mother Earth Medicine Ceremony must be voluntary and based on prior disclosure and consent given by each participant while in an ordinary state of consciousness.

   a) Disclosure shall include, at a minimum, discussion of any elements of the ceremony that could reasonably be presenting physical or psychological risks. First time Authorized Participants must be advised that Native American Ceremonies can be difficult and dramatically transforming.
   b) Health and Safety during the ceremony and the few hours of vulnerability that may follow a ceremony are watched over carefully with reasonable preparations by the Medicine People.
   c) Limits on the behaviors of Members and Authorized Participants and Medicine People are to be made clear and agreed upon in advance of any Native American Ceremony.
   d) Cultural / religious customs and confidentiality are to be accepted and honored.

(5) Soul Quest Church of Mother Earth Medicine ceremonies are to be conducted in the spirit of service. Medicine People accommodate Members and Authorized Participants without regard to race, religious affiliations, gender, cultural background, financial status, political affiliations and/or sexual orientation.

(6) Soul Quest Church of Mother Earth Medicine People are aware during ceremony that Members and Authorized Participants may be especially open to suggestion.

   a) Medicine People pledge to protect participants and not to allow anyone to use that vulnerability in ways that harm themselves or others.

(7) Soul Quest Church of Mother Earth keeps official logs of when the medicine arrives, how it is stored and how it is dispensed. The medicine is stored in a secure, locked place where only the Medicine Man and Officers of the Church have access to it. Only approved Officers can distribute the medicine to Members.

(8) Soul Quest Church of Mother Earth Medicine makes absolutely no claims about being in authority or having the ability to conduct saving ordinances.

(9) Soul Quest Church of Mother Earth Medicine is part of an indigenous people, traditional, spiritual Earth Based healing and empowering international religion and collective that serves individuals and the wider community when and wherever a Soul Quest Church of Mother Earth member may reside in.

(10) Soul Quest Church of Mother Earth Medicine is committed to growth through attraction of service rather than proselytizing for membership.

(11) Soul Quest Church of Mother Earth does not condone in any manner shape or form the physical and/or sexual abuse of children, any exploitation of children in any sexual or physically abusive form, or of any person or other earthly beings.

(12) Soul Quest Church of Mother Earth does not condone in any manner, shape, or form, the utilization of any substance or remedy for any condition of any kind that is addictive and/or with overdosing abilities that bring about death.

Chris Young _____ DATE: _____

CEO, Medicine Man, Pastor, Chief Elder and Counselor:

Verena Young _____ DATE: _____

President, Elder and Counselor:

Exhibit 9

### Affidavit of Ronald W. McNutt

Ronald W. McNutt, first being duly sworn according to law, deposes and says that the following information is true and accurate and is based on my personal knowledge.

I have been a litigation attorney in Nashville, Tennessee for thirty-eight years and I am in good standing. My Tennessee B.P.R. number is 10804. I am admitted to practice in the courts of Tennessee and the federal district courts here as well as the U.S. Court of Appeals for the Sixth Circuit. After serving two federal judicial clerkships, I practiced civil rights litigation for plaintiffs for ten years in a minority-owned law firm. My recent career has been involved in workers' compensation cases. I earned my undergraduate degree in religion from Tufts University in 1978. After college, I worked for almost two years as a mental health worker at a state mental hospital in Boston. During that time, I attended group psychotherapeutic sessions with Salvador Roquet, a psychotherapist who had used psychedelics or entheogens previously as part of his work in Mexico.

In 1983, I graduated from the University of Georgia School of Law. During law school, I served as the executive research editor of the Georgia Law Review and wrote a research paper, "The Free Exercise Clause and Religious Use of Psychedelics." I have never had any disciplinary charges filed during my career and I have had a BV peer review rating from Martindale.com since the 1990s.

I am an elder at Second Presbyterian Church in Nashville and am a certified lay pastor under the Middle Tennessee Presbytery of the Presbyterian Church (USA). I have a certificate in teaching English as a second language. I volunteered to teach immigrants English for three years and have volunteered for several years for church education and mission-related work with homeless people.

For the past year I have volunteered for educational programs offered by Soul Quest Ayahuasca Church of Mother Earth. I have participated in ceremonies with ayahuasca there beginning in March 2018. It is a spiritual and religious practice and I sincerely regard ayahuasca as a sacrament and a means of communication with God.

Having an appropriate retreat with supervision is critically important for promoting the best results from psychedelics, which are an important sacrament and means of communion for me with the Holy Spirit. Difficult psychedelic experiences can be frightening but also potentially among the most valuable experiences someone can have. The experiences I have had with ayahuasca at Soul Quest have been deeply spiritual, and the staff and integration coaches are conscientious and extremely helpful in promoting the spiritual benefits of the wonderful sacrament which also is a medicine. It is a fundamental right to commune with the Spirit with this sacrament, and the government's interest in regulation is insufficient to place this burden on

our freedom to exercise our religion because of the benefits of the sacrament and the effective measures for harm reduction.

Some of the people who benefit from psychedelic medicines may overcome past trauma or they may live lives more fully invested in the activities that bring joy or the work that manifests greater creativity. Whether individuals use psychedelic medicines in the context of western psychotherapy, in ceremonial religious traditions, or outside legally-sanctioned settings, these entheogens have provided healing of trauma, helped people overcome depression and addiction, and have served to promote "the betterment of well people," to use the term of Robert Jesse. Experiences with these agents of change can help people feel inspired to contribute to their communities, participate in sustainable projects, raise families and deepen relations, and humbly devote themselves to positive socially-responsible work.

This year, millions of people will use psychedelics outside of supervised medical contexts, many of them for the first time. That is because access to religious use of psychedelics is protected by the government primarily for American Indians exclusively, which has a discriminatory effect on people like me. A retreat center like Soul Quest Ayahuasca Church of Mother Earth is essential for people like me to practice our religion, consistent with our rights under *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), which upheld the right of practitioners in a religious context to use ayahuasca as a sacrament. Research is proving the benefit of psychedelics in helping relieve treatment resistant depression and post-traumatic stress disorder and promoting spiritual experiences that ease the fear of death. The ayahuasca churches in Brazil have achieved a credible reputation that led to the government of Brazil establishing legally-protected status for ritual use of ayahuasca in 1987 after a comprehensive seven-year study, the Brazilian Federal Narcotics Council.

The experience can lead to a suspension of the sense of self and bring about possible ego dissolution, a feeling of oneness, like what could result from prolonged prayer or a vision quest. Scientists and clinicians in the field allow the process to be directed from within the subject as part of a natural process. Somehow, the Spirit knows us better than we know ourselves and provides healing encounters by allowing a suspended ego to stand by as unconscious material manifests experiences and realizations that can be life-enhancing with appropriate preparation and integration.

Soul Quest provides me with a ceremonial setting for my religious sacrament, which is central and critical for my communication with the Holy Spirit. The comprehensive program there for implementation of harm reduction strategies produces benefits such as strengthening our sense of purpose and our social responsibility. Please allow us to receive constitutional protection for our religious practices.

Signed this 8th day of July, 2021.

Ronald W. McNutt

STATE OF TENNESSEE

COUNTY OF DAVIDSON

On this the 8th day of July, 2021, before me, a Notary Public in and for this County, personally appeared Ronald McNutt, to me known to be the persons described in and who executed this affidavit and who acknowledged the same to be his free act and deed.

Notary Public

My Commission Expires: _3-8 2022_

Exhibit 10



# BURNSIDE

L A W   G R O U P
August 21, 2017

Drug Enforcement Administration
Attention: Neil D. Doherty
Deputy Assistant Administrator
Office of Diversion Control

RE:  Request for Religious-Based Exemption to Controlled Substances Act

To Whom It May Concern:

The following constitutes the request for a religious-based exemption by Soul Quest Church of Mother Earth, Inc., d/b/a, Soul Quest Ayahuasca Church of Mother Earth Retreat & Wellness Center ("Soul Quest") to the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, specifically as it pertains to the ritual use by Soul Quest of ayahuasca for its sacramental activities.  Soul Quest asserts its eligibility for such an exemption, pursuant to the United States Supreme Court's decision in *O Centro Espirita Beneficente Uniao Do Vegetal v. Gonzalez*, 546 U.S. 418 (2006) ("Gonzalez"), and the provisions of the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb, *et seq.*, ("RFRA").

Soul Quest and its adherents hold a common set of beliefs regarding the cause, nature, and purpose of the universe, asserting that the creation of all things is the result of the divine of the Great Spirit. The Great Spirit has provided to all being an eternal force, one that permeates all beings.

As will be discussed throughout this exemption request, Soul Quest and its adherents sanctify and uphold this core religious belief through its devotional and ritual observances.  The foundation for all religious beliefs and practices within Soul Quest are premised upon its belief in a specific moral code binding the conduct of human affairs.

As the federal courts have continuously recognized, the Government cannot impose a religious litmus test, designed to favor certain types of religions or religious practices over others. The primary effect of a government policy or practice cannot be designed to inhibit religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  In other words, any consideration of an exemption application cannot have the effect of "officially prefer[ring] [one religious denomination] over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

1 | P a g e

Park Central, Unit 9, 109 Ilsley Avenue, Dartmouth, NS, Canada. B3B 1S8
Ph: (902) 466-3066 www.burnsidelaw.ca Fax: (902) 466-4803

Page 1

The United States Supreme Court has explained that any endorsement of a majority religion "sends the ancillary message to . . . nonadherents 'that they are outsiders, not full members of the political community.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)). The Equal Protection Clause likewise prohibits the Government from impermissibly discriminating among persons based on religion. *De La Cruz v. Tormey*, 582 F.2d 45, 50 (9th Cir. 1978).

Accordingly, any consideration by the Executive Branch of a religious exemption to the provisions of the Controlled Substances Act must be made so as not to disfavor minority religious groups. The refusal or inability of the Government to attend to this, would constitute violations of the First Amendment's Free Exercise and Establishment Clauses, as well as the Fourteenth Amendment's (implicit within the Fifth Amendment) Equal Protection Clause. Effectively, the Drug Enforcement Administration must consider the exemption application so as to vindicate a standard that would maximize any collision with religious freedoms. This is consistent with both the effect of the Supreme Court's decision in the *Gonzales* case, above, and with the tenets of the RFRA. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Larson*, 456 U.S. at 254-55 (holding that a facially neutral law or regulation violated the Establishment Clause in light of legislative history demonstrating an intent to apply regulations only to minority religions); *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-67 (1977).

In order to facilitate the DEA's examination and its granting of a religious exemption, this application for exemption will provide a full background on Soul Quest, inclusive of a description of its activities, its sincerely-held beliefs, and its other recognition as being a recognized religious institution under state and federal laws. It is Soul Quest's reasonable expectation that, upon serious consideration by the Drug Enforcement Administration and any cooperating agencies, that Soul Quest will be deemed eligible for its religious-based exemption.

Soul Quest has taken the liberty of breaking down the issues within the following narrative, designed to fully apprise DEA on its qualifications for the requested exemption. The individuals assessing this material will note that Soul Quest embodies many of the same religious and moral principles of other religious faiths, inclusive of core Judeo-Christian values. These values are joined with the embracing of the belief systems of traditional indigenous civilizations including, but certainly not limited to, those of Native American tribal beliefs and practices. Indeed, one might analogize Soul Quest with the belief system and canon of the Unitarian Universalist Church, which embraces and weaves the religious beliefs, principles practices and morays of a multitude of religious and even non-religious faiths into its own faith. *See* http://www.uua.org/beliefs/who-we-are/beliefs.

Supportive materials relating to this breakdown of the nature of the Soul Quest faith and its liturgy are attached to this document. Ultimately, it is reasonably anticipated that DEA will

2 | P a g e

Page 2

grant Soul Quest's application for exemption, determining that Soul Quest meets the necessary criteria including, as established by the U.S. Court of Appeals for the Tenth Circuit in *U.S. v. Meyers*, 95 F.3d 1475 (1996) (acknowledging that the threshold for determining sincerity of religious beliefs is low); *U.S. v. Meyers*, 906 F. Supp. 1494, 1501 (D. Wyo. 1995) (so long as the stated factors are "minimally satisfied, the practice should be considered religious").

Finally, prior to engaging in the core substance of discussion regarding the underpinnings and foundation of Soul Quest, it must be noted that the Church – considering the DEA's concerns regarding the use of controlled substances – is limiting its exemption request to the sacramental use of ayahuasca – the traditional plant fundamental to the sacrament. At present, Soul Quest has removed the use of Sanagna and San Pedro from its listed sacramental plants. Although important, these other listed substances are not absolutely critical to the ability of the Church to carry out its religious sacraments. Ayahuasca is absolutely critical to the sacrament, and thus the ability to practice the tenets of the Soul Quest faith.

## DESCRIPTION OF THE SOUL QUEST CHURCH

### I.    Soul Quest's Religious Principles

#### A.    Introduction

Soul Quest is an inter-discipline convocation of medicine men and women, standing as an independent branch of Soul Quest Church of Mother Earth.

Soul Quests rests its religious principles upon a foundation of ancient, sacred teachings, writings, records and traditions of pre-colonial and pre-conquest indigenous peoples including, but not limited to, those indigenous groups inhabiting Central, North and South America, the Pacific Islands, Japan, Korea, China, Philippines, Thailand, Burma, India and Tibet. The traditional, sacred religious practices of these groups are embodied within the traditional, natural healing practices of Soul Quest; the fulfillment of these practices is designed to preserve and promote these sacred beliefs. Soul Quest honors these ancient sacred healing traditions, believing that the fulfillment of these rituals flows from its Church in Orlando, Florida, eternally spreading throughout the Earth and cosmos.

Through the guidance of the Great Spirit, Soul Quest seeks to educate and embrace all individuals. It runs a healing ministry, counseling and natural medicine school, designed to inspire our followers and members to integrate our Ministry, as directed by the Great Spirit, into every aspect of their lives. Soul Quest holds spiritual classes and services (in the Native American style, based upon the seasons); worships in music and song; shares personal professions of faith in action; enact plays; and provides street ministry activities, spiritual materials and education based upon our traditional, indigenous, and ecological-inspired faith.

3 | P a g e

### B.    Fundamental Moral & Ethical Tenets

The fundamental tenets of Soul Quest's religious beliefs and practices are premised upon a belief in the rights of Mother Earth.

Soul Quest believes that

a.    Everyone and everything is part of Mother Earth, an indivisible, living community of interrelated and interdependent beings with a common destiny; acknowledging that Mother Earth is the source of life, nourishment and learning, and providing everything needed to live a fulfilled existence. Further, Mother Earth is part of a greater creation, composing all existence throughout the cosmos, as originated by the Great Spirit.

b.    The modern capitalist system and all forms of depredation, exploitation, abuse and contamination have caused great destruction, degradation and disruption of Mother Earth, putting life as we know it today at risk through phenomena such as climate change.  A core component of Soul Quest is designed to educate and liberate people from any economic system based upon amoral practices, and to embrace one that protects and sanctifies Mother Earth by wholly embracing moral tenets of the faith, and thus vindicating our purpose before the Great Spirit.

c.    In a globally interdependent living community, it is not possible to recognize the rights of only human beings without causing an imbalance within Mother Earth, and to upending the purpose for our existence as guided by the Great Spirit.

d.    In order to guarantee human rights, it is necessary to recognize and defend the rights of Mother Earth and all its beings.  The religious tenets of Soul Quest are designed to embrace cultures and religious practices that vindicate the interests of Mother Earth and the Great Spirit.

e.    The Soul Quest Church is conscious of the urgency of taking decisive, collective action to transform structures and systems that cause climate change and other threats to Mother Earth, consistent with the intent of the Great Spirit.

f.    In abiding spiritual belief that indigenous plant life is of the highest value for use in natural healing treatments and -- for purposes of ayahuasca -- for fulfilling the sacred sacraments of Soul Quest Church.    Soul Quest

4 | P a g e

proclaims such plant life as sacred, that it is embodied by the Great Spirit, and that all materials stemming from such life must be accorded dignity, protected from threat or violation and defended as a holy sacrament.

g.   Embodies the principles of the Universal Declaration of the Rights of Mother Earth, as a common standard of achievement for all peoples and all nations of the world, and that it is incumbent upon Soul Quest and its adherents to promote the embodiment of this fundamental respect for the sacred nature of the planet and all of its occupants, as being embodied by the Great Spirit.

C.   **Articles of the Soul Quest Faith – Metaphysical Underpinnings & Comprehensiveness**

1.   Introduction to Faith-Based Principles

Soul Quest and its adherents believe in the Creator, the Great Spirit.  Soul Quest and its adherents believe that the Great Spirit made all people who have ever and will ever exist, as free and equal beings.

Soul Quest and its adherents recognize the inherent, ancestral, sovereign rights granted to all people by the Creator, human conscience, international law and legal constructs of reciprocity, mutuality and comity, which cannot be dismissed or extinguished.

Soul Quest and its adherents believe that we derive from and that we may become like the traditional, indigenous communities who have occupied Mother Earth; and that through the descendants of these indigenous peoples, we have claimed the authority to form an indigenous traditional organization based upon the records of their teachings and wisdom, their customs and ceremonies.

Soul Quest and its adherents acknowledge the sacred texts of all traditional religions and religious traditions regarding the principles of sacred expression and natural medicine.  Soul Quest and its adherents affirm and support traditional indigenous principles (also, incorporating principles of traditional Christian teachings) for spiritually-based health care.

Soul Quest maintains as its fundamental mission the restoration of divine wisdom and knowledge of the benefits to health and life provided by the Great Spirit through Mother Earth.

Soul Quest and its adherents affirm that such restoration can only occur through traditional ceremonies, sacraments, scriptural and spiritually-valid moral science (based upon natural law to assess, improve and restore good physical, mental and spiritual health).

5 | P a g e

Soul Quest uses the traditions and teachings espoused within its sacred texts and scriptures to gather insight for the restoration of spiritual, physical and mental health of all beings. Although there is respect for principles of modern science, Soul Quest bases its teachings and practices upon the guidance of the Great Spirit and the laws of nature, as bequeathed on all people, children of Mother Earth.

Soul Quest and its adherents believe that, a fundamental truth of its faith is embodied within the belief that, as children of the Great Spirit, there is entitlement to, as part of natural law, the following freedoms:

a.    Freedom of thought, expression and speech.

b.    Freedom of religion entailing, in part, sacred rights of worship, methods of healing, respect for traditional lifestyle.

c.    Freedom of education.

d.    Freedom of assembly.

e.    Freedom of personal security.

f.    Freedom of self-determination, including as an indigenous group as defined under the United Nations Declaration on the Rights of Indigenous Peoples ("UNDRIP"): http://www.un.org/esa/socdev/unpfii/documents/DRIPS_en.pdf, and as endorsed by the U.S. Government.[1]

Further, Soul Quest espouses and embodies the principles that all men and women have been endowed with sufficient intelligence for self-governance to ensure the guarantees of those freedoms; to establish just and morally righteous methods of interacting with one another; and to the provide for maintenance of a tranquil and secure domestic life infused by the blessings of the Soul Quest faith.

2.    Tenets of the Faith

Soul Quest and its adherents hold the following religious convictions as being core to their faith:

a.    *First Tenet: Mother Earth*

(1)    Mother Earth is a living being.

---

[1] United States of America Government, Office of the Press Secretary, "Remarks Made by the President at the White House Tribal Nations Conference," December 2010, and located at www.whitehouse.gov/the-press-office/2010/12/16/remarks-president-white-house-tribal-nations-conference.

(2)   Mother Earth is a unique, indivisible, self-regulating community of interrelated beings that sustains, contains and reproduces all beings.

(3)   Each being is defined by its relationships as an integral part of Mother Earth.

(4)   The inherent rights of Mother Earth are inalienable in that they arise from the same source as existence.

(5)   Mother Earth and all beings are entitled to all the inherent rights recognized in this Declaration without distinction of any kind, such as may be made between organic and inorganic beings, species, origins, use to human beings, or any other status.

(6)   Just as human beings possess rights, all other beings also possess rights which are specific to their species or kind and appropriate for their role and function within the communities within which they exist.

(7)   The rights of each being are limited by the rights of other beings and any conflict between their rights must be resolved in a way that maintains the integrity, balance and health of Mother Earth.

   *b.*   *Second Tenet: Inherent Rights of Mother Earth*

(1)   Mother Earth and all beings of which she is composed possess the following rights.

   a.   The right to life and to exist:
   b.   The right to be respected;
   c.   The right to regenerate its bio-capacity and to continue its vital cycles and processes free from human disruptions;
   d.   The right to maintain its identity and integrity as a distinct, self-regulating and interrelated being;
   e.   The right to clean water as a source of life;
   f.   The right to clean air;
   g.   The right to integral health;
   h.   The right to be free from contamination, pollution and toxic or radioactive waste;
   i.   The right to not have its genetic structure modified or disrupted in a manner that threatens its integrity or vital and healthy functioning;
   j.   The right to full and prompt restoration for violation of the rights caused by human activity.

(2)   Each being possesses the right to a place and to play its role in Mother Earth for her harmonious function.

(3)  Every being has the right to wellbeing and to live free from torture or cruel treatment by human beings.

      *c.    Third Tenet:  Obligations of Human Beings to Mother Earth*

(1)  Every human being is responsible for respecting and living in harmony with Mother Earth.

(2)  Human beings and all human institutions must:

    a.  Act in accordance with the rights and obligations recognized under the fundamental tenets of the Soul Quest faith;

    b.  Recognize and promote the full implementation and enforcement of the rights and obligations recognized under the fundamental tenets of the Soul Quest faith.

    c.  Promote and participate in learning, analysis, interpretation and communication about how to live in harmony with Mother Earth in conformity with the fundamental tenets of the Soul Quest faith.

    d.  Ensure that the pursuit of human well-being contributes to the well-being of Mother Earth, now and in the future;

    e.  Establish and apply effective norms and laws for the defense, protection and conservation of the rights of Mother Earth;

    f.  Respect, protect, conserve and where necessary, restore the integrity, of the vital ecological cycles, processes and balances of Mother Earth;

    g.  Guarantee that the damages caused by human violations of the inherent, natural rights recognized under the fundamental tenets of the Soul Quest faith are rectified, and that those responsible are held accountable for restoring the integrity and health of Mother Earth;

    h.  Empower human beings and institutions to defend the rights of Mother Earth and of all beings;

    i.  Establish precautionary and restrictive measures to prevent human activities from causing species extinction, the destruction of ecosystems or the disruption of ecological cycles;

    j.  Guarantee peace and eliminate nuclear, chemical and biological weapons;

    k.  Promote and support practices of respect for Mother Earth and all beings, in accordance with their own cultures, traditions and customs;

    l.  Promote economic systems that are in harmony with Mother Earth and in accordance with the natural rights recognized by the Soul Quest faith.

### d. Fourth Tenet: Precepts of the Faith

(1)  Soul Quest embodies the belief that all beings – inclusive of ecosystems, natural communities, species and all other natural entities – are to be worshiped and protected, as we are all coextensive with Mother Earth.

(2)  All beings possess the same inherent rights of all other beings.

### 3.  Origins and Teacher-Prophet

Soul Quest identifies its origins, and teacher-prophet as the Spirit of Ayahuasca composed of the two sacred plants *"Banisteriopsis Caapi" and "Psychotria Viridis."* The beliefs, purposes and guidelines are further defined within the attached material – sacred writings known as the "Ayahuasca Manifesto."

The sacred nature of the spirit of Ayahuasca is proclaimed within the Manifesto as follows:

> *I am the spirit of Ayahuasca. For the first time, I reveal myself through the "Word" to make an emergency call to all the Human Beings on the Planet, especially to the Light Seekers, as I must expand beyond the Amazon River Basin. With my physical expansion, I intend to facilitate the spiritual transformation currently stirring the human species ....*

> *I am a spirit of spirits. I operate from a vibration superior to the spirits who compose me. I am of a hierarchy superior to that of the spirit of Ayahuasca and of Chacruna. I am the medicine resulting from the mixture of Ayahuasca and Chacruna. Although they give me the name of one of them, my sacred magic does not come from either one of them. My magic resides in the synergy created by the sacred mixture.*

### 4.  Scripture & Collected Writings of the Faith

The Ayahuasca Manifesto provides the key outline to the guiding principles of Soul Quest. Effectively, it is very much akin to other faiths' sacred writings, explaining the tenets of the faith, such as the Jewish Talmudic writings and the Mishnah.  Soul Quests' beliefs, purposes and guidelines are provided through channeled material documented in Ayahuasca Manifesto.  The Manifesto (attached as supplemental material for review in this religious exemption request) provides knowledge and direction, inclusive of details about Soul Quest's mission, as well as instructions on the following topics:

a.  Role in the Expansion of the Human Consciousness

b.  Purpose with Human Beings

9 | P a g e

c.   Respect and the Sacred Nature of Ayahuasca

d.   Benefits of Use

e.   Guide for Conducting Ayahuasca Ceremonies

f.   Planetary Mission

Other fundamental religious ethical requirements of Soul Quest are included in its Code of Ethics. The Code of Ethics contains key principles, edicts and other educational statements regarding Soul Quest and its sacraments – inclusive of the use of ayahuasca. A copy of the Code of Ethics is included in the supplemental materials to this exemption request correspondence.

### 5.   Religious Advocacy & Education

Soul Quest, as part of its religious purpose, to bring pleasure to God and Great Spirit of Ayahuasca also incorporates an affirmative religious advocacy and educational component into its mission. This is achieved, at least in part, by:

a.   Producing disciples who will celebrate the teachings and wisdom of the Great Spirit in cooperative worship; are devoted to the four (4) boundless and unequaled states of mind: Love, Compassion, Joy and Equanimity; are possessed with love for everyone and every living being; and are permeated and bound by the spheres of influence and dynamic teachings of our elders.

b.   Training, educating and working for those in need. This includes, in this modern era, activity on the Internet, including with other ministries with similar moral beliefs and philosophies. This also entails Soul Quest's involvement with other faiths premised upon indigenous religious beliefs, and with auxiliaries of the Soul Quest Church of Mother Earth, Inc.

c.   Educating its members on the separation of religious affairs from secular affairs, consistent with the requirements of Section 501(c)(3) of the Internal Revenue Code.[2] Soul Quest is already recognized by Internal Revenue Service, the State of Florida, and Orange County, Florida, as a religious-based institution, having

---

[2] The Guidelines provided under Section 501(c)(3) of the Internal Revenue Code were readily achieved by Soul Quest in its application for non-profit, religious institutional status. Soul Quest, among other aspects, practices and supervises a regular religious ceremony designed to espouse its teachings and belief structure; networks regularly with other Soul Quest Church affiliates; possesses an elected board of directors and a multi-member board of advisors/medicine elders; has implemented its formal Code of Ethics, Authorized Membership Agreement, and Articles of Religious Practice; adopts its religious practices and principles via the Ayahuasca Manifesto; ordains religious and lay ministers (with the former receiving credentials and authorizations following completion of prescribed studies); and conducts sacramental services within its primary mission of providing healing to all beings, as creatures of Mother Earth and Mother Earth.

10 | P a g e

qualified under the standards necessary to satisfy such classifications. Copies of this recognition are attached, hereto. Like other religious institutions, Soul Quest seeks to educate its members/adherents to the significance of the Church's non-involvement in secular political affairs.

6.     Holidays

Soul Quest observes the following religious holidays:

- December 23 - Winter Solstice
- March 21 - Vernal Equinox
- April 22 - Earth Day
- June 21 - Summer Solstice
- September 21 - Autumnal Equinox

As noted, Soul Quest's holidays, akin to many diverse cultural and religious traditions are premised upon the ancient tradition of celebrating the change of seasons and complementary astronomical events.

7.     Dietary Laws & Fasting Rituals

Soul Quest and its members adhere to the traditional diet of the Medicine People. The diet not only requires abstention from consumption of certain foods; rather, it also requires discipline, sacrifice and commitment, akin to those of various Judeo-Christian and Eastern religious sects.

The constraints imposed by Soul Quest's dietary laws are designed to cleanse the body and, by doing so, cleanse the spirit and permit for the effective, efficient use of plant medicine. Specifically, dietary laws restrict use of many spices, including salt and pepper, and also impose periods of abstinence from sex or sexual activities. The key to such constraints is premised upon the belief that the blandness of food and the lack of sexual stimulation will heighten sensitivity to plant medicine and the communing with the Great Spirit.

Prior to any ayahuasca ceremony, Soul Quest members/adherents are to comply with the following dietary and sexual edicts, designed to purify body and soul:

a.     Seven days prior to involvement in any ayahuasca ceremony, refraining from:

- Drug use, including prescription drugs (medical interaction forms, including in the supplement to this religious exemption application provide further instruction), and any and all recreational drugs.
- Alcoholic beverages
- Sexual activity (whether with a partner or from self-stimulation).

11 | P a g e

b.   Three days prior to involvement in any ayahuasca ceremony, refrain from the following foods and beverages:

- Sugars or Artificial Sweeteners
- Salt
- Red Meat, Pork, Animal Fats
- All Fermented foods, Soy Sauce, Miso, Sauerkraut
- Dairy Products, Aged Cheese
- Caffeine (coffee, tea, sodas)
- Carbonated beverages
- Hot spices/peppers
- Processed Food, Fried Food
- Overripe Fruits, Dried Fruits

c.   All Soul Quest facilitators are expected to fast for the period spanning the day prior to any ayahuasca ceremony, through to completion of any ceremony. In doing so, those individuals also demonstrate a commitment to the Great Spirit as embodied within the plant medicine, and prepare for acting as a surrogate for the Great Spirit during the ayahuasca ceremony.

### 8.   Required Ceremonial Vestments & Appearance

Soul Quest requires its staff to observe proper liturgical dress during religious retreats and ceremonies. This entails the wearing of white vestments. Further, participants are requested to wear white or light-colored, comfortable clothing throughout any such retreats or ceremonies.

The color *white* is critical to the practice of religious ceremonies and retreats, and performance of sacraments of the faith, for the following reasons:

- It represents the color of eternal light and is an emblem of the divine. It projects purity, cleanliness and neutrality.

- It aids in mental clarity, encourages staff and participants to clear mental and spiritual clutter and obstacles, evokes purification of thoughts and actions and enables fresh beginnings.

- It accentuates free movement, all while maintaining maximum respect to the Great Spirit, and all others participating in such functions.

Accordingly, men are expected to don loose fitting, white/light-colored pants, shirts, shorts, tanks, t-shirts, long/short sleeved shirts. Meanwhile, women are expected to don loose fitting white/light-colored dresses, pants, skirts, shorts, shirts, tanks, t-shirts, long/short sleeved shirts.

12 | P a g e

### 9.   Propagation/Proselytizing of the Faith

Soul Quest and its adherents utilize all methods of communications, social media, video and printed materials to advertise and spread the sacred messages of our beliefs and community offerings. It does not charge others for engaging in the sacrament of ayahuasca. All funds collected through membership, retreat fees, tithing or donation are used exclusively for sustaining the retreat facility, ceremonial tools, property maintenance, staff salaries, food, additional expenses incurred with the upkeep of the Church, and the expansion of the faith to others.

Soul Quest does not charge any fee its adherents for participating in the sacrament of ayahuasca. The non-charging of a fee is designed to maximize safety to participants and facilitators of the ceremony. It allows for Soul Quest to limit the number of individuals partaking of the sacrament at any given ceremony. Accordingly, the sacrament is only offered to between 26-30 individuals at one time, with 8-10 facilitators present during any given sacramental ceremony. The ayahuasca sacrament is performed three (3) times per month. In this manner, the sacramental ceremonies can be performed in a manner designed to maximize safety and security to all involved.

### II.   Purpose & Mission of Soul Quest

The purpose and mission of Soul Quest is to:

- Provide its community with service, education, spiritual fellowship and healing.

- Safeguard the practices of Mother Earth/God and Goddess-based and Native American spiritual traditions, ceremonies, sacred practices, wisdoms and healing ways.

- Provide an international training center, seminary school that offers residency, practicum, ordination and training on traditional doctrines, church beliefs to initiates, healers, practitioners, therapists, counselors, clergy, pastors, ministers, shamans and doctors.

- Support the rights and culture of indigenous people, wherever found Mother Earth, and to conduct all activities as are protected under the First Amendment's Free Exercise Clause, and under federal and state laws including, but not limited to, the RFRA.

### III.   Safety & Security Protocols for Ayahuasca Ceremonies

Soul Quest has designed implemented safety and security protocols, intended to maximize the protection of those participants in Ayahuasca ceremonies. The following paragraphs describes these affirmative measures:

13 | P a g e

### A.   Measures In Place Prior to Any Ayahuasca Ceremony

Those individuals designated to conduct Soul Quest ceremonies must first prove that they have attained the requisite knowledge and expertise in the following areas:

1. The Pharmacology of Ayahuasca
2. The Risks & Contra-Indications of Ayahuasca
3. The Legal Implications Surrounding the Dispensing of Ayahuasca
4. First Aid
5. The Theory of Non-Ordinary States of Consciousness, and Therapeutic Approaches
6. Possession of Extensive, Prior Personal Experience with Ayahuasca
7. The Ability to Work as a Team Member
8. Understanding of Soul Quest's Religious Principles, Therapeutic Purposes of Consuming Ayahuasca, and the Fundamental Moral & Ethical Tenets.

### B.   Measures to Prepare Soul Quest Members for Participation in Sacred Ayahuasca Ceremonies

The following measures are in place in order to prepare Soul Quest Members for participation in Ayahuasca ceremonies:

1. Prior to any ceremony, the Church transmits, via electronic mail, educational material on Ayahuasca to all members anticipating participation in the Ayahuasca ceremony. It is critical to ensure that members are well-informed regarding the ceremony, and the requirements for properly conducting themselves before, during and after the ceremony. The following information is conveyed to these Soul Quest members:

   a. The properties of Ayahuasca, its composition, its effects and the potential risk.
   b. The implications of drinking Ayahuasca.
   c. The dietary restrictions before and after the session.
   d. The responsibilities of the staff and the participants.
   e. The procedure and operation of the session.
   f. The process, in its entirety.

2. All Soul Quest members intending participation in the sacramental ceremonies involving Ayahuasca are required to complete and return a medical form prior to participation, to ascertain whether or not there are potential medical limitations to such participation.

3. Soul Quest conducts individualized interviews with the member intending to participate in the Ayahuasca ceremony. The purpose for these interviews is to:

14 | P a g e

a.   Establish a rapport with the individual; ascertain their basis and willingness to participate in the sacred Ayahuasca ritual; and to qualitatively assess current psychological and physical status; and

b.   (Re)assess an individual who has previously participated in the Ayahuasca ceremony.

4.   Soul Quest presents and explains the mandatory consent form (titled, "Participant Member Informed Consent, Disclosure & Disclaimer: Sanctified Healing Services/Counseling/Therapy).

5.   Soul Quest uses the information gathered through its described written and oral questions/interviews to determine whether or not to permit any given individual to participate in the Church's sacred Ayahuasca ceremony. The acceptance of an individual's participation in the ceremony is premised upon:

a.   Members demonstrating their understanding of the personal, religious process entailed by their participation.

b.   Accepting only members whose personal participation is unlikely to require greater assistance (in time or resources) than is available in the current context of the Ayahuasca ceremony.

c.   Determining whether members perhaps require additional therapy prior to consuming the sacramental Ayahuasca tea. Should additional therapy might potentially involve advising the member to seek appropriate, external professional assistance.

6.   In cases where any member's participation in the sacred Ayahuasca ceremony is declined by the Church, Soul Quest provides that member with an explanation for its decision, and suggests alternative methods for achieving suitable religious and therapeutic fulfillment. If Soul Quest determines there to be doubts about any member's suitability, then participation in the Ayahuasca ceremony is not permitted.

### C.   Pre-Ceremonial Procedures

1.   The facilitators used by Soul Quest during the Ayahuasca ceremony are trained to know the strength of Ayahuasca, its ingredients, and the religious and physiological impact from its use during the sacramental ceremony. Under no circumstance is any administration of prepared Ayahuasca

15 | P a g e

sacramental tea permitted that has not been properly analyzed and tested by those overseeing the ceremony.

2. Soul Quest requires a 1:5 ratio of facilitators-to-members to be present to cater to all members participating in the sacramental ceremony involving Ayahuasca. Any higher ratio is not permitted, as the security and health of the participating members is deemed critical.

3. Soul Quest provides a safe, comfortable and secure venue at its Church, with more than ample space, drinking water and toilet amenities.

4. Soul Quest further ensures member physical safety and comfort by preparing the environment to accommodate individualized needs (e.g., removal of any objects presenting a possible hazard; providing mats, blankets, pillows, buckets, paper tissues, etc.).

5. Soul Quest has developed an emergency plan for various scenarios, and has educated its facilitation team to know and understand what steps to take in case of an emergency. This entails the following safeguards:

   a. Pre-Screening for major health conditions of participants to ensure the safety for all.

   b. The Church preexisting facilities to take participants to a safe place away from the ceremony group to ensure their safety in case of physical, mental issues or concerns.

   c. Providing all facilitators with ready access to a well-stocked First Aid kit, blood pressure and any other necessary medical equipment.

   d. Ensuring that facilitators are certified in CPR.

   e. Training facilitators to exercise proper authority on whether to contact emergency services in the event of issues arising that require such attention. An emergency station is a mere three (3) minute commute from the Church property.

   f. Providing for evening facilitators to ensure participant safety during the evening.

16 | P a g e

### D. Ceremonial Procedures

1. Soul Quest estimates and measures the correct dosage of Ayahuasca for sacramental use. Dosage amounts are measured according to the member's age, gender, experience, health condition and individual needs. Any uncertainty results in administration of a smaller dose.

2. Soul Quest ensures member physical safety by observing for any potential hazards (e.g., removal of potentially dangerous objects; prohibiting any operation of a motorized vehicle; preventing any member from wandering from the area where the sacrament is administered; preventing any member from mistakenly sitting on another's palette/mat; etc.).

3. Soul Quest ensures each member's emotional safety. This includes, but is not necessarily limited to, providing any necessary emotional support; and ensuring no harmful interactions between other members and/or assistants.

4. Soul Quest ensures that no member is ever left alone during any part of the ceremony.

5. Soul Quest commits to the protection of, the integrity of, privacy of and security of the members and their interactions during the Ayahuasca sacramental ceremony.

6. Soul Quest ensures that no member is permitted to depart the ceremony prior to its closure, and then only until and unless first checked by a facilitator who confirms the member's ability to safely and securely depart.

7. Soul Quest checks each member prior to the ceremony's closure, to ensure that he or she possesses stable emotional state of mind and physical capacity.

8. Soul Quest is prepared to request additional assistance in the event of any emergency or other critical situation, including contacting local Emergency Medical Service ("EMS") personnel and/or police.

9. Soul Quest never denies any request for assistance; safety is of paramount concern.

10. In order to maximize potential benefits and experience during the Ayahuasca ceremony, Soul Quest also implements the following:

    a. *Optimization of Physical Position*: Soul Quest suggests that participating members remain in an upright, seated position, rather than lying down during the ceremony. This prevents any risk of choking, in case of vomiting, and helps identify

anyone who might confront a temporary loss of consciousness.

b.   *Implementation of Non-Pharmacological Techniques:* Soul Quest will undertake focused breathing, active listening, and stress the 'serene presence' through techniques designed to calm any Member who might experience heightened emotions during the ritual.

### E.   Post-Ceremonial Procedures

1.   Soul Quest provides its members with ample time for recovery prior to departing the Church premises. Members who have participated in the sacramental ceremony are provided with sufficient recovery space; traditionally, members return to their beds or remain in the ceremonial space until morning.

2.   Soul Quest ensures ongoing support available for those requiring it after the close of the sacramental ceremony.

3.   Soul Quest provides a group integration area, where the members can, whether individually or in groups use creative materials (paper, pencils and crayons for drawing, etc.), and as they continue to process their experience.

4.   Soul Quest ensures that all members possess the opportunity to attend a group integration process where they may share their experience with the rest of the group.

5.   Soul Quest is mindful of the interventions during group integration. An active listening attitude transpires, without judgment or interpretation that can narrow the amplitude of the experience. Soul Quest allows each member to reach his/her own conclusions and interpretations of their experience.

6.   Soul Quest checks the physical and emotional state of all members prior to departure, in order to ensure their continued safety and public safety.

7.   Soul Quest offers the possibility of additional support after the ceremony, providing contact information for any member to maintain post-ceremony communication and necessary counseling and other aftercare.

8.   Soul Quest directs participants to a qualified professional if unable to provide the level of support required during their integration/recovery process.

18 | P a g e

9. In order to improve on the service and experience from the ceremony, Soul Quest employs an evaluation form to gather feedback about the ceremony, the Church's efforts, and the Church facility.

10. Soul Quest utilizes two (2) separate questionnaires (pre- and post-ceremony) on the well-being of members participating in the sacramental use of Ayahuasca, to measure the impact of the experience and to monitor the integration/recovery process. The questionnaire is sent to the participating member one (1) week prior to, and then one week following the ceremony.

11. Soul Quest is mindful of its role as facilitators in this spiritual process, never taking for granted the profound and/or enlightening experiences that any member might experience during the ceremony. Soul Quest recognizes the significance of remaining supportive of its members, while allowing each participating member to direct their own spiritual energy into this process. Ultimately, the member is the responsible for interpreting his or her own spiritual evolution, discoveries and connections stemming from participation in the Ayahuasca sacrament.

**F.    Storage & Use Protocols for Sacramental Use of Ayahuasca**

Soul Quest undertakes rigid protocols to ensure the proper storage of the sacramental medicines intended for use during the Ayahuasca sacramental ceremony. The sacrament and medicines used during the ceremony are either prepared in the sacred traditions of the indigenous tribes of the Amazon at our Church or procured from the indigenous tribes of the Amazon. All such sacramental substances are stored in a locked cabinet, and are only accessible to two Church elders. Further, all sacraments and other medicines are labeled with a preparation date, time and quantity. Finally, the date and time when such substances are consumed is properly charted by Soul Quest. It is the conviction of Soul Quest that it must maintain such records in order to maximize the safeguarding of the substances and their ritual uses.

**IV.    Governance of SQCME/SOACME**

Ultimate authority lies in the Creator/Great Spirit of Ayahuasca as the head of the church and in the sacred beliefs and doctrines expressed as the basis. For all faith and practice. This church shall remain free and self-governing. The Government is vested in its membership and administered by its officers. In function, final authority shall reside in the membership. They shall approve and/or affirm SQCME qualified leadership, to carry out the purposes of the spirit of Ayahuasca. Our leadership will hold leadership meetings to talk, brainstorm and agree on any discipline or change that maybe required.

Akin to other religious institutions, Soul Quest maintains multiple instruments for governance of its affairs. Presently, this includes the following lay and religious officials/bodies:

*Chief Executive Officer, Chief Medicine Man, Pastor, Chief Elder and Counselor:* Chris Young

19 | P a g e

*President, Elder and Counselor:* Verena Young

*Director, Medicine Man/Woman, Elder and Counselor:* TBD

*Council of Elders:* Constituted of selected senior members of Soul Quest, and occupying various areas of specialization, as necessary for the maintenance and welfare of the Church.

Further, other officers such as church administrator, secretary, visiting ministers and teachers/elders will be assigned with Board permission. Presently, pending future growth of the Church, the Senior Pastor fills such duties.

### A.   Authority Granted to Soul Quest Lay & Religious Leadership

Soul Quest officers are authorized to take all necessary and proper actions to develop the Church and its mission. Each calendar year, a full and complete accounting of the actions taken is made available to Soul Quest members, via an annual general meeting. At that time, a full accounting of the preceding year's activities is presented. The Soul Quest Board is designated to meet monthly, or when otherwise deemed appropriate to discuss current issues, seasonal traditions and plans for future events. Further, the financial affairs of the institution are reviewed semi-annually by the Board, and are subject to annual reporting to Soul Quest's members.

### B.   Federal & State Religious Non-Profit Entity Recognition

As referenced, above, Soul Quest holds the following federal and state tax treatments as a religious-based, non-profit entity.

1.   Soul Quest Church of Mother Earth Inc. (SQCME) – Non-Profit Corporation Federal Identification No.: 841402813, and Florida State Non-Profit Corporation, founded by Medicine Man, Pastor, Chief Elder and Counselor, Chris Young; and its Elder and Counselor, Verena Young.

2.   Soul Quest Ayahuasca Church of Mother Earth Retreat and Wellness Center (SQACME), as an independent branch or Free Church of SQCME; Florida State Non-Profit Corporation 501 IRS-compliant Non-Profit was first incorporated July 15, 2016, with its Charter Declaration also entered on July 15, 2016, recognizing its founders, Medicine Man, Pastor, Chief Elder and Counselor Chris Young; and Elder and Counselor Verena Young.

All documentations reflecting the above statuses are included within the supplement to this exemption application.

### C.   Membership

Soul Quest receives all individuals as members who accept the spiritual and religious principles of the Church, as well as recognize the fruits of the Great Spirit in their lives, and who

20 | Page

agree to abide by Church's doctrine. The only requirement for membership is a singular request: the individual must express a belief in the foundation principles of the Soul Quest Church.

### D.    Provisions for By-Laws and Policy Manual

Soul Quest is governed by its Constitution and By-Laws, both of which are attached as a supplement to this exemption application. These documents embody the stated qualifications for church leaders and officers. Further, the By-Laws define officers' duties, provisions for appointment of additional leaders and teachers, conditions for membership, methods by which new members are received, and identify other rules and regulations for church activities, as needed. Last, a Policy Manual – also included in the supplement to this exemption application – encompasses all other operational matters including, but not limited to, job descriptions for all Church personnel.

### V.    Conclusion & Request for Granting of Religious-Based Exemption

In conclusion, Soul Quest reiterates its request for a religious-based exemption from the provisions of the Controlled Substances Act, as pertaining to its ritual use of ayahuasca in its conducting holy sacraments. Soul Quest remains confident that a review of this application, inclusive of all supplemental materials, will result in the granting of the requested exemption. Of course, Soul Quest welcomes the opportunity to address any questions or issues raised by the Drug Enforcement Administration or its cooperating agents in its consideration of this exemption application.

Sincerely,

DEREK B. BRETT
Legal Counsel for Soul Quest

21 | P a g e

Exhibit 11

# Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act

In recent years, the Drug Enforcement Administration (DEA) has seen an increase in requests from parties requesting religious exemptions from the Controlled Substances Act (CSA) to permit the use of controlled substances. The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person is in furtherance of a compelling governmental interest" and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-I. In *Gonzales v. O Centra Espirita Beneficente Uniao do Vegetal*, 126 S.Ct. 1211 (2006), the Supreme Court held that government action taken pursuant to the CSA is subject to RFRA. In order to obtain an exemption under RFRA, a party must, as a preliminary matter, demonstrate that its (1) sincere (2) religious exercise is (3) substantially burdened by the CSA. 42 U.S.C. § 2000bb et seq.

The guidelines that follow are an interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA:

1. *Filing Address.* All petitions for exemption from the Controlled Substances Act under RFRA shall be submitted in writing to Susan A. Gibson, Deputy Assistant Administrator, Diversion Control Division, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.

2. *Content of Petition.* A petition may include both a written statement and supporting documents. A petitioner should provide as much information as he/she deems necessary to demonstrate that application of the Controlled Substances Act to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise. Such a record should include detailed information about, among other things, (1) the nature of the religion {e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession. A petitioner is not limited to the topics outlined above, and may submit any and all information he/she believes to be relevant to DEA's determination under RFRA and the Controlled Substances Act.

3. *Signature.* The petition must be signed by the petitioner, who must declare under penalty of perjury that the information provided therein is true and correct. See *28 U.S.C. § 1746.*

4. *Acceptance of Petition for Filing.* Petitions submitted for filing are dated upon receipt by DEA. If it is found to be complete, the petition will be accepted as filed, and the petitioner will receive notification of acceptance. Petitions that do not conform to this guidance will not generally be accepted for filing. A petition that fails to conform to this guidance will be

Last updated: February 26, 2018

returned to the petitioner with a statement of the reason for not accepting the petition for filing. A deficient petition may be corrected and resubmitted. Acceptance of a petition for filing does not preclude DEA from making subsequent requests for additional information.

5. *Requests for Additional Information.* DEA may require a petitioner to submit such additional documents or written statements of facts relevant to the petition as DEA deems necessary to determine whether the petition should be granted. It is the petitioner's responsibility to provide DEA with accurate contact information. If a petitioner does not respond to a request for additional information within 60 days from the date of DEA's request, the petition will be considered to be withdrawn.

6. *Applicability of DEA Regulations.* A petitioner whose petition for a religious exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, quotas, recordkeeping and reporting, security and storage, labeling and packaging, other things. See *21 C.F.R. §§ 1300-1316.* A petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under *21 C.F.R. § 1307.03.* Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

7. *Activity Prohibited Until Final Determination.* No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. A registration granted to a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with CSA regulations and RFRA.

8. *Final Determination.* After the filed petition—along with all submissions in response to any requests for additional information—has been fully evaluated, the Deputy Assistant Administrator of the Diversion Control Division shall provide a written response that either grants or denies the petition. Except in the case of affirming a prior denial or when the denial is self-explanatory, the response shall be accompanied by a statement of reasons upon which the decision is based. This written response is a final determination under *21 U.S.C. § 877.*

9. *Application of State and Other Federal Law.* Nothing in these guidelines shall be construed as authorizing or permitting any party to take any action which such party is not authorized or permitted to take under other Federal laws or under the laws of the State in which he/she desires to take such action. Likewise, compliance with these guidelines shall not be construed as compliance with other Federal or State laws unless expressly provided in such other laws.

Exhibit 12



# Office of the Attorney General
## Washington, D.C. 20530
### October 6, 2017

MEMORANDUM FOR ALL EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:      THE ATTORNEY GENERAL

SUBJECT:   Federal Law Protections for Religious Liberty

The President has instructed me to issue guidance interpreting religious liberty protections in federal law, as appropriate. Exec. Order No. 13798 § 4, 82 Fed. Reg. 21675 (May 4, 2017). Consistent with that instruction, I am issuing this memorandum and appendix to guide all administrative agencies and executive departments in the execution of federal law.

## Principles of Religious Liberty

Religious liberty is a foundational principle of enduring importance in America, enshrined in our Constitution and other sources of federal law. As James Madison explained in his Memorial and Remonstrance Against Religious Assessments, the free exercise of religion "is in its nature an unalienable right" because the duty owed to one's Creator "is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."[1] Religious liberty is not merely a right to personal religious beliefs or even to worship in a sacred place. It also encompasses religious observance and practice. Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. The following twenty principles should guide administrative agencies and executive departments in carrying out this task. These principles should be understood and interpreted in light of the legal analysis set forth in the appendix to this memorandum.

1. **The freedom of religion is a fundamental right of paramount importance, expressly protected by federal law.**

   Religious liberty is enshrined in the text of our Constitution and in numerous federal statutes. It encompasses the right of all Americans to exercise their religion freely, without being coerced to join an established church or to satisfy a religious test as a qualification for public office. It also encompasses the right of all Americans to express their religious beliefs, subject to the same narrow limits that apply to all forms of speech. In the United States, the free exercise of religion is not a mere policy preference to be traded against other policy preferences. It is a fundamental right.

---

[1] James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), *in* 5 THE FOUNDERS' CONSTITUTION 82 (Phillip B. Kurland & Ralph Lerner eds., 1987).

Federal Law Protections for Religious Liberty
Page 2

**2. The free exercise of religion includes the right to *act* or *abstain from action* in accordance with one's religious beliefs.**

The Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs. Federal statutes, including the Religious Freedom Restoration Act of 1993 ("RFRA"), support that protection, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether or not central to, or required by, a particular religious faith.

**3. The freedom of religion extends to persons *and* organizations.**

The Free Exercise Clause protects not just persons, but persons collectively exercising their religion through churches or other religious denominations, religious organizations, schools, private associations, and even businesses.

**4. Americans do not give up their freedom of religion by participating in the marketplace, partaking of the public square, or interacting with government.**

Constitutional protections for religious liberty are not conditioned upon the willingness of a religious person or organization to remain separate from civil society. Although the application of the relevant protections may differ in different contexts, individuals and organizations do not give up their religious-liberty protections by providing or receiving social services, education, or healthcare; by seeking to earn or earning a living; by employing others to do the same; by receiving government grants or contracts; or by otherwise interacting with federal, state, or local governments.

**5. Government may not restrict acts or abstentions because of the beliefs they display.**

To avoid the very sort of religious persecution and intolerance that led to the founding of the United States, the Free Exercise Clause of the Constitution protects against government actions that target religious conduct. Except in rare circumstances, government may not treat the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons. For example, government may not attempt to target religious persons or conduct by allowing the distribution of political leaflets in a park but forbidding the distribution of religious leaflets in the same park.

**6. Government may not target religious individuals or entities for special disabilities based on their religion.**

Much as government may not restrict actions only because of religious belief, government may not target persons or individuals because of their religion. Government may not exclude religious organizations as such from secular aid programs, at least when the aid is not being used for explicitly religious activities such as worship or proselytization. For example, the Supreme Court has held that if government provides reimbursement for scrap tires to replace child playground surfaces, it may not deny participation in that program to religious schools. Nor may

Federal Law Protections for Religious Liberty
Page 3

government deny religious schools—including schools whose curricula and activities include religious elements—the right to participate in a voucher program, so long as the aid reaches the schools through independent decisions of parents.

**7. Government may not target religious individuals or entities through discriminatory enforcement of neutral, generally applicable laws.**

Although government generally may subject religious persons and organizations to neutral, generally applicable laws—e.g., across-the-board criminal prohibitions or certain time, place, and manner restrictions on speech—government may not apply such laws in a discriminatory way. For instance, the Internal Revenue Service may not enforce the Johnson Amendment—which prohibits 501(c)(3) non-profit organizations from intervening in a political campaign on behalf of a candidate—against a religious non-profit organization under circumstances in which it would not enforce the amendment against a secular non-profit organization. Likewise, the National Park Service may not require religious groups to obtain permits to hand out fliers in a park if it does not require similarly situated secular groups to do so, and no federal agency tasked with issuing permits for land use may deny a permit to an Islamic Center seeking to build a mosque when the agency has granted, or would grant, a permit to similarly situated secular organizations or religious groups.

**8. Government may not officially favor or disfavor particular religious groups.**

Together, the Free Exercise Clause and the Establishment Clause prohibit government from officially preferring one religious group to another. This principle of denominational neutrality means, for example, that government cannot selectively impose regulatory burdens on some denominations but not others. It likewise cannot favor some religious groups for participation in the Combined Federal Campaign over others based on the groups' religious beliefs.

**9. Government may not interfere with the autonomy of a religious organization.**

Together, the Free Exercise Clause and the Establishment Clause also restrict governmental interference in intra-denominational disputes about doctrine, discipline, or qualifications for ministry or membership. For example, government may not impose its nondiscrimination rules to require Catholic seminaries or Orthodox Jewish yeshivas to accept female priests or rabbis.

**10. The Religious Freedom Restoration Act of 1993 prohibits the federal government from substantially burdening any aspect of religious observance or practice, unless imposition of that burden on a particular religious adherent satisfies strict scrutiny.**

RFRA prohibits the federal government from substantially burdening a person's exercise of religion, unless the federal government demonstrates that application of such burden to the religious adherent is the least restrictive means of achieving a compelling governmental interest. RFRA applies to all actions by federal administrative agencies, including rulemaking, adjudication or other enforcement actions, and grant or contract distribution and administration.

Federal Law Protections for Religious Liberty
Page 4

**11. RFRA's protection extends not just to individuals, but also to organizations, associations, and at least some for-profit corporations.**

RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies. For example, the Supreme Court has held that Hobby Lobby, a closely held, for-profit corporation with more than 500 stores and 13,000 employees, is protected by RFRA.

**12. RFRA does not permit the federal government to second-guess the reasonableness of a religious belief.**

RFRA applies to all sincerely held religious beliefs, whether or not central to, or mandated by, a particular religious organization or tradition. Religious adherents will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts.

**13. A governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice.**

Because the government cannot second-guess the reasonableness of a religious belief or the adherent's assessment of the religious connection between the government mandate and the underlying religious belief, the substantial burden test focuses on the extent of governmental compulsion involved. In general, a government action that bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, will qualify as a substantial burden on the exercise of religion. For example, a Bureau of Prisons regulation that bans a devout Muslim from growing even a half-inch beard in accordance with his religious beliefs substantially burdens his religious practice. Likewise, a Department of Health and Human Services regulation requiring employers to provide insurance coverage for contraceptive drugs in violation of their religious beliefs or face significant fines substantially burdens their religious practice, and a law that conditions receipt of significant government benefits on willingness to work on Saturday substantially burdens the religious practice of those who, as a matter of religious observance or practice, do not work on that day. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself regards as unimportant or inconsequential imposes no substantial burden on that adherent. And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.

Federal Law Protections for Religious Liberty
Page 5

**14. The strict scrutiny standard applicable to RFRA is exceptionally demanding.**

Once a religious adherent has identified a substantial burden on his or her religious belief, the federal government can impose that burden on the adherent only if it is the least restrictive means of achieving a compelling governmental interest. Only those interests of the highest order can outweigh legitimate claims to the free exercise of religion, and such interests must be evaluated not in broad generalities but as applied to the particular adherent. Even if the federal government could show the necessary interest, it would also have to show that its chosen restriction on free exercise is the least restrictive means of achieving that interest. That analysis requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program.

**15. RFRA applies even where a religious adherent seeks an exemption from a legal obligation requiring the adherent to confer benefits on third parties.**

Although burdens imposed on third parties are relevant to RFRA analysis, the fact that an exemption would deprive a third party of a benefit does not categorically render an exemption unavailable. Once an adherent identifies a substantial burden on his or her religious exercise, RFRA requires the federal government to establish that denial of an accommodation or exemption to that adherent is the least restrictive means of achieving a compelling governmental interest.

**16. Title VII of the Civil Rights Act of 1964, as amended, prohibits covered employers from discriminating against individuals on the basis of their religion.**

Employers covered by Title VII may not fail or refuse to hire, discharge, or discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's religion. Such employers also may not classify their employees or applicants in a way that would deprive or tend to deprive any individual of employment opportunities because of the individual's religion. This protection applies regardless of whether the individual is a member of a religious majority or minority. But the protection does not apply in the same way to religious employers, who have certain constitutional and statutory protections for religious hiring decisions.

**17. Title VII's protection extends to discrimination on the basis of religious observance or practice as well as belief, unless the employer cannot reasonably accommodate such observance or practice without undue hardship on the business.**

Title VII defines "religion" broadly to include all aspects of religious observance or practice, except when an employer can establish that a particular aspect of such observance or practice cannot reasonably be accommodated without undue hardship to the business. For example, covered employers are required to adjust employee work schedules for Sabbath observance, religious holidays, and other religious observances, unless doing so would create an undue hardship, such as materially compromising operations or violating a collective bargaining agreement. Title VII might also require an employer to modify a no-head-coverings policy to allow a Jewish employee to wear a yarmulke or a Muslim employee to wear a headscarf. An

Federal Law Protections for Religious Liberty
Page 6

employer who contends that it cannot reasonably accommodate a religious observance or practice must establish undue hardship on its business with specificity; it cannot rely on assumptions about hardships that might result from an accommodation.

**18. The Clinton Guidelines on Religious Exercise and Religious Expression in the Federal Workplace provide useful examples for private employers of reasonable accommodations for religious observance and practice in the workplace.**

President Clinton issued Guidelines on Religious Exercise and Religious Expression in the Federal Workplace ("Clinton Guidelines") explaining that federal employees may keep religious materials on their private desks and read them during breaks; discuss their religious views with other employees, subject to the same limitations as other forms of employee expression; display religious messages on clothing or wear religious medallions; and invite others to attend worship services at their churches, except to the extent that such speech becomes excessive or harassing. The Clinton Guidelines have the force of an Executive Order, and they also provide useful guidance to private employers about ways in which religious observance and practice can reasonably be accommodated in the workplace.

**19. Religious employers are entitled to employ only persons whose beliefs and conduct are consistent with the employers' religious precepts.**

Constitutional and statutory protections apply to certain religious hiring decisions. Religious corporations, associations, educational institutions, and societies—that is, entities that are organized for religious purposes and engage in activity consistent with, and in furtherance of, such purposes—have an express statutory exemption from Title VII's prohibition on religious discrimination in employment. Under that exemption, religious organizations may choose to employ only persons whose beliefs and conduct are consistent with the organizations' religious precepts. For example, a Lutheran secondary school may choose to employ only practicing Lutherans, only practicing Christians, or only those willing to adhere to a code of conduct consistent with the precepts of the Lutheran community sponsoring the school. Indeed, even in the absence of the Title VII exemption, religious employers might be able to claim a similar right under RFRA or the Religion Clauses of the Constitution.

**20. As a general matter, the federal government may not condition receipt of a federal grant or contract on the effective relinquishment of a religious organization's hiring exemptions or attributes of its religious character.**

Religious organizations are entitled to compete on equal footing for federal financial assistance used to support government programs. Such organizations generally may not be required to alter their religious character to participate in a government program, nor to cease engaging in explicitly religious activities outside the program, nor effectively to relinquish their federal statutory protections for religious hiring decisions.

Federal Law Protections for Religious Liberty
Page 7

## Guidance for Implementing Religious Liberty Principles

Agencies must pay keen attention, in everything they do, to the foregoing principles of religious liberty.

### Agencies As Employers

Administrative agencies should review their current policies and practices to ensure that they comply with all applicable federal laws and policies regarding accommodation for religious observance and practice in the federal workplace, and all agencies must observe such laws going forward. In particular, all agencies should review the Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, which President Clinton issued on August 14, 1997, to ensure that they are following those Guidelines. All agencies should also consider practical steps to improve safeguards for religious liberty in the federal workplace, including through subject-matter experts who can answer questions about religious nondiscrimination rules, information websites that employees may access to learn more about their religious accommodation rights, and training for all employees about federal protections for religious observance and practice in the workplace.

### Agencies Engaged in Rulemaking

In formulating rules, regulations, and policies, administrative agencies should also proactively consider potential burdens on the exercise of religion and possible accommodations of those burdens. Agencies should consider designating an officer to review proposed rules with religious accommodation in mind or developing some other process to do so. In developing that process, agencies should consider drawing upon the expertise of the White House Office of Faith-Based and Neighborhood Partnerships to identify concerns about the effect of potential agency action on religious exercise. Regardless of the process chosen, agencies should ensure that they review all proposed rules, regulations, and policies that have the potential to have an effect on religious liberty for compliance with the principles of religious liberty outlined in this memorandum and appendix before finalizing those rules, regulations, or policies. The Office of Legal Policy will also review any proposed agency or executive action upon which the Department's comments, opinion, or concurrence are sought, *see, e.g.,* Exec. Order 12250 § 1-2, 45 Fed. Reg. 72995 (Nov. 2, 1980), to ensure that such action complies with the principles of religious liberty outlined in this memorandum and appendix. The Department will not concur in any proposed action that does not comply with federal law protections for religious liberty as interpreted in this memorandum and appendix, and it will transmit any concerns it has about the proposed action to the agency or the Office of Management and Budget as appropriate. If, despite these internal reviews, a member of the public identifies a significant concern about a prospective rule's compliance with federal protections governing religious liberty during a period for public comment on the rule, the agency should carefully consider and respond to that request in its decision. *See Perez v. Mortgage Bankers Ass'n,* 135 S. Ct. 1199, 1203 (2015). In appropriate circumstances, an agency might explain that it will consider requests for accommodations on a case-by-case basis rather than in the rule itself, but the agency should provide a reasoned basis for that approach.

Federal Law Protections for Religious Liberty
Page 8

## Agencies Engaged in Enforcement Actions

Much like administrative agencies engaged in rulemaking, agencies considering potential enforcement actions should consider whether such actions are consistent with federal protections for religious liberty. In particular, agencies should remember that RFRA applies to agency enforcement just as it applies to every other governmental action. An agency should consider RFRA when setting agency-wide enforcement rules and priorities, as well as when making decisions to pursue or continue any particular enforcement action, and when formulating any generally applicable rules announced in an agency adjudication.

Agencies should remember that discriminatory enforcement of an otherwise nondiscriminatory law can also violate the Constitution. Thus, agencies may not target or single out religious organizations or religious conduct for disadvantageous treatment in enforcement priorities or actions. The President identified one area where this could be a problem in Executive Order 13798, when he directed the Secretary of the Treasury, to the extent permitted by law, not to take any "adverse action against any individual, house of worship, or other religious organization on the basis that such individual or organization speaks or has spoken about moral or political issues from a religious perspective, where speech of *similar character*" from a non-religious perspective has not been treated as participation or intervention in a political campaign. Exec. Order No. 13798, § 2, 82 Fed. Reg. at 21675. But the requirement of nondiscrimination toward religious organizations and conduct applies across the enforcement activities of the Executive Branch, including within the enforcement components of the Department of Justice.

## Agencies Engaged in Contracting and Distribution of Grants

Agencies also must not discriminate against religious organizations in their contracting or grant-making activities. Religious organizations should be given the opportunity to compete for government grants or contracts and participate in government programs on an equal basis with nonreligious organizations. Absent unusual circumstances, agencies should not condition receipt of a government contract or grant on the effective relinquishment of a religious organization's Section 702 exemption for religious hiring practices, or any other constitutional or statutory protection for religious organizations. In particular, agencies should not attempt through conditions on grants or contracts to meddle in the internal governance affairs of religious organizations or to limit those organizations' otherwise protected activities.

*     *     *

Any questions about this memorandum or the appendix should be addressed to the Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C. 20530, phone (202) 514-4601.

Federal Law Protections for Religious Liberty
Page 1a

# APPENDIX

Although not an exhaustive treatment of all federal protections for religious liberty, this appendix summarizes the key constitutional and federal statutory protections for religious liberty and sets forth the legal basis for the religious liberty principles described in the foregoing memorandum.

## Constitutional Protections

The people, acting through their Constitution, have singled out religious liberty as deserving of unique protection. In the original version of the Constitution, the people agreed that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const., art. VI, cl. 3. The people then amended the Constitution during the First Congress to clarify that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1. Those protections have been incorporated against the States. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15 (1947) (Establishment Clause); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (Free Exercise Clause).

### A.  Free Exercise Clause

The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). Government may not attempt to *regulate* religious beliefs, *compel* religious beliefs, or *punish* religious beliefs. *See id.*; *see also Sherbert v. Verner*, 374 U.S. 398, 402 (1963); *Torcaso v. Watkins*, 367 U.S. 488, 492–93, 495 (1961); *United States v. Ballard*, 322 U.S. 78, 86 (1944). It may not lend its power to one side in intra-denominational disputes about dogma, authority, discipline, or qualifications for ministry or membership. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 185 (2012); *Smith*, 494 U.S. at 877; *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 451 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 120–21 (1952). It may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status. *Smith*, 494 U.S. at 877; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978). And with the exception of certain historical limits on the freedom of speech, government may not punish or otherwise harass churches, church officials, or religious adherents for speaking on religious topics or sharing their religious beliefs. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981); *see also* U.S. Const., amend. I, cl. 3. The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government. *Smith*, 494 U.S. at 877; *Sherbert*, 374 U.S. at 402; *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious

Federal Law Protections for Religious Liberty
Page 2a

tradition. *Frazee v. Illinois Dept. of Emp't Sec.*, 489 U.S. 829, 833–34 (1989). As the Supreme
Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or
comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi
Babalu Aye v. Hialeah*, 508 U.S. 520, 531 (1993) (internal quotation marks omitted). They must
merely be "sincerely held." *Frazee*, 489 U.S. at 834.

Importantly, the protection of the Free Exercise Clause also extends to acts undertaken in
accordance with such sincerely-held beliefs. That conclusion flows from the plain text of the First
Amendment, which guarantees the freedom to "*exercise*" religion, not just the freedom to
"believe" in religion. *See Smith*, 494 U.S. at 877; *see also Thomas*, 450 U.S. at 716; *Paty*, 435
U.S. at 627; *Sherbert*, 374 U.S. at 403–04; *Wisconsin v. Yoder*, 406 U.S. 205, 219–20 (1972).
Moreover, no other interpretation would actually guarantee the freedom of belief that Americans
have so long regarded as central to individual liberty. Many, if not most, religious beliefs require
external observance and practice through physical acts or abstention from acts. The tie between
physical acts and religious beliefs may be readily apparent (e.g., attendance at a worship service)
or not (e.g., service to one's community at a soup kitchen or a decision to close one's business on
a particular day of the week). The "exercise of religion" encompasses all aspects of religious
observance and practice. And because individuals may act collectively through associations and
organizations, it encompasses the exercise of religion by such entities as well. *See, e.g., Hosanna-
Tabor*, 565 U.S. at 199; *Church of the Lukumi Babalu Aye*, 508 U.S. at 525–26, 547; *see also
Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2770, 2772–73 (2014) (even a closely held
for-profit corporation may exercise religion if operated in accordance with asserted religious
principles).

As with most constitutional protections, however, the protection afforded to Americans by
the Free Exercise Clause for physical acts is not absolute, *Smith*, 491 U.S. at 878–79, and the
Supreme Court has identified certain principles to guide the analysis of the scope of that protection.
First, government may not restrict "acts or abstentions only when they are engaged in for religious
reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the
religious for special disabilities based on their religious status," *Trinity Lutheran Church of
Columbia, Inc. v. Comer*, 582 U.S. ___, ___ (2017) (slip op. at 6) (internal quotation marks
omitted), for it was precisely such "historical instances of religious persecution and intolerance
that gave concern to those who drafted the Free Exercise Clause." *Church of the Lukumi Babalu
Aye*, 508 U.S. at 532 (internal quotation marks omitted). The Free Exercise Clause protects against
"indirect coercion or penalties on the free exercise of religion" just as surely as it protects against
"outright prohibitions" on religious exercise. *Trinity Lutheran*, 582 U.S. at ___ (slip op. at 11)
(internal quotation marks omitted). "It is too late in the day to doubt that the liberties of religion
and expression may be infringed by the denial of or placing of conditions upon a benefit or
privilege." *Id.* (quoting *Sherbert*, 374 U.S. at 404).

Because a law cannot have as its official "object or purpose . . . the suppression of religion
or religious conduct," courts must "survey meticulously" the text and operation of a law to ensure
that it is actually neutral and of general applicability. *Church of the Lukumi Babalu Aye*, 508 U.S.
at 533–34 (internal quotation marks omitted). A law is not neutral if it singles out particular
religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for
secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions

Federal Law Protections for Religious Liberty
Page 3a

on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533–35, 538 (internal quotation marks omitted). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, *id.*, or enables, expressly or de facto, "a system of individualized exemptions," as discussed in *Smith*, 494 U.S. at 884; *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 537.

"Neutrality and general applicability are interrelated, . . . [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* at 531. For example, a law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable. *See Trinity Lutheran*, 582 U.S. at ___ – ___ (slip op. at 9–11). Likewise, a law that selectively prohibits the killing of animals for religious reasons and fails to prohibit the killing of animals for many nonreligious reasons, or that selectively prohibits a business from refusing to stock a product for religious reasons but fails to prohibit such refusal for myriad commercial reasons, is neither neutral, nor generally applicable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533–36, 542–45. Nonetheless, the requirements of neutral and general applicability are separate, and any law burdening religious practice that fails one or both must be subjected to strict scrutiny, *id.* at 546.

Second, even a neutral, generally applicable law is subject to strict scrutiny under this Clause if it restricts the free exercise of religion and another constitutionally protected liberty, such as the freedom of speech or association, or the right to control the upbringing of one's children. *See Smith*, 494 U.S. at 881–82; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004). Many Free Exercise cases fall in this category. For example, a law that seeks to compel a private person's speech or expression contrary to his or her religious beliefs implicates both the freedoms of speech and free exercise. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 707–08 (1977) (challenge by Jehovah's Witnesses to requirement that state license plates display the motto "Live Free or Die"); *Axson-Flynn*, 356 F.3d at 1280 (challenge by Mormon student to University requirement that student actors use profanity and take God's name in vain during classroom acting exercises). A law taxing or prohibiting door-to-door solicitation, at least as applied to individuals distributing religious literature and seeking contributions, likewise implicates the freedoms of speech and free exercise. *Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943) (challenge by Jehovah's Witnesses to tax on canvassing or soliciting); *Cantwell*, 310 U.S. at 307 (same). A law requiring children to receive certain education, contrary to the religious beliefs of their parents, implicates both the parents' right to the care, custody, and control of their children and to free exercise. *Yoder*, 406 U.S. at 227–29 (challenge by Amish parents to law requiring high school attendance).

Strict scrutiny is the "most rigorous" form of scrutiny identified by the Supreme Court. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546; *see also City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law."). It is the same standard applied to governmental classifications based on race, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007), and

Federal Law Protections for Religious Liberty
Page 4a

restrictions on the freedom of speech, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). *See Church of the Lukumi Babalu Aye*, 508 U.S. at 546–47. Under this level of scrutiny, government must establish that a challenged law "advance[s] interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 546 (internal quotation marks omitted). "[O]nly in rare cases" will a law survive this level of scrutiny. *Id.*

Of course, even when a law is neutral and generally applicable, government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 537 (government discriminatorily interpreted an ordinance prohibiting the unnecessary killing of animals as prohibiting only killing of animals for religious reasons); *Fowler v. Rhode Island*, 345 U.S. 67, 69–70 (1953) (government discriminatorily enforced ordinance prohibiting meetings in public parks against only certain religious groups). The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents. *See Trinity Lutheran*, 582 U.S. at ___ (slip op. at 6); *cf. Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114 (2001) (recognizing that Establishment Clause does not justify discrimination against religious clubs seeking use of public meeting spaces); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 837, 841 (1995) (recognizing that Establishment Clause does not justify discrimination against religious student newspaper's participation in neutral reimbursement program). That is true regardless of whether the discriminatory application is initiated by the government itself or by private requests or complaints. *See, e.g., Fowler*, 345 U.S. at 69; *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

B. Establishment Clause

The Establishment Clause, too, protects religious liberty. It prohibits government from establishing a religion and coercing Americans to follow it. *See Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819–20 (2014); *Good News Club*, 533 U.S. at 115. It restricts government from interfering in the internal governance or ecclesiastical decisions of a religious organization. *Hosanna-Tabor*, 565 U.S. at 188–89. And it prohibits government from officially favoring or disfavoring particular religious groups as such or officially advocating particular religious points of view. *See Galloway*, 134 S. Ct. at 1824; *Larson v. Valente*, 456 U.S. 228, 244–46 (1982). Indeed, "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Rosenberger*, 515 U.S. at 839 (emphasis added). That "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Id.* Thus, religious adherents and organizations may, like nonreligious adherents and organizations, receive indirect financial aid through independent choice, or, in certain circumstances, direct financial aid through a secular-aid program. *See, e.g., Trinity Lutheran*, 582 U.S. at ___ (slip. op. at 6) (scrap tire program); *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (voucher program).

C. Religious Test Clause

Finally, the Religious Test Clause, though rarely invoked, provides a critical guarantee to religious adherents that they may serve in American public life. The Clause reflects the judgment

Federal Law Protections for Religious Liberty
Page 5a

of the Framers that a diversity of religious viewpoints in government would enhance the liberty of all Americans. And after the Religion Clauses were incorporated against the States, the Supreme Court shared this view, rejecting a Tennessee law that "establishe[d] as a condition of office the willingness to eschew certain protected religious practices." *Paty*, 435 U.S. at 632 (Brennan, J., and Marshall, J., concurring in judgment); *see also id.* at 629 (plurality op.) ("[T]he American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").

Statutory Protections

Recognizing the centrality of religious liberty to our nation, Congress has buttressed these constitutional rights with statutory protections for religious observance and practice. These protections can be found in, among other statutes, the Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq.*; the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; and the American Indian Religious Freedom Act, 42 U.S.C. § 1996. Such protections ensure not only that government tolerates religious observance and practice, but that it embraces religious adherents as full members of society, able to contribute through employment, use of public accommodations, and participation in government programs. The considered judgment of the United States is that we are stronger through accommodation of religion than segregation or isolation of it.

A. Religious Freedom Restoration Act of 1993 (RFRA)

The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, prohibits the federal government from "substantially burden[ing] a person's exercise of religion" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a), (b). The Act applies even where the burden arises out of a "rule of general applicability" passed without animus or discriminatory intent. *See id.* § 2000bb-1(a). It applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *see* §§ 2000bb-2(4), 2000cc-5(7), and covers "individuals" as well as "corporations, companies, associations, firms, partnerships, societies, and joint stock companies," 1 U.S.C. § 1, including for-profit, closely-held corporations like those involved in *Hobby Lobby*, 134 S. Ct. at 2768.

Subject to the exceptions identified below, a law "substantially burden[s] a person's exercise of religion," 42 U.S.C. § 2000bb-1, if it bans an aspect of the adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice, *see Sherbert*, 374 U.S. at 405–06. The "threat of criminal sanction" will satisfy these principles, even when, as in *Yoder*, the prospective punishment is a mere $5 fine. 406 U.S. at 208, 218. And the denial of, or condition on the receipt of, government benefits may substantially burden the exercise of religion under these principles. *Sherbert*, 374 U.S. at 405–06; *see also Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987); *Thomas*, 450 U.S. at 717–18. But a law that infringes, even severely, an aspect of an adherent's religious observance or practice that the adherent himself

Federal Law Protections for Religious Liberty
Page 6a

regards as unimportant or inconsequential imposes no substantial burden on that adherent.  And a law that regulates only the government's internal affairs and does not involve any governmental compulsion on the religious adherent likewise imposes no substantial burden.  *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–49 (1988); *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

As with claims under the Free Exercise Clause, RFRA does not permit a court to inquire into the reasonableness of a religious belief, including into the adherent's assessment of the religious connection between a belief asserted and what the government forbids, requires, or prevents.  *Hobby Lobby*, 134 S. Ct. at 2778.  If the proffered belief is sincere, it is not the place of the government or a court to second-guess it.  *Id.*  A good illustration of the point is *Thomas v. Review Board of Indiana Employment Security Division*—one of the *Sherbert* line of cases, whose analytical test Congress sought, through RFRA, to restore, 42 U.S.C. § 2000bb.  There, the Supreme Court concluded that the denial of unemployment benefits was a substantial burden on the sincerely held religious beliefs of a Jehovah's Witness who had quit his job after he was transferred from a department producing sheet steel that could be used for military armaments to a department producing turrets for military tanks.  *Thomas*, 450 U.S. at 716–18.  In doing so, the Court rejected the lower court's inquiry into "what [the claimant's] belief was and what the religious basis of his belief was," noting that no one had challenged the sincerity of the claimant's religious beliefs and that "[c]ourts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."  *Id.* at 714–15 (internal quotation marks omitted).  The Court likewise rejected the lower court's comparison of the claimant's views to those of other Jehovah's Witnesses, noting that "[i]ntrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences."  *Id.* at 715.  The Supreme Court reinforced this reasoning in *Hobby Lobby*, rejecting the argument that "the connection between what the objecting parties [were required to] do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they [found] to be morally wrong (destruction of an embryo) [wa]s simply too attenuated."  134 S. Ct. at 2777.  The Court explained that the plaintiff corporations had a sincerely-held religious belief that provision of the coverage was morally wrong, and it was "not for us to say that their religious beliefs are mistaken or insubstantial."  *Id.* at 2779.

Government bears a heavy burden to justify a substantial burden on the exercise of religion.  "[O]nly those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion."  *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215).  Such interests include, for example, the "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history," *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983), and the interest in ensuring the "mandatory and continuous participation" that is "indispensable to the fiscal vitality of the social security system," *United States v. Lee*, 455 U.S. 252, 258–59 (1982).  But "broadly formulated interests justifying the general applicability of government mandates" are insufficient.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006).  The government must establish a compelling interest to deny an accommodation to the particular claimant.  *Id.* at 430, 435–38.  For example, the military may have a compelling interest in its

Federal Law Protections for Religious Liberty
Page 7a

uniform and grooming policy to ensure military readiness and protect our national security, but it does not necessarily follow that those interests would justify denying a particular soldier's request for an accommodation from the uniform and grooming policy. *See, e.g.*, Secretary of the Army, Army Directive 2017-03, Policy for Brigade-Level Approval of Certain Requests for Religious Accommodation (2017) (recognizing the "successful examples of Soldiers currently serving with" an accommodation for "the wear of a hijab; the wear of a beard; and the wear of a turban or under-turban/patka, with uncut beard and uncut hair" and providing for a reasonable accommodation of these practices in the Army). The military would have to show that it has a compelling interest in denying that particular accommodation. An asserted compelling interest in denying an accommodation to a particular claimant is undermined by evidence that exemptions or accommodations have been granted for other interests. *See O Centro*, 546 U.S. at 433, 436–37; *see also Hobby Lobby*, 134 S. Ct. at 2780.

The compelling-interest requirement applies even where the accommodation sought is "an exemption from a legal obligation requiring [the claimant] to confer benefits on third parties." *Hobby Lobby*, 134 S. Ct. at 2781 n.37. Although "in applying RFRA 'courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries,'" the Supreme Court has explained that almost any governmental regulation could be reframed as a legal obligation requiring a claimant to confer benefits on third parties. *Id.* (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)). As nothing in the text of RFRA admits of an exception for laws requiring a claimant to confer benefits on third parties, 42 U.S.C. § 2000bb-1, and such an exception would have the potential to swallow the rule, the Supreme Court has rejected the proposition that RFRA accommodations are categorically unavailable for laws requiring claimants to confer benefits on third parties. *Hobby Lobby*, 134 S. Ct. at 2781 n.37.

Even if the government can identify a compelling interest, the government must also show that denial of an accommodation is the least restrictive means of serving that compelling governmental interest. This standard is "exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. It requires the government to show that it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which may include, in certain circumstances, expenditure of additional funds, modification of existing exemptions, or creation of a new program. *Id.* at 2781. Indeed, the existence of exemptions for other individuals or entities that could be expanded to accommodate the claimant, while still serving the government's stated interests, will generally defeat a RFRA defense, as the government bears the burden to establish that no accommodation is viable. *See id.* at 2781–82.

B. Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA)

Although Congress's leadership in adopting RFRA led many States to pass analogous statutes, Congress recognized the unique threat to religious liberty posed by certain categories of state action and passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) to address them. RLUIPA extends a standard analogous to RFRA to state and local government actions regulating land use and institutionalized persons where "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §§ 2000cc(a)(2), 2000cc-1(b).

Federal Law Protections for Religious Liberty
Page 8a

RLUIPA's protections must "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by [RLUIPA] and the Constitution." *Id.* § 2000cc-3(g). RLUIPA applies to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc-5(7)(A), and treats "[t]he use, building, or conversion of real property for the purpose of religious exercise" as the "religious exercise of the person or entity that uses or intends to use the property for that purpose," *id.* § 2000cc-5(7)(B). Like RFRA, RLUIPA prohibits government from substantially burdening an exercise of religion unless imposition of the burden on the religious adherent is the least restrictive means of furthering a compelling governmental interest. *See id.* § 2000cc-1(a). That standard "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c); *cf. Holt v. Hobbs,* 135 S. Ct. 853, 860, 864–65 (2015).

With respect to land use in particular, RLUIPA also requires that government not "treat[] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution," 42 U.S.C. § 2000cc(b)(1), "impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination," *id.* § 2000cc(b)(2), or "impose or implement a land use regulation that (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction," *id.* § 2000cc(b)(3). A claimant need not show a substantial burden on the exercise of religion to enforce these antidiscrimination and equal terms provisions listed in § 2000cc(b). *See id.* § 2000cc(b); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 510 F.3d 253, 262–64 (3d Cir. 2007), *cert. denied,* 553 U.S. 1065 (2008). Although most RLUIPA cases involve places of worship like churches, mosques, synagogues, and temples, the law applies more broadly to religious schools, religious camps, religious retreat centers, and religious social service facilities. Letter from U.S. Dep't of Justice Civil Rights Division to State, County, and Municipal Officials re: The Religious Land Use and Institutionalized Persons Act (Dec. 15, 2016).

C. Other Civil Rights Laws

To incorporate religious adherents fully into society, Congress has recognized that it is not enough to limit governmental action that substantially burdens the exercise of religion. It must also root out public and private discrimination based on religion. Religious discrimination stood alongside discrimination based on race, color, and national origin, as an evil to be addressed in the Civil Rights Act of 1964, and Congress has continued to legislate against such discrimination over time. Today, the United States Code includes specific prohibitions on religious discrimination in places of public accommodation, 42 U.S.C. § 2000a; in public facilities, *id.* § 2000b; in public education, *id.* § 2000c-6; in employment, *id.* §§ 2000e, 2000e-2, 2000e-16; in the sale or rental of housing, *id.* § 3604; in the provision of certain real-estate transaction or brokerage services, *id.* §§ 3605, 3606; in federal jury service, 28 U.S.C. § 1862; in access to limited open forums for speech, 20 U.S.C. § 4071; and in participation in or receipt of benefits from various federally-funded programs, 15 U.S.C. § 3151; 20 U.S.C. §§ 1066c(d), 1071(a)(2), 1087-4, 7231d(b)(2), 7914; 31 U.S.C. § 6711(b)(3); 42 U.S.C. §§ 290cc-33(a)(2), 300w-7(a)(2), 300x-57(a)(2), 300x-65(f), 604a(g), 708(a)(2), 5057(c), 5151(a), 5309(a), 6727(a), 9858l(a)(2), 10406(2)(B), 10504(a), 10604(e), 12635(c)(1), 12832, 13791(g)(3), 13925(b)(13)(A).

Federal Law Protections for Religious Liberty
Page 9a

Invidious religious discrimination may be directed at religion in general, at a particular religious belief, or at particular aspects of religious observance and practice. *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 532–33. A law drawn to prohibit a specific religious practice may discriminate just as severely against a religious group as a law drawn to prohibit the religion itself. *See id.* No one would doubt that a law prohibiting the sale and consumption of Kosher meat would discriminate against Jewish people. True equality may also require, depending on the applicable statutes, an awareness of, and willingness reasonably to accommodate, religious observance and practice. Indeed, the denial of reasonable accommodations may be little more than cover for discrimination against a particular religious belief or religion in general and is counter to the general determination of Congress that the United States is best served by the participation of religious adherents in society, not their withdrawal from it.

1. Employment

i. Protections for Religious Employees

Protections for religious individuals in employment are the most obvious example of Congress's instruction that religious observance and practice be reasonably accommodated, not marginalized. In Title VII of the Civil Rights Act, Congress declared it an unlawful employment practice for a covered employer to (1) "fail or refuse to hire or to discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," as well as (2) to "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a); *see also* 42 U.S.C. § 2000e-16(a) (applying Title VII to certain federal-sector employers); 3 U.S.C. § 411(a) (applying Title VII employment in the Executive Office of the President). The protection applies "regardless of whether the discrimination is directed against [members of religious] majorities or minorities." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977).

After several courts had held that employers did not violate Title VII when they discharged employees for refusing to work on their Sabbath, Congress amended Title VII to define "[r]eligion" broadly to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *Hardison*, 432 U.S. at 74 n.9. Congress thus made clear that discrimination on the basis of religion includes discrimination on the basis of any aspect of an employee's religious observance or practice, at least where such observance or practice can be reasonably accommodated without undue hardship.

Title VII's reasonable accommodation requirement is meaningful. As an initial matter, it requires an employer to consider what adjustment or modification to its policies would effectively address the employee's concern, for "[a]n *ineffective* modification or adjustment will not *accommodate*" a person's religious observance or practice, within the ordinary meaning of that word. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (considering the ordinary

Federal Law Protections for Religious Liberty
Page 10a

meaning in the context of an ADA claim). Although there is no obligation to provide an employee with his or her preferred reasonable accommodation, *see Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986), an employer may justify a refusal to accommodate only by showing that "an undue hardship [on its business] would *in fact* result from *each available* alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." *Id.* Likewise, the fact that an accommodation may grant the religious employee a preference is not evidence of undue hardship as, "[b]y definition, any special 'accommodation' requires the employer to treat an employee ... differently, *i.e.*, preferentially." *U.S. Airways*, 535 U.S. at 397; *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices—that they may be treated no worse than other practices. Rather, it gives them favored treatment.").

Title VII does not, however, require accommodation at all costs. As noted above, an employer is not required to accommodate a religious observance or practice if it would pose an undue hardship on its business. An accommodation might pose an "undue hardship," for example, if it would require the employer to breach an otherwise valid collective bargaining agreement, *see, e.g., Hardison*, 432 U.S. at 79, or carve out a special exception to a seniority system, *id.* at 83; *see also U.S. Airways*, 535 U.S. at 403. Likewise, an accommodation might pose an "undue hardship" if it would impose "more than a de minimis cost" on the business, such as in the case of a company where weekend work is "essential to [the] business" and many employees have religious observances that would prohibit them from working on the weekends, so that accommodations for all such employees would result in significant overtime costs for the employer. *Hardison*, 432 U.S. at 80, 84 & n.15. In general, though, Title VII expects positive results for society from a cooperative process between an employer and its employee "in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Philbrook*, 479 U.S. at 69 (internal quotations omitted).

The area of religious speech and expression is a useful example of reasonable accommodation. Where speech or expression is part of a person's religious observance and practice, it falls within the scope of Title VII. *See* 42 U.S.C. §§ 2000e, 2000e-2. Speech or expression outside of the scope of an individual's employment can almost always be accommodated without undue hardship to a business. Speech or expression within the scope of an individual's employment, during work hours, or in the workplace may, depending upon the facts and circumstances, be reasonably accommodated. *Cf. Abercrombie*, 135 S. Ct. at 2032.

The federal government's approach to free exercise in the federal workplace provides useful guidance on such reasonable accommodations. For example, under the Guidelines issued by President Clinton, the federal government permits a federal employee to "keep a Bible or Koran on her private desk and read it during breaks"; to discuss his religious views with other employees, subject "to the same rules of order as apply to other employee expression"; to display religious messages on clothing or wear religious medallions visible to others; and to hand out religious tracts to other employees or invite them to attend worship services at the employee's church, except to the extent that such speech becomes excessive or harassing. Guidelines on Religious Exercise and Religious Expression in the Federal Workplace, § 1(A), Aug. 14, 1997 (hereinafter "Clinton

Federal Law Protections for Religious Liberty
Page 11a

Guidelines"). The Clinton Guidelines have the force of an Executive Order. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order."); *see also* Memorandum from President William J. Clinton to the Heads of Executive Departments and Agencies (Aug. 14, 1997) ("All civilian executive branch agencies, officials, and employees must follow these Guidelines carefully."). The successful experience of the federal government in applying the Clinton Guidelines over the last twenty years is evidence that religious speech and expression can be reasonably accommodated in the workplace without exposing an employer to liability under workplace harassment laws.

Time off for religious holidays is also often an area of concern. The observance of religious holidays is an "aspect[] of religious observance and practice" and is therefore protected by Title VII. 42 U.S.C. §§ 2000e, 2000e-2. Examples of reasonable accommodations for that practice could include a change of job assignments or lateral transfer to a position whose schedule does not conflict with the employee's religious holidays, 29 C.F.R. § 1605.2(d)(1)(iii); a voluntary work schedule swap with another employee, *id.* § 1065.2(d)(1)(i); or a flexible scheduling scheme that allows employees to arrive or leave early, use floating or optional holidays for religious holidays, or make up time lost on another day, *id.* § 1065.2(d)(1)(ii). Again, the federal government has demonstrated reasonable accommodation through its own practice: Congress has created a flexible scheduling scheme for federal employees, which allows employees to take compensatory time off for religious observances, 5 U.S.C. § 5550a, and the Clinton Guidelines make clear that "[a]n agency must adjust work schedules to accommodate an employee's religious observance—for example, Sabbath or religious holiday observance—if an adequate substitute is available, or if the employee's absence would not otherwise impose an undue burden on the agency," Clinton Guidelines § 1(C). If an employer regularly permits accommodation in work scheduling for secular conflicts and denies such accommodation for religious conflicts, "such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness." *Philbrook*, 479 U.S. at 71.

Except for certain exceptions discussed in the next section, Title VII's protection against disparate treatment, 42 U.S.C. § 2000e-2(a)(1), is implicated *any time* religious observance or practice is a motivating factor in an employer's covered decision. *Abercrombie*, 135 S. Ct. at 2033. That is true even when an employer acts without actual knowledge of the need for an accommodation from a neutral policy but with "an unsubstantiated suspicion" of the same. *Id.* at 2034.

## ii. Protections for Religious Employers

Congress has acknowledged, however, that religion sometimes *is* an appropriate factor in employment decisions, and it has limited Title VII's scope accordingly. Thus, for example, where religion "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," employers may hire and employ individuals based on their religion. 42 U.S.C. § 2000e-2(e)(1). Likewise, where educational institutions are "owned, supported, controlled or managed, [in whole or in substantial part] by a particular religion or by a particular religious corporation, association, or society" or direct their curriculum "toward the

Federal Law Protections for Religious Liberty
Page 12a

propagation of a particular religion," such institutions may hire and employ individuals of a particular religion. *Id.* And "a religious corporation, association, educational institution, or society" may employ "individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." *Id.* § 2000e-1(a); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335–36 (1987).

Because Title VII defines "religion" broadly to include "all aspects of religious observance and practice, as well as belief," 42 U.S.C. § 2000e(j), these exemptions include decisions "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991); *see also Killinger v. Samford Univ.*, 113 F.3d 196, 198–200 (11th Cir. 1997). For example, in *Little*, the Third Circuit held that the exemption applied to a Catholic school's decision to fire a divorced Protestant teacher who, though having agreed to abide by a code of conduct shaped by the doctrines of the Catholic Church, married a baptized Catholic without first pursuing the official annulment process of the Church. 929 F.2d at 946, 951.

Section 702 broadly exempts from its reach religious corporations, associations, educational institutions, and societies. The statute's terms do not limit this exemption to non-profit organizations, to organizations that carry on only religious activities, or to organizations established by a church or formally affiliated therewith. *See* Civil Rights Act of 1964, § 702(a), *codified at* 42 U.S.C. § 2000e-1(a); *see also Hobby Lobby*, 134 S. Ct. at 2773–74; *Corp. of Presiding Bishop*, 483 U.S. at 335–36. The exemption applies whenever the organization is "religious," which means that it is organized for religious purposes and engages in activity consistent with, and in furtherance of, such purposes. Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008). Thus, the exemption applies not just to religious denominations and houses of worship, but to religious colleges, charitable organizations like the Salvation Army and World Vision International, and many more. In that way, it is consistent with other broad protections for religious entities in federal law, including, for example, the exemption of religious entities from many of the requirements under the Americans with Disabilities Act. *See* 28 C.F.R. app. C; 56 Fed. Reg. 35544, 35554 (July 26, 1991) (explaining that "[t]he ADA's exemption of religious organizations and religious entities controlled by religious organizations is very broad, encompassing a wide variety of situations").

In addition to these explicit exemptions, religious organizations may be entitled to additional exemptions from discrimination laws. *See, e.g., Hosanna-Tabor*, 565 U.S. at 180, 188–90. For example, a religious organization might conclude that it cannot employ an individual who fails faithfully to adhere to the organization's religious tenets, either because doing so might itself inhibit the organization's exercise of religion or because it might dilute an expressive message. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649–55 (2000). Both constitutional and statutory issues arise when governments seek to regulate such decisions.

As a constitutional matter, religious organizations' decisions are protected from governmental interference to the extent they relate to ecclesiastical or internal governance matters. *Hosanna-Tabor*, 565 U.S. at 180, 188–90. It is beyond dispute that "it would violate the First Amendment for courts to apply [employment discrimination] laws to compel the ordination of

Federal Law Protections for Religious Liberty
Page 13a

women by the Catholic Church or by an Orthodox Jewish seminary." *Id.* at 188. The same is true for other employees who "minister to the faithful," including those who are not themselves the head of the religious congregation and who are not engaged solely in religious functions. *Id.* at 188, 190, 194–95; *see also* Br. of Amicus Curiae the U.S. Supp. Appellee, *Spencer v. World Vision, Inc.*, No. 08-35532 (9th Cir. 2008) (noting that the First Amendment protects "the right to employ staff who share the religious organization's religious beliefs").

Even if a particular associational decision could be construed to fall outside this protection, the government would likely still have to show that any interference with the religious organization's associational rights is justified under strict scrutiny. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (infringements on expressive association are subject to strict scrutiny); *Smith*, 494 U.S. at 882 ("[I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns."). The government may be able to meet that standard with respect to race discrimination, *see Bob Jones Univ.*, 461 U.S. at 604, but may not be able to with respect to other forms of discrimination. For example, at least one court has held that forced inclusion of women into a mosque's religious men's meeting would violate the freedom of expressive association. *Donaldson v. Farrakhan*, 762 N.E.2d 835, 840–41 (Mass. 2002). The Supreme Court has also held that the government's interest in addressing sexual-orientation discrimination is not sufficiently compelling to justify an infringement on the expressive association rights of a private organization. *Boy Scouts*, 530 U.S. at 659.

As a statutory matter, RFRA too might require an exemption or accommodation for religious organizations from antidiscrimination laws. For example, "prohibiting religious organizations from hiring only coreligionists can 'impose a significant burden on their exercise of religion, even as applied to employees in programs that must, by law, refrain from specifically religious activities.'" *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act*, 31 Op. O.L.C. 162, 172 (2007) (quoting *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129, 132 (2001)); *see also Corp. of Presiding Bishop*, 483 U.S. at 336 (noting that it would be "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court w[ould] consider religious" in applying a nondiscrimination provision that applied only to secular, but not religious, activities). If an organization establishes the existence of such a burden, the government must establish that imposing such burden on the organization is the least restrictive means of achieving a compelling governmental interest. That is a demanding standard and thus, even where Congress has not expressly exempted religious organizations from its antidiscrimination laws—as it has in other contexts, *see, e.g.*, 42 U.S.C. §§ 3607 (Fair Housing Act), 12187 (Americans with Disabilities Act)—RFRA might require such an exemption.

2. Government Programs

Protections for religious organizations likewise exist in government contracts, grants, and other programs. Recognizing that religious organizations can make important contributions to government programs, *see, e.g.*, 22 U.S.C. § 7601(19), Congress has expressly permitted religious organizations to participate in numerous such programs on an equal basis with secular

Federal Law Protections for Religious Liberty
Page 14a

organizations, *see, e.g.*, 42 U.S.C. §§ 290kk-1, 300x-65 604a, 629i. Where Congress has not expressly so provided, the President has made clear that "[t]he Nation's social service capacity will benefit if all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." Exec. Order No. 13559, § 1, 75 Fed. Reg. 71319, 71319 (Nov. 17, 2010) (amending Exec. Order No. 13279, 67 Fed. Reg. 77141 (2002)). To that end, no organization may be "discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs." *Id.* "Organizations that engage in explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization)" are eligible to participate in such programs, so long as they conduct such activities outside of the programs directly funded by the federal government and at a separate time and location. *Id.*

The President has assured religious organizations that they are "eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social services programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character." *See id.*; *see also* 42 U.S.C. § 290kk-1(e) (similar statutory assurance). Religious organizations that apply for or participate in such programs may continue to carry out their mission, "including the definition, development, practice, and expression of . . . religious beliefs," so long as they do not use any "direct Federal financial assistance" received "to support or engage in any explicitly religious activities" such as worship, religious instruction, or proselytization. Exec. Order No. 13559, § 1. They may also "use their facilities to provide social services supported with Federal financial assistance, without removing or altering religious art, icons, scriptures, or other symbols from these facilities," and they may continue to "retain religious terms" in their names, select "board members on a religious basis, and include religious references in . . . mission statements and other chartering or governing documents." *Id.*

With respect to government contracts in particular, Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002), confirms that the independence and autonomy promised to religious organizations include independence and autonomy in religious hiring. Specifically, it provides that the employment nondiscrimination requirements in Section 202 of Executive Order 11246, which normally apply to government contracts, do "not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Exec. Order No. 13279, § 4, *amending* Exec. Order No. 11246, § 204(c), 30 Fed. Reg. 12319, 12935 (Sept. 24, 1965).

Because the religious hiring protection in Executive Order 13279 parallels the Section 702 exemption in Title VII, it should be interpreted to protect the decision "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Little*, 929 F.2d at 951. That parallel interpretation is consistent with the Supreme Court's repeated counsel that the decision to borrow statutory text in a new statute is "strong indication that the two statutes should be interpreted pari passu." *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427 (1973) (per curiam); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559

Federal Law Protections for Religious Liberty
Page 15a

U.S. 573, 590 (2010). It is also consistent with the Executive Order's own usage of discrimination on the basis of "religion" as something distinct and more expansive than discrimination on the basis of "religious belief." *See, e.g.*, Exec. Order No. 13279, § 2(c) ("No organization should be discriminated against on the basis of religion *or* religious belief . . . " (emphasis added)); *id.* § 2(d) ("All organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief. Accordingly, organizations, in providing services supported in whole or in part with Federal financial assistance, and in their outreach activities related to such services, should not be allowed to discriminate against current or prospective program beneficiaries on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to actively participate in a religious practice."). Indeed, because the Executive Order uses "on the basis of religion or religious belief" in both the provision prohibiting discrimination against religious organizations and the provision prohibiting discrimination "against beneficiaries or potential beneficiaries," a narrow interpretation of the protection for religious organizations' hiring decisions would lead to a narrow protection for beneficiaries of programs served by such organizations. *See id.* §§ 2(c), (d). It would also lead to inconsistencies in the treatment of religious hiring across government programs, as some program-specific statutes and regulations expressly confirm that "[a] religious organization's exemption provided under section 2000e-1 of this title regarding employment practices shall not be affected by its participation, or receipt of funds from, a designated program." 42 U.S.C. § 290kk-1(e); *see also* 6 C.F.R. § 19.9 (same).

Even absent the Executive Order, however, RFRA would limit the extent to which the government could condition participation in a federal grant or contract program on a religious organization's effective relinquishment of its Section 702 exemption. RFRA applies to all government conduct, not just to legislation or regulation, *see* 42 U.S.C. § 2000bb-1, and the Office of Legal Counsel has determined that application of a religious nondiscrimination law to the hiring decisions of a religious organization can impose a substantial burden on the exercise of religion. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. O.L.C. at 172; *Direct Aid to Faith-Based Organizations*, 25 Op. O.L.C. at 132. Given Congress's "recognition that religious discrimination in employment is permissible in some circumstances," the government will not ordinarily be able to assert a compelling interest in prohibiting that conduct as a general condition of a religious organization's receipt of any particular government grant or contract. *Application of the Religious Freedom Restoration Act to the Award of a Grant*, 31 Op. O.L.C. at 186. The government will also bear a heavy burden to establish that requiring a particular contractor or grantee effectively to relinquish its Section 702 exemption is the least restrictive means of achieving a compelling governmental interest. *See* 42 U.S.C. § 2000bb-1.

The First Amendment also "supplies a limit on Congress' ability to place conditions on the receipt of funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013) (internal quotation marks omitted)). Although Congress may specify the activities that it wants to subsidize, it may not "seek to leverage funding" to regulate constitutionally protected conduct "outside the contours of the program itself." *See id.* Thus, if a condition on participation in a government program—including eligibility for receipt of federally backed student loans— would interfere with a religious organization's constitutionally protected rights, *see, e.g.*,

Federal Law Protections for Religious Liberty
Page 16a

*Hosanna-Tabor*, 565 U.S. at 188–89, that condition could raise concerns under the "unconstitutional conditions" doctrine, *see All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. at 2328.

Finally, Congress has provided an additional statutory protection for educational institutions controlled by religious organizations who provide education programs or activities receiving federal financial assistance. Such institutions are exempt from Title IX's prohibition on sex discrimination in those programs and activities where that prohibition "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). Although eligible institutions may "claim the exemption" in advance by "submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions . . . [that] conflict with a specific tenet of the religious organization," 34 C.F.R. § 106.12(b), they are not required to do so to have the benefit of it, *see* 20 U.S.C. § 1681.

### 3. Government Mandates

Congress has undertaken many similar efforts to accommodate religious adherents in diverse areas of federal law. For example, it has exempted individuals who, "by reason of religious training and belief," are conscientiously opposed to war from training and service in the armed forces of the United States. 50 U.S.C. § 3806(j). It has exempted "ritual slaughter and the handling or other preparation of livestock for ritual slaughter" from federal regulations governing methods of animal slaughter. 7 U.S.C. § 1906. It has exempted "private secondary school[s] that maintain[] a religious objection to service in the Armed Forces" from being required to provide military recruiters with access to student recruiting information. 20 U.S.C. § 7908. It has exempted federal employees and contractors with religious objections to the death penalty from being required to "be in attendance at or to participate in any prosecution or execution." 18 U.S.C. § 3597(b). It has allowed individuals with religious objections to certain forms of medical treatment to opt out of such treatment. *See, e.g.*, 33 U.S.C. § 907(k); 42 U.S.C. § 290bb-36(f). It has created tax accommodations for members of religious faiths conscientiously opposed to acceptance of the benefits of any private or public insurance, *see, e.g.*, 26 U.S.C. §§ 1402(g), 3127, and for members of religious orders required to take a vow of poverty, *see, e.g.*, 26 U.S.C. § 3121(r).

Congress has taken special care with respect to programs touching on abortion, sterilization, and other procedures that may raise religious conscience objections. For example, it has prohibited entities receiving certain federal funds for health service programs or research activities from requiring individuals to participate in such program or activity contrary to their religious beliefs. 42 U.S.C. § 300a-7(d), (e). It has prohibited discrimination against health care professionals and entities that refuse to undergo, require, or provide training in the performance of induced abortions; to provide such abortions; or to refer for such abortions, and it will deem accredited any health care professional or entity denied accreditation based on such actions. *Id.* § 238n(a), (b). It has also made clear that receipt of certain federal funds does not require an individual "to perform or assist in the performance of any sterilization procedure or abortion if [doing so] would be contrary to his religious beliefs or moral convictions" nor an entity to "make its facilities available for the performance of" those procedures if such performance "is prohibited by the entity on the basis of religious beliefs or moral convictions," nor an entity to "provide any personnel for the performance or assistance in the performance of" such procedures if such performance or assistance "would be contrary to the religious beliefs or moral convictions of such

Federal Law Protections for Religious Liberty
Page 17a

personnel." *Id.* § 300a-7(b). Finally, no "qualified health plan[s] offered through an Exchange" may discriminate against any health care professional or entity that refuses to "provide, pay for, provide coverage of, or refer for abortions," § 18023(b)(4); *see also* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, § 507(d), 129 Stat. 2242, 2649 (Dec. 18, 2015).

Congress has also been particularly solicitous of the religious freedom of American Indians. In 1978, Congress declared it the "policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. Consistent with that policy, it has passed numerous statutes to protect American Indians' right of access for religious purposes to national park lands, Scenic Area lands, and lands held in trust by the United States. *See, e.g.,* 16 U.S.C. §§ 228i(b), 410aaa-75(a), 460uu-47, 543f, 698v-11(b)(11). It has specifically sought to preserve lands of religious significance and has required notification to American Indians of any possible harm to or destruction of such lands. *Id.* § 470cc. Finally, it has provided statutory exemptions for American Indians' use of otherwise regulated articles such as bald eagle feathers and peyote as part of traditional religious practice. *Id.* §§ 668a, 4305(d); 42 U.S.C. § 1996a.

*    *    *

The depth and breadth of constitutional and statutory protections for religious observance and practice in America confirm the enduring importance of religious freedom to the United States. They also provide clear guidance for all those charged with enforcing federal law: The free exercise of religion is not limited to a right to hold personal religious beliefs or even to worship in a sacred place. It encompasses all aspects of religious observance and practice. To the greatest extent practicable and permitted by law, such religious observance and practice should be reasonably accommodated in all government activity, including employment, contracting, and programming. *See Zorach v. Clauson,* 343 U.S. 306, 314 (1952) ("[Government] follows the best of our traditions . . . [when it] respects the religious nature of our people and accommodates the public service to their spiritual needs.").

# DKT. 61
# DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

———————————————————————

SOUL QUEST CHURCH OF MOTHER
EARTH, INC., and CHRISTOPHER
YOUNG,

          Plaintiffs,

      v.

MERRICK B. GARLAND, Attorney
General of the United States of America,
and ANNE M. MILGRAM, Administrator of
the U.S. Drug Enforcement Administration,

          Defendants.

———————————————————————

No.  6:20-cv-701-WBB-DCI

**DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 2

I.      Statutory and Regulatory Background .................................................... 2

II.     Administrative Background ...................................................................... 5

III.    The Instant Litigation .............................................................................. 7

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT .......................................................................................................... 8

I.      PURSUANT TO 21 U.S.C. § 877, THIS COURT LACKS JURISDICTION
        OVER PLAINTIFFS' CLAIMS. ................................................................ 8

        A.      Under § 877, jurisdiction over Plaintiffs' claims lies exclusively in
                the court of appeals. ................................................................... 11

                1.      Challenge to DEA's denial of Plaintiffs' exemption request .......... 11

                2.      Plaintiffs' challenge to the Guidance ............................................. 13

        B.      Alternate statutory provisions do not override § 877's exclusive
                review provision to confer subject matter jurisdiction over Plaintiffs'
                claims.         .......................................................................... 17

II.     PLAINTIFFS' APA AND CONSTITUTIONAL CLAIMS MUST BE
        DISMISSED UNDER RULE 12(b)(6). ..................................................... 19

        A.      Plaintiffs' APA claim must be dismissed. .................................. 20

        B.      Plaintiffs' Free Exercise claim must be dismissed. ................... 23

CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adorers of the Blood of Christ v. FERC*,
   897 F.3d 187 (3d Cir. 2018) .................................................................................. 18, 19

*Alabama v. PCI Gaming Auth.*,
   801 F.3d 1278 (11th Cir. 2015) ................................................................................ 14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .................................................................................................... 8

*Bold All. v. FERC*,
   No. 17-CV-1822-RJL, 2018 WL 4681004 (D.D.C. Sept. 28, 2018) ........................... 18

*Bowles v. Russell*,
   551 U.S. 205 (2007) .................................................................................................... 9

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) .................................................................................................. 20

*Califano v. Sanders*,
   430 U.S. 99 (1977) .................................................................................................... 16

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U.S. 520 (1993) ............................................................................................ 23, 24

*City of Rochester v. Bond*,
   603 F.2d 927 (D.C. Cir. 1979) .................................................................................. 15

*City of Tacoma v. Taxpayers of Tacoma*,
   357 U.S. 320 (1958) ............................................................................................. 8, 10

*Clark Cnty. v. FAA*,
   522 F.3d 437 (D.C. Cir. 2008) .................................................................................. 22

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005) .................................................................................................. 20

*Diaz v. Medline Indus., Inc.*,
   No. 20-24952-CIV, 2021 WL 2075422 (S.D. Fla. Feb. 24, 2021) .............................. 25

*Doe v. FAA,*
    432 F.3d 1259 (11th Cir. 2005) ...................................................... 10, 14, 15

*Drummond Coal Co. v. Watt,*
    735 F.2d 469 (11th Cir. 1984) ........................................................... 9

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith,*
    494 U.S. 872 (1990) .......................................................................... 23

*FCC v. ITT World Commc'ns, Inc.,*
    466 U.S. 463 (1984) .......................................................................... 17

*First Assembly of God of Naples v. Collier Cnty.,*
    20 F.3d 419 (11th Cir. 1994) ............................................................ 23

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) .......................................................................... 14

*Friends of the Everglades v. EPA,*
    699 F.3d 1280 (11th Cir. 2012) ........................................................ 8

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ...................................................................... 24

*Gen. Fin. Corp. v. FTC,*
    700 F.2d 366 (7th Cir. 1983) ............................................................ 18

*George Kabeller, Inc. v. Busey,*
    999 F.2d 1417 (11th Cir. 1993) ........................................................ 11, 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ..................................................................*passim*

*Gonzales v. Raich,*
    545 U.S. 1 (2005) .............................................................................. 2, 6, 7

*Green v. Brantley,*
    981 F.2d 514 (11th Cir. 1993) .......................................................... 10, 14

*Hakki v. Sec'y, Dep't of Veterans Affs.,*
    19-14645, 2021 WL 3354715 (11th Cir. Aug. 3, 2021) .............................. 19

*Hemp Indus. Ass'n v. DEA,*
    No. 20-cv-2921-JEB, 2021 WL 1734920 (D.D.C. May 3, 2021)................ 9, 15, 16, 17

*Hill Dermaceuticals, Inc. v. Anthem, Inc.*,
   228 F. Supp. 3d 1292 (M.D. Fla. 2017) ....................................................... 19

*Jarkesy v. SEC*,
   803 F.3d 9 (D.C. Cir. 2015) ............................................................. 9, 10, 13

*John Doe, Inc. v. DEA*,
   484 F.3d 561 (D.C. Cir. 2007) ............................................................ *passim*

*John Doe, Inc. v. Gonzalez*,
   No. 06-CV-966-CKK, 2006 WL 1805685 (D.D.C. June 29, 2006) ........................ 15, 18

*Keeton v. Anderson-Wiley*,
   664 F.3d 865 (11th Cir. 2011) ................................................................ 24

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) .......................................................................... 8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .................................................................. 20, 21

*Marathon Oil Co. v. EPA,*
   564 F.2d 1253 (9th Cir. 1977) ............................................................... 22

*McCormick v. Aderholt*,
   293 F.3d 1254 (11th Cir. 2002) ............................................................... 8

*McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*,
   501 F.3d 1244 (11th Cir. 2007) ............................................................... 8

*Mims v. Arrow Fin. Servs., LLC*,
   565 U.S. 368 (2012) ...................................................................... 8, 18

*Myers v. Bethlehem Shipbuilding Corp.*,
   303 U.S. 41 (1938) .......................................................................... 17

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
   282 F. Supp. 2d 1236 (D.N.M. 2002) .......................................................... 3

*Oregon v. Ashcroft*,
   368 F.3d 1118 (9th Cir. 2004) ................................................................ 9

*Otwell v. Ala. Power Co.*,
   747 F.3d 1275 (11th Cir. 2014) .............................................................. 17

iv

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*,
  344 U.S. 237 (1952) ................................................................. 17

*Sharma v. DEA*,
  511 F. App'x 898 (11th Cir. 2013) ........................................ 9, 13

*Taylor v. Dist. Eng'r, U. S. Army Corps of Engineers, Jacksonville, Fla.*,
  567 F.2d 1332 (5th Cir. 1978) ................................................. 22

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ................................................................. 16

*United States v. Blanton*,
  730 F.2d 1425 (11th Cir. 1984) ............................................... 24

*United States v. Christie*,
  825 F.3d 1048 (9th Cir. 2016) ................................................. 25

*United States v. Fla. E. Coast Ry. Co.*,
  410 U.S. 224 (1973) ................................................................. 22

*United States v. Salmona*,
  810 F.3d 806 (11th Cir. 2016) ................................................... 8

*United States v. Seeger*,
  380 U.S. 163 (1965) ................................................................. 21

*Wind River Min. Corp. v. United States*,
  946 F.2d 710 (9th Cir. 1991) ................................................... 14

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950) ................................................................... 22

*Woods v. DEA*,
  283 F. Supp. 3d 649 (W.D. Tenn. 2017) ................................... 15

**Statutes**

5 U.S.C. § 551 .............................................................................. 22

5 U.S.C. § 554 .............................................................................. 22

5 U.S.C. § 558 .............................................................................. 22

21 U.S.C. § 801 ............................................................................................ 2, 24

21 U.S.C. § 821 ................................................................................................ 21

21 U.S.C. § 822 .................................................................................................. 3

21 U.S.C. § 871 ......................................................................................... 2, 3, 13

21 U.S.C. § 877 ........................................................................................... *passim*

21 U.S.C. § 811 ............................................................................................ 3, 13

28 U.S.C. § 1331 ....................................................................................... 17, 18

28 U.S.C. § 1346 ............................................................................................... 19

28 U.S.C. § 1361 ............................................................................................... 19

28 U.S.C. § 2201 ........................................................................................ 18, 19

28 U.S.C. § 2202 ........................................................................................ 18, 19

28 U.S.C. § 2401 ............................................................................................... 14

42 U.S.C. § 2000bb ................................................................................... 1, 4, 19

**Rules**

Fed. R. Civ. P. 15(a)(1) ..................................................................................... 1

Fed. R. Civ. P. 12(b)(1) .................................................................................. 1, 8

**Regulations**

21 C.F.R. § 1307.03 ............................................................................................ 4

21 C.F.R. § 1300 ................................................................................................. 3

21 CFR § 1307.31 ............................................................................................... 4

28 C.F.R. § 0.100 ............................................................................................... 3

**Other Authorities**

Diversion Control Division, DEA, Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration

Act (Revised) (updated Nov. 20, 2020),
    https://perma.cc/VE74-SQMH ..................................................................................... 5

Soul Quest Ayahuasca Church of Mother Earth, Programs,
    https://perma.cc/KU6M-SAVH (last visited Aug. 24, 2021) ......................................... 23

Defendants Merrick B. Garland, in his official capacity as U.S. Attorney General, and Anne M. Milgram, in her official capacity as Administrator, U.S. Drug Enforcement Administration (DEA), hereby move to dismiss Plaintiffs' Third Amended, Verified Complaint for Declaratory and Injunctive Relief Pursuant F.R.C.P. 15(a)(1) (Compl.), ECF No. 59, under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, Rule 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In the Controlled Substances Act (CSA), Congress gave the Attorney General authority to issue, deny, suspend, or revoke registrations for the importation, manufacture, and distribution of controlled substances. By regulation, the Attorney General delegated this authority to DEA. Pursuant to that authority, and in accordance with the Religious Freedom Restoration Act (RFRA), DEA considers requests for religious exemptions from the CSA. This suit challenges DEA's Final Determination that Plaintiffs were not entitled under RFRA, 42 U.S.C. §§ 2000bb *et seq.*, to a religious exemption from the CSA, and DEA's conclusions as to the framework for considering religious exemptions. By statute, jurisdiction over this dispute lies exclusively in the courts of appeals. 21 U.S.C. § 877. Section 877 vests the courts of appeals with exclusive jurisdiction over claims such as these relating to DEA's administration and application of the CSA. That provision bars district courts from exercising jurisdiction over challenges to final determinations under the CSA. Dismissal of the entire action is warranted for this reason alone.

Even if Plaintiffs could clear this jurisdictional bar, their constitutional and procedural claims must be dismissed under Rule 12(b)(6). Plaintiffs' Administrative

Procedure Act (APA) claim must be dismissed because DEA has statutory authority to consider an individual's request for a religious exemption to the CSA. And Plaintiffs' Free Exercise claim fails because the CSA is a neutral and generally applicable law, and the right of free exercise does not relieve an individual of the obligation to comply with such a law on the ground that the law proscribes what one's religion requires.

**BACKGROUND**

I.     Statutory and Regulatory Background

By the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236, Congress created a "comprehensive" federal scheme to regulate the handling of controlled substances. *Gonzales v. Raich*, 545 U.S. 1, 10, 12-13 (2005). Title II of that Act contains the statutory provisions known as the Controlled Substances Act, by which Congress established "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Id.* at 12-13. Congress enacted the CSA based on a finding that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." 21 U.S.C. § 801(2); *Raich*, 545 U.S. at 12-13 (CSA enacted "to conquer drug abuse," "to control the legitimate and illegitimate traffic in controlled substances," and "to prevent the diversion of drugs from legitimate to illicit channels").

Subchapter I of the CSA vests in the Attorney General (and his delegees, 21 U.S.C. § 871(a)) regulatory and enforcement authority over controlled substances and their handling, including complete authority to determine who may manufacture, distribute, dispense, or possess any controlled substance and in what manner. *See, e.g.*,

21 U.S.C. §§ 811, 822-824, 831 & 841. The CSA also grants the Attorney General plenary authority to "promulgate rules and regulations … relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." *Id.* § 821; *see also id.* § 871(b) ("The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter."). The Attorney General has delegated this authority to DEA. *Id.* § 871(a); 28 C.F.R. § 0.100. DEA, in turn, has promulgated regulations related to controlled substances. *See* 21 C.F.R. §§ 1300-1316.

The CSA established five "schedules" of controlled substances, and placed "any material, compound, mixture, or preparation, which contains any quantity of … Dimethyltryptamine [(DMT)]" in Schedule I. *See id.* § 812(a), (b)(1), (c) sched. I (c)(6). For placement in Schedule I, DEA must find that a substance: "has a high potential for abuse"; "has no currently accepted medical use in treatment in the United States"; and is one for which "[t]here is a lack of accepted safety for use … under medical supervision." *Id.* § 812(b)(1). Ayahuasca contains the Schedule I controlled substance DMT. *See, e.g.*, *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1240 (D.N.M. 2002) ("'Ayahuasca' … refers to a category of South American teas containing DMT and beta-carbolines."), *aff'd*, 342 F.3d 1170 (10th Cir. 2003), *on reh'g en banc*, 389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006); Compl. ¶ 6 ("Ayahuasca contains small quantities of a Schedule I controlled substance, dimethyltryptamine (DMT).").

By its terms, the CSA authorizes the Attorney General to create exemptions from the Act's prohibitions related to handling controlled substances. *See* 21 U.S.C. § 822(d).

3

Pursuant to this authority, and corollary to the Attorney General's categorical authority to determine who may handle any controlled substance and in what manner, 21 C.F.R. § 1307.03 provides that "[a]ny person may apply for an exception to the application of any provision of [the DEA regulations]" by filing a written request with the DEA Administrator, who has delegated authority to grant such an exception.

In 1993, Congress passed the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–1 *et seq.* RFRA provides that the Government "shall not substantially burden a person's exercise of religion" unless "it demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(a)–(b). RFRA applies to "all Federal law, and the implementation of that law," *id.* § 2000bb-3(a), and authorizes persons whose religious exercise has been substantially burdened to "assert that violation as a claim … in a judicial proceeding," *id.* § 2000bb-1(c).

As of 2006, no process existed by which an individual who wished to use ayahuasca (or any controlled substance, other than peyote, *see* 21 CFR § 1307.31) for religious purposes could obtain permission to do so under the CSA. In *Gonzales* v. *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (*O Centro*), however, the Supreme Court held that the Government must assess an individual's claims that provisions of the CSA burden religious exercise under RFRA. When the Government makes such RFRA assessments, RFRA's "compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." 546 U.S. at 430-31.

Accordingly, following *O Centro,* DEA created a petition process for religious

4

exemption from the CSA pursuant to RFRA. The petition process is open to anyone who wishes to manufacture, distribute, import, export, use, or possess ayahuasca or another controlled substance for religious purposes. *See generally* Off. of Diversion Control, DEA, Guidance Regarding Petitions for Religious Exemption from the CSA Pursuant to the Religious Freedom Restoration Act (2009, updated Feb. 26, 2018) ("Guidance"), Compl. Ex. 11, ECF No. 59-11. That process remains in place today,[1] and directly responds to the Court's concern in *O Centro* that the previous regulatory regime did not allow DEA to address "the harms posed by the particular use at issue." *O Centro*, 546 U.S. at 432. This petition process now allows religious entities to raise religious objections that arise when the Government chooses to act. That process allows DEA, in accommodating religious beliefs, to at the same time ensure that the CSA's compelling governmental interests are satisfied, including protecting against the risk of diversion of controlled substances.

II.   Administrative Background

In August 2016, Plaintiff Christopher Young received a letter sent by DEA to Oklevueha Native American Church Somaveda of Soul Quest, Inc., at the business address of Plaintiff Soul Quest.[2] *See* Compl. ¶¶ 111-114, 139, 141; *id.* at Ex. 5 ¶ 22, ECF No. 59-5; *id.* at Ex. 2 at 4, ECF No. 59-2 (in August 2016, Soul Quest operated under the name Oklevueha Native American Church Somaveda of Soul Quest, Inc.); DEA Letter of August 1, 2016 ("DEA Letter"), ECF No. 13-3. The letter stated that it had "come to

---

[1] Diversion Control Division, DEA, Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act (Revised) (updated Nov. 20, 2020), https://perma.cc/VE74-SQMH.

[2] Plaintiffs refer to a letter from DEA dated August 22, 2016. *See, e.g.*, Compl. ¶ 111. Plaintiffs presumably intend to refer to the August 1, 2016 letter from DEA attached to the First Amended Complaint. *Compare* Compl. ¶¶ 111-114, 139, 141 *with* ECF No. 13-3.

[DEA's] attention" that Soul Quest's predecessor entity was "involved in offering 'retreats' through [its] website, www.soulquest-retreat.com," at which ayahuasca, as well as Schedule I controlled substances ibogaine and mescaline, are provided to "clientele." DEA Letter at 1. Citing applicable statutory, regulatory, and caselaw authorities, the letter explained that, pursuant to RFRA, DEA considers religious-based petitions for exemption from the CSA. *Id.* DEA invited the recipient to submit an exemption petition for DEA to "consider … based on the specific facts regarding [the recipient's] plans to distribute controlled substances," and attached a copy of the applicable Guidance. *Id.* at 1, 3-6.

By letter from counsel dated August 21, 2017, Soul Quest submitted to DEA a Request for Religious-Based Exemption to Controlled Substances Act ("Plaintiffs' Exemption Request"), "as it pertains to the ritual use by Soul Quest of ayahuasca for its sacramental activities." Compl. Ex. 10 at 1, ECF No. 59-10. As the basis for its eligibility for an exemption, Soul Quest cited RFRA and *O Centro*. *Id.* Plaintiffs' Exemption Request stated that "Soul Quest and its adherents hold a common set of beliefs regarding the cause, nature, and purpose of the universe … Soul Quest and its adherents sanctify and uphold this core religious belief through its devotional and ritual observances." *Id.* The Request detailed the "common set of beliefs" held by "Soul Quest and its adherents," *id.* at 3-13, and stated that, as a "requirement for membership" in Soul Quest, an "individual must express a belief in the foundation principles of the Soul Quest Church," *id.* at 21. The Request also described protocols for "Safety and Security" and "Storage and Use" related to "Sacramental Use of Ayahuasca." *Id.* at 13-19.

On April 16, 2021, DEA responded to Plaintiffs' Exemption Request. Compl. Ex. 2, ECF No. 59-2 ("Final Determination"). The Final Determination stated that DEA had

"determined that the request must be denied" for two reasons based on DEA's investigation of Soul Quest. *Id.* at 2. First, DEA's investigation found that "Soul Quest has not satisfied its burden under RFRA of demonstrating that its use of ayahuasca is pursuant to a religious exercise and based on a sincerely held religious belief." *Id.* at 4. DEA explained that "[i]n practice, Soul Quest … promotes ayahuasca to the public for self-help and therapeutic reasons, rather than solely to fellow believers for … religious ritual purposes," *id.*, noting that language from Soul Quest's website "supports a conclusion that Soul Quest understands and advertises the use and distribution of ayahuasca to the public as fundamentally medicinal," *id.* at 3. Thus, DEA "conclude[d] that Soul Quest's promotion of ayahuasca to the public in this manner does not constitute a sincere exercise of religion under RFRA." *Id.* at 4. Second, "[b]ased upon a thorough review of the entire record," DEA concluded that Soul Quest's practices "cannot be accommodated in a manner that would allow DEA to preserve its compelling interests in public health and safety and in preventing illegal diversion of ayahuasca." *Id.* at 8. DEA noted that "to the extent Soul Quest and its customers use ayahuasca for purposes other than sincere religious exercise, their own use constitutes unlawful diversion." *Id.* Finally, DEA explained that "[t]his letter is a final determination under 21 U.S.C. § 877." *Id.*

III.    The Instant Litigation

The relevant litigation history is provided in ECF No. 57 at ¶¶ 1-12, and incorporated here by reference. On July 20, 2021, the Court granted Plaintiffs leave to amend their complaint for a third time. Minute Order, ECF No. 58. On July 22, 2021, Plaintiffs filed the Third Amended Complaint, ECF No. 59, asserting three claims against Defendants under: (1) RFRA, *id.* ¶¶ 118-30; (2) the APA, *id.* ¶ 131-42; and (3) the Free

Exercise Clause of the First Amendment to the U.S. Constitution, *id.* ¶¶ 143-53.

## STANDARD OF REVIEW

A court "must have both statutory and constitutional jurisdiction before it may decide a case on the merits." *See Friends of the Everglades v. EPA*, 699 F.3d 1280, 1288 (11th Cir. 2012). A Rule 12(b)(1) motion should be granted if the complaint fails to allege facts sufficient to establish subject matter jurisdiction or if evidence external to the complaint refutes the jurisdictional facts alleged. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). Plaintiffs bear the burden of demonstrating jurisdiction by a preponderance of the evidence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *McCormick v. Aderholt*, 293 F.3d 1254, 1257-58 (11th Cir. 2002). In addition, when considering a 12(b)(6) motion, courts are not required to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

## I.  PURSUANT TO 21 U.S.C. § 877, THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

Federal courts "are courts of limited jurisdiction" that "possess only that power authorized by the Constitution and statute," *Kokkonen*, 511 U.S. at 377, which "is not to be expanded by judicial decree," *United States v. Salmona*, 810 F.3d 806, 810 (11th Cir. 2016) (quoting *Kokkonen*, 511 U.S. at 377). Congress has the power to "prescribe the procedures and conditions under which, and the courts in which, judicial review of administrative orders may be had." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335-36 (1958). For example, Congress may provide for exclusive review in a court of appeals of an administrative agency's actions. *See id.*; *see also Mims v. Arrow Fin.*

*Servs., LLC*, 565 U.S. 368, 378-79 (2012). Although "[l]itigants generally may seek review of agency action in district court under any applicable jurisdictional grant," that presumption is displaced when Congress has established a "special statutory review scheme." *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (citing *Bowles v. Russell*, 551 U.S. 205, 212 (2007)). "It is well settled that if Congress … specifically designates a forum for judicial review of administrative action, that forum is exclusive." *Drummond Coal Co. v. Watt*, 735 F.2d 469, 475 (11th Cir. 1984); *see also Jarkesy*, 803 F.3d at 15.

Congress expressly granted jurisdiction over DEA's administration and application of the CSA exclusively to the courts of appeals. *See* 21 U.S.C. § 877. Specifically, Congress, in empowering the Attorney General to enforce the CSA, provided that:

> All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located upon petition filed with the court and delivered to the Attorney General within thirty days after notice of the decision.

21 U.S.C. § 877. Courts have repeatedly affirmed that § 877 channels review over DEA's administration and application of the CSA exclusively into the courts of appeals. *See, e.g.*, *Sharma v. DEA*, 511 F. App'x 898, 903 (11th Cir. 2013); *John Doe, Inc. v. DEA*, 484 F.3d 561, 568 (D.C. Cir. 2007); *Oregon v. Ashcroft*, 368 F.3d 1118, 1120 & n.1 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006); *Hemp Indus. Ass'n v. DEA*, No. 20-cv-2921-JEB, 2021 WL 1734920, at *1 (D.D.C. May 3, 2021). For example, the Eleventh Circuit has determined that § 877 vests exclusive jurisdiction in the courts of appeals over challenges—including constitutional ones—to DEA's termination of a physician's registration. *See Sharma*, 511 F. App'x at 903 (considering claims under "the

First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments"). The D.C. Circuit likewise has held that § 877 vests "exclusive jurisdiction in the courts of appeals over 'all final determinations, findings, and conclusions' of the DEA applying the CSA." *John Doe*, 484 F.3d at 568 (considering APA and Due Process claims).

Where Congress has established a "special statutory review scheme"—as it did in § 877—courts assume that "Congress intended [for] that procedure to be the *exclusive means* of obtaining judicial review in those cases in which it applies." *Jarkesy*, 803 F.3d at 15 (emphasis added). Plaintiffs may not evade the exclusive-review scheme Congress established in § 877 by bringing their claims in district court. *See Green v. Brantley*, 981 F.2d 514, 521 (11th Cir. 1993) ("Where Congress has provided in the courts of appeals an exclusive forum for the correction of procedural and substantive administrative errors, a plaintiff may not bypass that forum by suing for damages in district court."). An exclusive jurisdiction provision extends to "all issues inhering in the controversy." *City of Tacoma*, 357 U.S. at 335-36 (interpreting similarly worded exclusive-review statute and explaining that challenges to agency action covered by exclusive-review provision "must be made in the Court of Appeals or not at all"). In this Circuit, courts have considered whether the merits of a plaintiff's claims are "intertwined" with a review of the merits of an agency's actions covered by an exclusive-review provision. *Green*, 981 F.2d at 521; *Doe v. FAA*, 432 F.3d 1259, 1263 (11th Cir. 2005) (holding that constitutional claims "f[e]ll within the ambit" of an exclusive-review provision because such claims "necessarily require a review of the procedures and actions taken by the FAA with regard to the mechanics' certificates"). This is why "as a matter of practice almost all cases" challenging DEA's interpretation of the CSA are "filed directly in the court of appeals." *John Doe*, 484 F.3d

at 568.

As explained below, Plaintiffs' claims are wholly intertwined with DEA's Final Determination. Because all of Plaintiffs' claims fall comfortably within the scope of § 877, review "resides exclusively in the court of appeals," *George Kabeller, Inc. v. Busey*, 999 F.2d 1417, 1421-22 (11th Cir. 1993), and Plaintiffs' claims should be dismissed for lack of jurisdiction.

A.   Under § 877, jurisdiction over Plaintiffs' claims lies exclusively in the court of appeals.

Plaintiffs' complaint makes clear that they challenge DEA's Final Determination. *See* Compl. ¶¶ 10-16, 19, 35-36, 43, 122-129, 136-141, 147; *see also* 21 U.S.C. § 877; Final Determination, ECF No. 59-2 at 9 (informing Soul Quest that decision to deny petition seeking permission to use ayahuasca for religious purposes constituted final determination under § 877). And as the D.C. Circuit has previously ruled, such a "denial … falls squarely within" § 877. *John Doe*, 484 F.3d at 568.

Plaintiffs challenge both the process that led to the Final Determination and the Final Determination itself. Though Plaintiffs' claims include constitutional, statutory, and procedural objections, all of these challenges are covered by § 877. As such, they must be brought exclusively "in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located." 21 U.S.C. § 877. Because this Court lacks jurisdiction over Plaintiffs' claims, the claims must be dismissed.

1.   *Challenge to DEA's denial of Plaintiffs' exemption request*

Plaintiffs enumerate a long list of disagreements with the Final Determination (which Plaintiffs call "DEA's Order"), referring to the decision in more than two dozen paragraphs. *See* Compl. ¶¶ 10-16, 19, 35-36, 43, 122-129, 136-141, 147. Plaintiffs allege:

11

- "The DEA's Order prohibits Plaintiffs free exercise of religion with ayahuasca."
- "The DEA's Order prohibits Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca."
- "The DEA's Order creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs."
- "The DEA's Order chills, burdens, inhibits, and destroys Plaintiffs' religious exercise."
- "The DEA's Order … is not the least restrictive means of furthering Defendants' stated interests."

Compl. ¶¶ 12-16. Whether brought under the APA, RFRA, or the Free Exercise Clause, each claim challenges the Final Determination, which DEA issued pursuant to its authority under Subchapter I of the CSA and in accordance with RFRA and controlling caselaw. Plaintiffs' APA claim, for example, alleges that DEA, in issuing its Final Determination, "unlawfully adjudicated Plaintiffs' religious sincerity," Compl. ¶ 133, "unlawfully issued an order prohibiting Plaintiffs' free exercise of religion," *id.* ¶ 136, and ultimately that "the DEA's Order … violate[s] Plaintiffs' rights secured to them by" the APA, *id.* ¶ 141. Plaintiffs' RFRA claim focuses solely on the assertion that the Final Determination "prohibits Plaintiffs free exercise of religion with ayahuasca." *Id.* ¶ 122; *see id.* ¶¶ 123-129 (each paragraph starts with "The DEA's Order"). Plaintiffs' Free Exercise claim takes issue with "the actions of Defendant in adjudicating Plaintiffs['] religious sincerity," that adjudication being part of the investigation on which the Final Determination is founded. *Id.* ¶ 147. Finally, the relief Plaintiffs seek is directed at the Final Determination. *See* Compl. Prayer for Relief (d) (asking Court to "void" the Final Determination).

Such challenges to DEA "final determinations" must be brought in a court of appeals. *See* 21 U.S.C. § 877. Plaintiffs wish to overturn DEA's determination denying Plaintiffs' Exemption Request. Plaintiffs seek this relief, in part, because they contend that the Final Determination "furthers no compelling governmental interest." Compl. ¶ 126. But

DEA determined otherwise after a full investigation, *see* ECF No. 59-2. The relief Plaintiffs request is contrary to DEA's determination that they are not entitled to a RFRA-based exception to manufacture, distribute, or possess ayahuasca. And, because they are not entitled to engage in such activities, Plaintiffs now seek an injunction preventing Defendants "from taking any action prohibiting plaintiffs from importing, possessing, manufacturing, and distributing" ayahuasca. Compl. Prayer for Relief (c). But as the Eleventh Circuit concluded, plaintiffs in this position "should have contested" the denial of "DEA registration by appealing to [that] court, pursuant to the scheme provided by the CSA." *Sharma*, 511 F. App'x at 903; *see also John Doe*, 484 F.3d at 570 ("The DEA's denial of Doe's permit is properly reviewable in [the D.C. Circuit] pursuant to 21 U.S.C. § 877."). Because Plaintiffs' claims belong in the court of appeals, this Court must dismiss these claims for lack of jurisdiction.

      2.    *Plaintiffs' challenge to the Guidance*

Plaintiffs' challenge to the Guidance also falls within the ambit of § 877. Plaintiffs wish to overturn DEA's general process for considering petitions by religious individuals to manufacture and distribute controlled substances, as articulated in the Guidance. *See, e.g.*, Compl. ¶¶ 132-134, 148-152. The CSA affords DEA exclusive federal authority over the control and handling of controlled substances, and to exercise its judgment and expertise in the exercise of that plenary authority, including, for example, drug scheduling decisions, 21 U.S.C. § 811, registration decisions, *id.* § 823, revocation decisions, *id.* § 824, and rulemakings, *id.* § 871(b). Where, as here, "Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Jarkesy*, 803 F.3d at 16 (quoting *Free Enter. Fund v.*

*Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)). Plaintiffs' challenge to the Guidance and methodology that DEA used in reaching its determination is "intertwined" with their challenge to the Final Determination itself, *Green*, 981 F.2d at 521, and falls "within the ambit" of § 877, *Doe v. FAA*, 432 F.3d at 1263.

Plaintiffs fundamentally disagree with the Guidance, contending that DEA lacks statutory authority to assess religious sincerity when determining whether an individual may be exempt from the CSA's prohibitions. *See id*. ¶ 134 ("There is no law authorizing Defendants to investigate, evaluate or adjudicate the sincerity of religious beliefs."); ¶ 115 (allegation that Guidance does not "reference … enabling legislation based by Congress pursuant to RFRA"). They lodge a range of procedural objections to DEA's decisional process for religious exemptions including complaints about "when [DEA's] process starts and finishes," *id.* ¶ 36, and that "DEA never published any rulemaking or other formal guidelines." *Id*. ¶ 35. Plaintiffs seek a declaration that Defendants violated RFRA, the APA, and the First Amendment. *See* Compl. Prayer for Relief (b).[3]

These claims challenge DEA's decisional process for considering petitions for religious exemptions from the CSA, including whether and what factors DEA may consider in adjudicating such a petition, and cannot be separated from Plaintiffs' challenge to the Final Determination. As the Eleventh Circuit held, such a claim would

---

[3] To the extent that Plaintiffs' challenges to the Guidance are facial, they are barred by the statute of limitations. *See* 28 U.S.C. § 2401(a); *Wind River Min. Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991); *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1292 (11th Cir. 2015) (likewise recognizing exceptions only for an as-applied challenge). Under § 2401(a), if a plaintiff "wishes to bring a policy-based facial challenge," or a challenge to a "procedural violation in the adoption of a regulation," he must bring suit within six years. *Wind River*, 946 F.2d at 715. Because Plaintiffs' facial challenges do not depend on the particular application of the Guidance to Plaintiffs, they have been barred since 2015.

"necessarily require a review of the procedures and actions taken" by DEA with regard to the very decision which "falls within the ambit of the administrative scheme." *Doe v. FAA*, 432 F.3d at 1263 (considering claims that the "FAA infringed upon [plaintiffs'] due process rights by failing to observe statutory and administrative processes").

Courts have held that similar challenges are subject to § 877 even where plaintiffs argued they were "not challenging a final action but the applicability of the regulation entirely." *See Woods v. DEA*, 283 F. Supp. 3d 649, 663 (W.D. Tenn. 2017). "Congress has provided an exclusive pathway for federal-court challenges to final DEA decisions" such as the Final Determination, where "the substance of a lawsuit challenges an assertion of agency authority" implicated by a final DEA decision "committed to the exclusive review" of the courts of appeals under § 877. *Hemp Indus.*, 2021 WL 1734920, at *11. Regardless of whether Plaintiffs frame their claims as a challenge to DEA's authority to consider a petition for a religious exemption in the first instance, Compl. ¶¶ 133-37; *see Hemp Indus.*, 2021 WL 1734920, at *1, objections to DEA's process, Compl. ¶¶ 138-141; *see Doe v. FAA*, 432 F.3d at 1263, or substantive disagreement with DEA's conclusion, Compl. ¶ 119-129; *see John Doe*, 484 F.3d at 571, such claims must be brought in the court of appeals under § 877. This court thus lacks jurisdiction over Plaintiffs' claims.

Sound policy supports these rules. *See City of Rochester v. Bond*, 603 F.2d 927, 936 (D.C. Cir. 1979). Allowing a plaintiff to bring in district court, either on an alternative theory or by artful pleading what is, unavoidably in substance, a challenge to DEA determinations would "encourage[] forum shopping," and lead to "duplicative" review and accompanying delays. *John Doe*, 484 F.3d at 570; *see also John Doe, Inc. v. Gonzalez*,

No. 06-CV-966-CKK, 2006 WL 1805685, at *21 (D.D.C. June 29, 2006) (noting similar reasons for exclusive court of appeals review, even when there is no "final determination"), *aff'd*, *John Doe*, 484 F.3d 561. This is no less true for a pre-enforcement challenge seeking to enjoin DEA "from taking any action prohibiting Plaintiffs from importing, possessing, manufacturing, and distributing ayahuasca." Compl. Prayer for Relief (c); *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994).[4]

In enacting § 877, Congress evinced a clear intent for the courts of appeals to resolve challenges related to the CSA. But that is a consequence of Congress's choice that determinations about the CSA be made first by the agency with relevant expertise, whose "final determinations, findings, and conclusions … shall be final and conclusive," subject to review—after they are made—by the courts of appeals. Plaintiffs cannot evade that intent through artful pleading or otherwise. *Cf. Califano v. Sanders*, 430 U.S. 99, 108 (1977) ("Congress' determination so to limit judicial review to the original decision denying benefits is a policy choice obviously designed to forestall repetitive or belated litigation of stale eligibility claims. Our duty, of course, is to respect that choice."). As the Supreme Court has held, "the declaratory judgment procedure will not be used to preempt and

---

[4] Indeed, essentially any challenge to a final registration decision could be reframed as a challenge to DEA's authority to act in the first place, or as seeking a declaration that the activity affected by the final decision is lawful or an injunction against enforcing the CSA. *Doe* is illustrative: the plaintiff sought to import a controlled substance it contended was in Schedule III; DEA denied an import registration application on the grounds that the substance was in Schedule I. 484 F.3d at 564. The plaintiff raised APA and Due Process claims, arguing that DEA wrongly concluded that the substance was in Schedule I, and that DEA's denial was therefore erroneous. *Id.* at 571. The D.C. Circuit held that such a claim could proceed only in a court of appeals. *Id.* at 568-70. *Doe* could not simply have reframed its claim as one seeking declaratory relief that the substance was in Schedule III, and then litigated in district court. Framing its complaint as a claim that DEA was not authorized to enforce the CSA should the plaintiff choose to import the substance anyway would be equally unavailing. *Cf. Hemp Indus.*, 2021 WL 1734920, at *8-9. So too, here.

prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review." *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 246 (1952); *see also Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48 (1938). The same is true for injunctive relief. *See FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984).

In sum, Plaintiffs seek to nullify both DEA's determination that they did not demonstrate that they qualify for a religious exemption and the Guidance interpreting the CSA as it applies to a registration sought for religious reasons. As the District Court for the District of Columbia—in which the overwhelming majority of district court challenges to agency actions are brought—recently held, plaintiffs seeking "declaratory and injunctive relief that would functionally nullify" the "final determination" or "conclusion made by DEA" must "obtain review of that decision in the court of appeals" under § 877. *Hemp Indus.*, 2021 WL 1734920, at *6; *see also Otwell v. Ala. Power Co.*, 747 F.3d 1275, 1282 (11th Cir. 2014) ("The review entailed by Appellants' claims is statutorily dedicated to the court of appeals, and the district court did not err by concluding it could not resolve the merits of Appellants' suit."). Plaintiffs must bring their challenges under the APA, RFRA, and the Constitution in the first instance in the court of appeals. *See FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468-69 (1984) ("[l]itigants may not evade [exclusive-review] provisions by requesting the District Court to enjoin action that is the outcome of the agency's order"). This Court lacks jurisdiction and should dismiss Plaintiffs' claims.

B.    Alternate statutory provisions do not override § 877's exclusive review provision to confer subject matter jurisdiction over Plaintiffs' claims.

No statutory provision cited in the complaint confers subject-matter jurisdiction on this court. Plaintiffs first cite 28 U.S.C. § 1331. *See* Compl. ¶ 39 (citing 28 U.S.C. §§ 1331,

1346, 1361, 2201, 2202). But "[w]hen Congress provides for exclusive review in a court of appeals," as in § 877, "that specific grant of jurisdiction displaces the general federal question statute, 28 U.S.C. § 1331." *Bold All. v. FERC*, No. 17-CV-1822-RJL, 2018 WL 4681004, at *4 (D.D.C. Sept. 28, 2018); *see also Mims,* 565 U.S. at 378–79 (general "principle" that "when federal law creates a private right of action … federal-question jurisdiction under § 1331" does not "endure[]" where "Congress divests federal courts of their § 1331 adjudicatory authority"). This displacement applies with equal force where "Plaintiff's claims arise under the [CSA]." *John Doe, Inc.*, 2006 WL 1805685, at *17-18 (surveying cases holding that "challenges to DEA's determination under the CSA" must be brought in court of appeals under § 877). The same is true here: the specific jurisdictional grant in § 877 overrides the general grant in § 1331.

That plaintiffs bring a RFRA claim does not alter this analysis. *See* Compl. ¶¶ 118-130. The Third Circuit recently considered whether a RFRA claim could be brought in district court where an exclusive-review provision applied. *Adorers of the Blood of Christ ("ABC") v. FERC*, 897 F.3d 187, 198 (3d Cir. 2018) (considering exclusive-review provision of Natural Gas Act). The court held that "a claim under RFRA" brought under § 1331 "does not abrogate or provide an exception to a specific and exclusive jurisdictional provision prescribed by Congress for judicial review of an agency's action." *Id.*; *see also Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (similar). The court expressly rejected the argument that RFRA grants plaintiffs the "statutory right to assert their RFRA claim in district court," determining that "[n]owhere does the text specifically confer jurisdiction to the federal district courts to hear RFRA claims." *ABC*, 897 F.3d at 194. Thus, RFRA is itself not jurisdictional, but sets forth a substantive legal standard.

Therefore, the court held that the RFRA claim must be brought in the manner provided in the exclusive-review provision and affirmed the district court's dismissal for lack of jurisdiction. *Id.* at 190.

The same result follows here. As explained above, Plaintiffs' RFRA claim is a direct challenge to the Final Determination and § 877 channels review of such a challenge exclusively into the court of appeals. RFRA itself does not require a claim to be brought in district court; it provides that an individual may assert a RFRA violation "as a claim or defense in a judicial proceeding." 42 U.S.C. § 2000bb-1(c). Only where "denial of review in the district court will truly foreclose all judicial review," is district court jurisdiction proper. *Kabeller*, 999 F.2d at 1421–22. Plaintiffs here may "assert [a RFRA] violation" "as a claim" in a court of appeals under § 877. 42 U.S.C. § 2000bb-1(c). As in *Kabeller*, "review is not precluded; review resides exclusively with the court of appeals." 999 F.2d at 1421-22.[5]

## II. PLAINTIFFS' APA AND CONSTITUTIONAL CLAIMS MUST BE DISMISSED UNDER RULE 12(b)(6).

As established above, all of Plaintiffs' claims are subject to § 877, and this Court therefore lacks jurisdiction over the claims. In the event the Court did have jurisdiction, however, the APA and constitutional claims would still be subject to dismissal pursuant

---

[5] Plaintiffs cite several other statutes as bases for jurisdiction, but none avails them. The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, does not provide an independent basis for jurisdiction. *See Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1299 (M.D. Fla. 2017) ("Declaratory Judgment Act does not … confer jurisdiction on federal courts") (citation omitted). Neither the Federal Torts Claim Act, 28 U.S.C. § 1346, nor the Mandamus Act, 28 U.S.C. § 1361, applies because Plaintiffs neither bring a tort claim against the United States nor seek a writ of mandamus. *See Hakki v. Sec'y, Dep't of Veterans Affs.*, No. 19-14645, 2021 WL 3354715, at *18 (11th Cir. Aug. 3, 2021).

to Rule 12(b)(6), as set forth below.[6]

      A.    <u>Plaintiffs' APA claim must be dismissed.</u>

Plaintiffs' APA claim should be dismissed. Plaintiffs' APA claim alleges that DEA lacks the statutory authority to assess sincerity when considering a petition for religious exemption from the CSA. *See* Compl. ¶¶ 133-136. This claim is without merit.

The Supreme Court has explicitly rejected the argument that an agency cannot craft and consider religious "exemptions from its own Guidelines" and the statutes an agency is tasked with carrying out. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380, 2383 (2020) (affirming that HHS had the authority "to exempt or accommodate … religious objections" to the ACA and that "it was appropriate for [HHS] to consider RFRA"). Indeed, DEA's prior failure to adequately consider religious uses of ayahuasca led to the Court's ruling in *O Centro*. And, as a result of *O Centro*, DEA established Guidance for petitions for religious exemption from the CSA.

Agencies are therefore empowered to undertake a RFRA inquiry, including the first step of that inquiry, which asks whether the entity's religious views are sincerely held. And though the Supreme Court expressed skepticism that an agency may decide whether "religious beliefs are mistaken or insubstantial," in considering requests for accommodation under RFRA, an agency may determine whether the asserted religious belief "reflects an honest conviction." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014); *see also Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (under RLUIPA,

---

[6] To the extent Plaintiffs' RFRA claim is permitted to proceed, review thereof would be on the record before DEA. In § 877, Congress additionally required that DEA's "[f]indings of fact … if supported by substantial evidence, shall be conclusive." 21 U.S.C. § 877.

"prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic").[7] Likewise, the Court in *O Centro* held that RFRA applies only to a "particular claimant whose *sincere* exercise of religion is being substantially burdened." 546 U.S. at 430-31 (emphasis added).[8]

By issuing the Guidance, DEA properly responded to *O Centro*'s direction that it consider religious hardship under RFRA, including RFRA's threshold inquiry regarding religious sincerity, in applying the CSA. *See* 21 U.S.C. § 821; 871(b) (authorizing the Attorney General to "promulgate any rules, regulations, and procedures which he may deem necessary to … functions under this subchapter"). Sections 821 and 871 provide DEA with ample authority to promulgate the Guidance.

In turn, RFRA—a law that imposes an independent obligation on DEA—contemplates that DEA will consider religious sincerity when evaluating a request for a religious exemption from the CSA. *See Little Sisters of the Poor*, 140 S. Ct. at 2383 (appropriate for agency to consider RFRA). That DEA exercised that authority and concluded that Plaintiffs are not entitled to such an exemption does not enable Plaintiffs to now claim that DEA lacked authority to make that determination in the first instance. Plaintiffs thus have failed to plausibly allege that DEA exceeded its authority in

---

[7] Under the Free Exercise case law that RFRA was intended to restore, courts were required to confirm the sincerity of the claimed religious objection. *See, e.g.*, *United States v. Seeger*, 380 U.S. 163, 185 (1965) ("[W]hile the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.' This is the threshold question of sincerity which must be resolved in every case.").

[8] In *O Centro*, the Supreme Court did *not* address whether the plaintiff's use of ayahuasca constituted a sincere religious practice. 546 U.S. at 423 (noting sincerity was not contested for the purposes of the plaintiffs' motion for a preliminary injunction). But the Court made clear that the whole of the RFRA inquiry—including sincerity determinations—is plaintiff-specific; accordingly, a court must ask whether *this* plaintiff sincerely holds the religious beliefs that it claims are burdened. *Id.* at 430-31.

considering religious sincerity in adjudicating Plaintiffs' petition under RFRA.

Plaintiffs also appear to claim that DEA had an obligation to "provide a hearing in accordance with APA procedures" to adjudicate Plaintiffs' Exemption Request. *See* Compl. ¶ 138. To the extent Plaintiffs assert this independent claim, it, too, lacks merit.

Under the APA, the Final Determination constitutes an "order" issued by "adjudication." 5 U.S.C. § 551(6), (7). "Formal" adjudication under the APA—*i.e.*, an adjudication involving a hearing conducted on the record—is only triggered when three conditions are met: (1) the adjudication is "required by statute," (2) to be conducted "on the record," and (3) with an "opportunity for an agency hearing." 5 U.S.C. § 554(a). *See, e.g.*, *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 236-38 (1973); *Wong Yang Sung v. McGrath,* 339 U.S. 33 (1950) (oral hearings are compulsory only when the statute governing the agency's actions make an oral hearing mandatory); *see also Clark Cnty. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (explaining that APA distinguishes between "formal" adjudication requiring "on-the-record hearings" and "informal" adjudication requiring less stringent procedures). Plaintiffs, however, identify no provision explicitly requiring a hearing on the record, whether as to the adjudication undertaken in the Final Determination or any other adjudication under the CSA. Accordingly, they have not plausibly alleged a claim that the Final Determination contravened 5 U.S.C. § 554(a).

Plaintiffs suggest that 5 U.S.C. § 558(c) imposed on DEA an independent obligation to conduct a hearing on the record before issuing the Final Determination. But § 558(c) does not independently require formal adjudication. *See Taylor v. Dist. Eng'r, U. S. Army Corps of Engineers, Jacksonville, Fla.*, 567 F.2d 1332, 1337 (5th Cir. 1978) ("[W]e do not read § 558 as requiring a § 556 hearing[.]"); *Marathon Oil Co. v. EPA,* 564

F.2d 1253, 1260-1261 n.25 (9th Cir. 1977) ("Section 558(c) does not independently provide that full adjudicatory hearings must be held."). Because Plaintiffs identify no provision explicitly requiring DEA to hold a hearing on the record before issuing the Final Determination, to the extent Count Two incorporates this claim, it must be dismissed.

      B.    Plaintiffs' Free Exercise claim must be dismissed.

Plaintiffs also fail to allege a Free Exercise claim. Plaintiffs contend that DEA violated the First Amendment by "adjudicating Plaintiffs' religious sincerity and prohibiting Plaintiffs religious exercise with ayahuasca." Compl. ¶ 147. As an initial matter, Plaintiffs' allegedly religious exercise appears to have continued through the investigation and since DEA issued its determination, as Soul Quest has continued to advertise and host ayahuasca retreats throughout this period. Compl. Ex. 2, ECF 59-2; *see also* Soul Quest Ayahuasca Church of Mother Earth, Programs, https://perma.cc/KU6M-SAVH (last visited Aug. 24, 2021).

To the extent that Plaintiffs allege that DEA's application of the CSA violates the First Amendment, their claim fails because the CSA is a neutral and generally applicable law, and "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes" what one's religion requires. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990). "[T]he threshold questions in analyzing a law challenged under the Free Exercise Clause are (1) is the law neutral, and (2) is the law of general applicability?" *First Assembly of God of Naples v. Collier Cnty.*, 20 F.3d 419, 423 (11th Cir. 1994). A law is neutral unless its "object … is to infringe upon or restrict practices because of their religious motivation*." Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,

508 U.S. 520, 533 (1993). A law is generally applicable if the government does not "in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543. A neutral and generally applicable law "is presumed constitutional and the burden is on the plaintiff to prove that it is not rationally related to a legitimate government interest." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 880 (11th Cir. 2011).

Plaintiffs do not dispute the CSA's neutrality or general applicability. *See* Compl. ¶¶ 143-153. Nor could they: Congress enacted the CSA to prevent "the diversion of drugs from legitimate channels to illegitimate channels." *United States v. Blanton*, 730 F.2d 1425, 1427 (11th Cir. 1984). The CSA's purpose is to ensure public health and safety, *see* 21 U.S.C. § 801, not to "suppress[] … religion or religious conduct," *Lukumi*, 508 U.S. at 533. The CSA is rationally related to legitimate public interests by ensuring an adequate supply of drugs with a "useful and legitimate medical purpose" while preventing the "illegal importation, manufacture, distribution, and possession and improper use of controlled substances," 21 U.S.C. § 801; *see O Centro*, 546 U.S. at 436-37.

Rather, Plaintiffs allege that the Guidance is not neutral and generally applicable because it creates a "mechanism for individualized exemptions to the [CSA]." Compl. ¶ 149. Plaintiffs appear to be invoking the Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). But *Fulton* does not apply here. In issuing the Guidance, DEA has not "refuse[d] to extend" a system of exemptions to cases of "religious hardship." *Fulton*, 141 S. Ct. at 1878. Instead, the Guidance is the very means through which DEA is making an exemption process available to religious entities. That the Guidance "invites the government to consider the particular reasons for a person's conduct, including religious sincerity" is not a flaw, as Plaintiffs allege. Compl. ¶ 149.

Rather, that individualized determination is precisely what RFRA demands. *See O Centro*, 546 U.S. at 430–31 (RFRA requires consideration of the alleged burden imposed by governmental action "'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."). Indeed, while Plaintiffs allege that others have been "uniformly" permitted to use ayahuasca in their religious practices, Compl. ¶ 9, Plaintiffs "cannot simply point to other groups who have won accommodations for the sacramental use of … [ayahuasca] and say 'we'll have what they're having,'" particularly when there are "material differences between those particular groups and their sacramental practices, on the one hand, and the [plaintiffs' allegedly] religious exercise, on the other." *United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016).

In any event, even if the *Fulton* rubric applied to Plaintiffs' challenge to DEA's Guidance, and even if Plaintiffs could establish that the CSA burdens religious beliefs that they sincerely hold, which the record establishes that they cannot, *see* Final Determination, ECF No. 59-2 at 1-4, the result simply would be that the standard applicable to RFRA claims would apply. Accordingly, at best, Plaintiffs' third count would be duplicative of their first. And dismissal of the Free Exercise claim would be warranted on that basis as well. *See, e.g.*, *Diaz v. Medline Indus., Inc.*, No. 20-24952-CIV, 2021 WL 2075422, at *1 (S.D. Fla. Feb. 24, 2021) ("[A] court should dismiss claims that are duplicative of other claims," such as those "that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint.

Dated:  August 26, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director
Civil Division, Federal Programs Branch

JULIE STRAUS HARRIS
Senior Trial Counsel (DC Bar # 1021928)

*/s/ Michael J. Gaffney*
MICHAEL J. GAFFNEY
Trial Attorney (DC Bar # 1048531)

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: (202) 514-2356
Fax: (202) 616-8460
Email: Michael.J.Gaffney@usdoj.gov

*Counsel for Defendant*

**Certificate of Compliance with Local Rule 3.01(g)**

By email on August 20 and 23, 2021, undersigned counsel conferred in good faith regarding the relief requested by this motion. Counsel for plaintiffs advised that plaintiffs oppose the relief sought in this motion.

/s/ *Michael J. Gaffney*
MICHAEL J. GAFFNEY

# Dkt. 74
# Order Granting
# Defendants' Motion to Dismiss

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SOUL QUEST CHURCH OF MOTHER
EARTH, INC. and CHRISTOPHER
YOUNG,

        Plaintiffs,

v.                                                    Case No. 6:20-cv-701-WWB-DCI

ATTORNEY GENERAL, UNITED
STATES OF AMERICA and
ADMINISTRATOR, U.S. DRUG
ENFORCEMENT ADMINISTRATION,

        Defendants.
_____/

**<u>ORDER</u>**

THIS CAUSE is before the Court on Defendants' Motion to Dismiss (Doc. 61),

Plaintiffs' Response and Opposition (Doc. 62), and Defendants' Reply (Doc. 65). For the

reasons set forth below, the Motion will be granted in part.

**I.**    **BACKGROUND**

Plaintiff Soul Quest Church of Mother Earth, Inc. ("**Soul Quest**") is an Orlando,

Florida based religious organization founded in 2016 under the direction of Plaintiff

Christopher Young. (Doc. 59, ¶¶ 46–47, 53). In the practice of their religion, Plaintiffs use

ayahuasca, a sacramental tea containing small amounts of the Schedule I controlled

substance dimethyltryptamine. (*Id.* ¶¶ 4–6). Soul Quest conducts ceremonies using the

tea three times a month and holds sober ministering services each Sunday that do not

include the use of the tea. (*Id.* ¶¶ 55, 58, 95–96). Prior to participation in the ceremony,

members must be educated and evaluated for suitability and participation may be denied

by Soul Quest with suggestions for "alternative methods for achieving suitable religious and therapeutic fulfillment." (*Id.* ¶ 100).

In August 2016, the Drug Enforcement Administration ("**DEA**") directed Plaintiffs to file a petition for religious exemption for the use of ayahuasca. (*Id.* ¶¶ 111–13). Accordingly, on August 21, 2017, Plaintiffs petitioned the DEA for a religious exemption. (*Id.* ¶ 115; *see also* Doc. 59-10). On April 16, 2021, the DEA denied Plaintiffs' application. (Doc. 59, ¶¶ 10–11, 24, 35, 117; *see also* Doc. 59-2). Pursuant to the DEA's order, Plaintiffs are prohibited from importing, possessing, manufacturing, and distributing ayahuasca. (Doc. 59-2 at 9). As a result, Plaintiffs seek declaratory and injunctive relief against Defendants pursuant to the Religious Freedom Restoration Act ("**RFRA**"), 42 U.S.C. § 2000bb *et seq.*, the Administrative Procedures Act ("**APA**"), 5 U.S.C. § 701 *et seq.*, and the First Amendment permitting them to import, possess, manufacture, and use ayahuasca in their religious ceremonies. (Doc. 59, ¶¶ 118–53).

## II.   DISCUSSION

In their Motion, Defendants argue that the Third Amended, Verified Complaint (Doc. 59) must be dismissed because this Court lacks jurisdiction to review the DEA's denial of a religious exemption pursuant to 21 U.S.C. § 877. In the alternative, Defendants argue that Plaintiffs' APA and First Amendment Claims must be dismissed for failure to state a claim. Plaintiffs dispute that § 877 vests jurisdiction of this case with the Courts of Appeal and that their APA claim is subject to dismissal. Plaintiffs do not respond to Defendants' arguments regarding their First Amendment claim.

A party may move to dismiss the claims against it for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Attacks on subject matter jurisdiction . . . come in

two forms: 'facial attacks' and 'factual attacks.'" *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260–61 (11th Cir. 1997) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). "Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint, and the district court takes the allegations as true in deciding whether to grant the motion." *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003). "However, where a defendant raises a factual attack on subject matter jurisdiction, the district court may consider extrinsic evidence such as deposition testimony and affidavits." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). "When jurisdiction is properly challenged, a plaintiff has the burden of showing jurisdiction exists." *Kruse, Inc. v. Aqua Sun Invs., Inc.*, No. 6:07-cv-1367-Orl-19UAM, 2008 WL 276030, at *2 (M.D. Fla. Jan. 31, 2008).

Defendants attack subject-matter jurisdiction pursuant to 21 U.S.C. § 877. Section 877 states that "any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located[.]" 21 U.S.C. § 877. Thus, if this Court determines that the DEA issued a final decision under the Controlled Substances Act ("**CSA**"), 21 U.S.C. § 801 *et seq.*, then this Court is divested of jurisdiction to review the final decision of the DEA or any claim that in substance seeks review of the issues addressed therein. *See Hemp Indus. Assoc. v. U.S. Drug Enf't Admin.*, 539 F. Supp. 3d 120, 130–31 (D.D.C. 2021); *John Doe, Inc. v. Gonzalez*, No. 06-966, 2006 WL 1805685, at *23 (D.D.C. June 29, 2006); *see also Avera v. Airline Pilots Ass'n Int'l*, 436 F. App'x 969, 973 (11th Cir. 2011) (stating, with respect a similar statute, that "[w]here Congress has provided in the courts of appeals an exclusive forum" for the

review of agency decisions, parties may not "bypass that forum" through artful pleading or an "impermissible collateral challenge" to the agency order (quoting *Green v. Brantley*, 981 F.2d 514, 521 (11th Cir. 1993))); *John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 570 (D.C. Cir. 2007) ("[A]dopting [a] narrow interpretation of § 877 encourages forum shopping and encourages dissatisfied claimants to 'jump the gun' by going directly to the district court to develop their case instead of exhausting their administrative remedies before the agency.").

Plaintiffs argue that § 877 does not preclude this Court's exercise of subject-matter jurisdiction because: (1) the determination letter was issued pursuant to RFRA, not the CSA; (2) the April 16, 2021 letter denying its petition for a religious-based exemption to the CSA did not constitute final agency action; and (3) § 877 is not exclusive.[1]

First, Plaintiffs argue that the DEA denied their request under RFRA and, therefore, the exclusive jurisdiction provision of the CSA does not apply. This argument, however, fails to acknowledge or address that the April 16, 2021 letter clearly and explicitly states that the DEA has a separate, independent basis to deny Plaintiffs' request under the CSA because the methods used by Plaintiffs for the importation, storage, and use of its ingredients and ayahuasca fail to pass muster under the DEA's standards. (Doc. 59-2 at 6–9). As set forth in the determination letter, the DEA found that "even assuming arguendo that [Plaintiffs'] practices constitute a religious exercise, [it] cannot be

---

[1] Plaintiffs attempt to "incorporate by reference" the arguments raised in "its prior Opposition to Motion to Dismiss[.]" (Doc. 62 at 1 n.1). However, pursuant to Local Rule 3.01, any and all arguments Plaintiffs intend to raise and rely on must be contained in a single filing. Thus, Plaintiffs' purported incorporation by reference is not proper and this Court will only consider those arguments properly raised and briefed in the Response and Opposition filed in response to the pending Motion.

accommodated in a manner that would allow DEA to preserve its compelling interests in public health and safety and in preventing illegal diversion of ayahuasca." (*Id.* at 9). Plaintiffs fail, entirely, to explain how this clear statement of decision under the CSA can or should be ignored by this Court for jurisdictional purposes.

Next, Plaintiffs posit that the April 16, 2021 letter does not constitute final agency action under the CSA because the DEA lacked authority to render a decision under RFRA. To constitute final agency action, "[f]irst, the action under review must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *John Doe, Inc.*, 484 F.3d at 566 (quotation omitted). Here, the record clearly reflects that the DEA engaged in an investigation regarding Plaintiffs' importation, storage, and distribution of ayahuasca—Plaintiffs' dispute as to the thoroughness of that investigation does not negate the clear fact that some investigation occurred—and then issued a decision that determined Plaintiffs' legal rights with respect to the CSA. Plaintiffs' argument, yet again, fails to acknowledge or address that the DEA offered a wholly independent basis for its denial of Plaintiffs' request that does not arise out of or rely on RFRA, but is entirely based on the CSA. Accordingly, Plaintiffs have not met their burden in showing that their claims are not inextricably intertwined with a final agency action under the CSA within the meaning of § 877.

Finally, Plaintiffs argue that even if the CSA applies, it does not divest this Court of jurisdiction. In support of this argument, Plaintiffs rely on *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). In *McNary*, the Supreme Court held that § 210(e) of

the Immigration and Nationality Act did not prevent the district court from exercising general federal question jurisdiction over claims "alleging a pattern or practice of procedural due process violations" because there was no clear congressional language precluding jurisdiction for the type of claim alleged and denying jurisdiction would foreclose meaningful judicial review of the plaintiffs' claims. *Id.* at 483–84. Plaintiffs fail to explain how *McNary*, which did not arise under § 877, applies to the facts in this case. Specifically, even if the statutory provisions were sufficiently similar to permit this Court to rely on *McNary*, there are no claims alleged in the Third Amended, Verified Complaint that amount to "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492. Rather, the claims alleged in this case are by a single entity challenging the specific findings and determination in its case and denying its individual application for relief from the CSA, which the *McNary* opinion did not state would have entitled the applicants to overcome an exclusive jurisdictional provision. *Id.* at 492–93.

Plaintiffs have failed to meet their burden in showing that this Court can exercise jurisdiction over this case. At the very least, because the DEA has provided a final decision that rests, at least in part, on a determination under the CSA that is separate and apart from any decisions under RFRA, it appears that this Court is divested of jurisdiction pursuant to § 877 over that determination, which is inextricably intertwined with the issues raised and the relief requested in this case. Thus, this case must be dismissed for lack of jurisdiction. The Court need not address Defendants' remaining arguments.

III.   **CONCLUSION**

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 61) is **GRANTED in part** as set forth in this Order and **DENIED as moot** in all other respects.

2. Third Amended, Verified Complaint (Doc. 59) is **DISMISSED without prejudice**.

3. The Clerk is directed to terminate all other pending motions and close this case.

**DONE AND ORDERED** in Orlando, Florida on March 4, 2022.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, a true and correct copy of the foregoing Volume II of II of the Petitioners' Appendix was filed using CM/ECF, which will automatically send a copy of this document to Assistant United States Attorney Lowell V. Sturgill.  Pursuant to Fed.R.App.P. 25(a)(2)(A)(ii) and 11th Cir. R. 30-1, the undersigned dispatched copies (2) copies of this appendix to a third-party commercial carrier for delivery to the Clerk of Court for the Eleventh Circuit, within three (3) days.

*s/A. Brian Phillips*
A. Brian Phillips
Local Counsel for Petitioners